## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| EDSAL MANUFACTURING CO., LTD.,      ) <br>      ) <br> Plaintiff,      ) <br>      ) <br> v.      ) <br>      ) <br> UNITED STATES,      ) <br>      ) <br> Defendant.      ) | Court No. 24-00108 |

## COMPLAINT

Edsal Manufacturing Co., Ltd. ("Edsal" or "Plaintiff"), through its attorneys, alleges and states as follows:

## JURISDICTION

1.      This Court has jurisdiction pursuant to 28 U.S.C. § 1581(c), as this action is brought pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(II) and (a)(2)(B)(i).

2.      Plaintiff contests certain factual findings and legal conclusions in the U.S. Department of Commerce's ("Commerce" or the "Department") less-than-fair-value investigation of boltless steel shelving units prepackaged for sale from Thailand (Case No. A-549-846).  The Department's Final Determination was published as Boltless Steel Shelving Units Prepackaged for Sale From Thailand: Final Affirmative Determination of Sales at Less Than Fair Value, 89 Fed. Reg. 28,738 (Apr. 19, 2024) ("Final Determination"), and the accompanying Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Boltless Steel Shelving Units Prepackaged for Sale from Thailand (Apr. 12, 2024) ("IDM").

**STANDING OF PLAINTIFF**

3.      Plaintiff Edsal Manufacturing Co., Ltd. is a manufacturer, producer, or wholesaler in the United States of the domestic like product, boltless steel shelving units prepackaged for sale. Plaintiff was the petitioner in the underlying agency investigation and actively participated as a party to that proceeding.  Thus, Plaintiff is an interested party within the meaning of sections 516A(f)(3) and 771(9)(C) of the Tariff Act of 1930, as amended (hereinafter "the statute" or "the Act"), 19 U.S.C. §§ 1516a(f)(3), 1677(9)(C), respectively, and Plaintiff has standing to bring this action pursuant to 19 U.S.C. § 1516a(d) and 28 U.S.C. § 2631(c).

**TIMELINESS OF THIS ACTION**

4.      Commerce published notice of its affirmative final determination in the Federal Register on April 19, 2024.  See Final Determination, 89 Fed. Reg. at 28,738.  Following the U.S. International Trade Commission's affirmative injury determination, Commerce published its antidumping duty order on boltless steel shelving units prepackaged for sale from Thailand on June 7, 2024.  Boltless Steel Shelving Units Prepackaged for Sale From Malaysia, Taiwan, Thailand, and the Socialist Republic of Vietnam: Amended Final Affirmative Antidumping Duty Determination for Taiwan and Antidumping Duty Orders, 89 Fed. Reg. 48,555 (June 7, 2024) (hereinafter "the Order").  Pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(II) and U.S. CIT Rule 3(a), Plaintiff timely filed a Summons within 30 days of the date on which the Order was published in the Federal Register (see Summons, ECF No. 1 (June 24, 2024)) and this Complaint is being timely filed within 30 days of the filing date of the Summons.  See 19 U.S.C. § 1516a(a)(2)(A)(i)(II); 28 U.S.C. § 2636(c); U.S.C.I.T. Rule 3(a)(2).

**STATEMENT OF CLAIMS AND BASIS FOR RELIEF**

**COUNT I**

5.      Paragraphs 1 through 4 above are re-alleged and incorporated herein by reference.

6.      In determining "whether subject merchandise is being, or is likely to be, sold at less than fair value, a fair comparison shall be made between the export price or constructed export price and normal value." 19 U.S.C. § 1677b(a). In to order achieve such "a fair comparison," the statute instructs Commerce to determine the normal value as "the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price." 19 U.S.C. § 1677b(a)(1)(B)(i); see also 19 U.S.C. § 1677b(a)(1)(A). However, when Commerce "determines that the aggregate quantity (or, if quantity is not appropriate, value) of the foreign like product sold in the exporting country is insufficient to permit a proper comparison with the sales of the subject merchandise to the United States," Commerce may use "the price at which the foreign like product is so sold (or offered for sale) for consumption in a country other than the exporting country or the United States," i.e., a third country, or "the constructed value of that merchandise." 19 U.S.C. § 1677b(a)(1)(C)(ii), (a)(1)(B)(ii), and (a)(4).

7.      "The aggregate quantity (or value) of the foreign like product sold in the exporting country shall normally be considered to be insufficient if such quantity (or value) is less than 5 percent of the aggregate quantity (or value) of sales of the subject merchandise to the United States," and Commerce also cannot use a third country price unless "the aggregate quantity (or, if quantity is not appropriate, value) of the foreign like product sold by the exporter or producer in such other country is 5 percent or more of the aggregate quantity (or value) of the subject

merchandise sold in the United States or for export to the United States."    19 U.S.C. § 1677b(a)(1)(C)(iii), (a)(1)(B)(ii)(II).

8.    In the underlying investigation, Commerce selected Bangkok Sheet Metal Public Co. ("Bangkok Sheet" or "BSM") and Siam Metal Tech Co., Ltd. ("Siam Metal" or "SMT") as the respondents to individually examine.

9.    Commerce issued its preliminary determination on November 21, 2023.  Boltless Steel Shelving Units Prepackaged for Sale From Thailand: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures, 88 Fed. Reg. 83,389 (Nov. 29, 2023) ("Preliminary Determination"), and accompanying Decision Memorandum for the Preliminary Affirmative Determination in the Less-Than-Fair-Value Investigation of Boltless Steel Shelving Units Prepackaged for Sale from Thailand (Nov. 21, 2023) ("PDM").

10.    Commerce found that BSM's and SMT's home and third country market sales were not viable.  PDM at 8-10.  Accordingly, Commerce invited interested parties to submit comments and factual information, including surrogate company financial statements, for Commerce's consideration in calculating constructed value ("CV") profit and selling expenses. See id. at 11. Interested parties submitted contemporaneous (fiscal year 2022) financial statements for seven entities: Sahamitr Pressure Container PLC ("Sahamitr"); Eonmetall Group Berhad; PNS; Bangsaphan Barmill Public Company Limited; Millcon Steel Public Company Limited; Tata Steel (Thailand) Public Company Limited, and; Eonmetall Systems Sdn Bhd. Id.  For the purposes of calculating CV profit under section 773(e)(2)(B)(iii) of the Act (19 U.S.C. § 1677b(2)(B)(iii)), Commerce preliminarily found all but one (PNS's) of the submitted surrogate company financial statements to be unsuitable for calculating CV profit. Id. at 11-12.

11.    Commerce issued its final determination on April 12, 2024.  Final Determination, 89 Fed. Reg. at 28,740.  Commerce continued to rely solely on the financial statements of PNS for calculating CV profit.  IDM at 5.  As to Sahamitr's financial statements, Commerce stated that "{b}ased on the{} four criteria, we find that because Sahamitr doesn't produce shelving, Sahamitr's financial statements are not a viable option for calculating CV profit."  Id. at 7.  In addition, Commerce determined that Sahamitr's financial statements were unsuitable for calculating CV profit because "Sahamitr received countervailable subsidies from the Thai government."  Id.

12.    Commerce's determination that Sahamitr's financial statements are unsuitable for calculating CV profit is not supported by substantial evidence and is not in accordance with law. Commerce's practice for choosing among surrogate profit data for CV profit does not require that a surrogate company produces merchandise that is identical to the merchandise under consideration.  Instead, Commerce considers "the similarity of the potential surrogate companies' business operations and products to the respondent's business operations and products."  Id. at 6. Commerce failed to contend with the fact that Sahamitr is a Thai producer of merchandise that is comparable to boltless steel shelving: steel cylinders.  Indeed, Sahamitr exclusively produces comparable merchandise, unlike PNS, which produces a wide variety of non-comparable merchandise.  Sahamitr's 2022 financial statements meet all of Commerce's criteria for the purpose of calculating CV profit.  Commerce's determination to the contrary is not supported by substantial evidence and is contrary to law.

13.    In addition, Commerce has a longstanding practice of relying on financial statements that show evidence of the receipt of subsidies, a practice that is consistent with the statute.  Commerce failed to explain its departure from this practice.  Commerce also failed to

consider the significance or impact, or lack thereof, of the particular "countervailable subsidies" at issue.  Compare id. at 7, with Edsal Case Brief Concerning BSM at 8-11 (Mar. 20, 2024), and Edsal Case Brief Concerning SMT at 8-11 (Mar. 20, 2024).  Commerce failed to consider evidence that any subsidies received by Sahamitr were negligible and did not have a distortive impact on the CV profit or selling expense ratios.

14.    Commerce also failed to compare the two financial statements or address the deficiencies in the PNS financial statement.  Compare IDM at 5-7, with Edsal Case Brief Concerning BSM at 12-14 (Mar. 20, 2024), and Edsal Case Brief Concerning SMT at 12-14 (Mar. 20, 2024).  The financial statements of PNS reflect business operations that include production of a wide variety of non-comparable merchandise.  The PNS financial statements also lack sufficient detail to reasonably breakdown selling and administrative expenses for indirect selling expenses.  In contrast, Sahamitr exclusively produces merchandise that is comparable to the merchandise under consideration.    Further, Sahamitr's financial statements are significantly more comprehensive and allow for a reasonable breakdown of selling expenses between direct and indirect selling expenses.

15.    Commerce's failure to address these arguments makes its Final Determination unsupported by substantial evidence and otherwise not in accordance with law.

## COUNT II

16.    Paragraphs 1 through 15 are re-alleged and incorporated herein by reference.

17.    If Commerce continued to find Sahamitr's financial statements to be unsuitable for calculating CV profit, Edsal alternatively urged Commerce to rely on an average of the information from Sahamitr's and PNS's financial statements, given that Sahamitr's financial statements are not distortive or otherwise unreliable.  Edsal Case Brief Concerning BSM at 12-18 (Mar. 20, 2024); Edsal Case Brief Concerning SMT at 12-18 (Mar. 20, 2024).  Edsal explained how PNS's financial

statements are inferior to Sahamitr's financial statements.  In addition, Edsal demonstrated how

Commerce's practice and long-standing preference supports using an average of financial ratios

obtained from multiple financial statements.

18.    Commerce failed to address these arguments in its <u>Final Determination</u>.

Commerce's refusal to use an average of information from PNS's and Sahamitr's financial

statements is inconsistent with the agency's past practice.   Moreover, Commerce failed to

acknowledge that an average of the two financial statements would result in a more accurate CV

profit and selling expense calculation.   Thus, Commerce's refusal to rely on an average of the

information from the two financial statements is unsupported by substantial evidence and is

otherwise not in accordance with law.

<b><u>COUNT III</u></b>

19.    Paragraphs 1 through 18 are re-alleged and incorporated herein by reference.

20.    Commerce's regulations provide that "{i}n identifying the date of sale of the

subject merchandise or foreign like product, the Secretary normally will use the date of invoice,

as recorded in the exporter or producer's records kept in the ordinary course of business."  19

C.F.R. § 351.401(i).   However, if record evidence establishes that an alternative date "better

reflects the date on which the exporter or producer establishes the material terms of sale,"

Commerce may use that alternative date.  <u>Id.</u>  A party "seeking to have the invoice date deemed

the date of sale is entitled to this regulatory presumption <u>only if</u> that party records the invoice date

as the date of sale in the company's 'records kept in the ordinary course of business.'"  <u>Allied Tube</u>

<u>& Conduit Corp. v. United States</u>, 132 F. Supp. 2d 1087, 1090 (Ct. Int'l Trade 2001) (emphasis

added) (quoting 19 C.F.R. § 351.401(i)).   If Commerce "is presented with satisfactory evidence

that the material terms of sale are finally established on a date other than the date of invoice, the

Department will use that alternative date as the date of sale."  <u>Yieh Phui Enter. Co. v. United</u>

- 7 -

<u>States</u>, 791 F. Supp. 2d 1319, 1323 (Ct. Int'l Trade 2011); <u>Antidumping Duties; Countervailing</u>

<u>Duties: Final Rule</u>, 62 Fed. Reg. 27,296, 27,349 (Dep't of Commerce May 19, 1997).

21.    In its response to Section A of Commerce's antidumping duty questionnaire, SMT

reported that its U.S. sales arise after an "<u>agreement</u> is reached <u>for quantity, prices etc.</u> with the

customer for the upcoming several months." Letter from deKieffer & Horgan, PLLC to Sec'y of

Commerce re: <u>Boltless Steel Shelving Units Prepackaged for Sale from Thailand: Section A</u>

<u>Questionnaire Response</u> at 12-13 (July 10, 2023) (hereinafter "SMT AQR") (emphasis added).

SMT emphasized that "{a}t the time of the agreement covering multiple months, the <u>price was set</u>

<u>and the period covered by the price was set</u> . . . ." <u>Id.</u> at 14 (emphasis added).    After this

"agreement" establishing "quantity, prices etc.," SMT would "issue invoices to a related third

country trading compan{y} . . . at internal transfer prices when the shipment is made," which

would then "issue invoices <u>at the agreed prices</u> to the third country unrelated trading compan{y},"

which could then receive payment from the customer and send that payment "to SMT's related

trading companies, and the related trading companies would make the payment to SMT." <u>Id.</u> at

12-13 (emphasis added).

22.    Edsal noted that the record lacked any evidence that the material terms of sales

changed between SMT's and its unaffiliated customers' "time of agreement" (at which point, the

customer would issue its purchase order to SMT), and when SMT subsequently issued its

commercial invoice. Letter from Kelley Drye & Warren LLP to Sec'y of Commerce re: <u>Boltless</u>

<u>Steel Shelving Units Prepacked for Sale from Thailand – Petitioner's Comments on Deficiencies</u>

<u>in Siam Metal Tech Co., Ltd.'s Section A Response</u> at 15-17 (July 20, 2023).    In addition, Edsal

urged Commerce to require additional information from SMT concerning changes to the material

terms of sale based on the record evidence showing that the purchase order date is the date when

the material terms of sale are established, and thus, the appropriate date of sale for SMT's U.S. sales. Letter from Kelley Drye & Warren LLP to Sec'y of Commerce re: Boltless Steel Shelving Units Prepacked for Sale from Thailand – Petitioner's Pre-Preliminary Comments Concerning Siam Metal Tech Co., Ltd. at 8-10 (Nov. 9, 2023).

23.    In its preliminary determination, despite the record evidence demonstrating an "agreement" on "quantity, prices etc." and the issuance of a purchase order to SMT prior to the issuance of invoices, Commerce "preliminarily accepted" SMT's reporting as the invoice date as the date of sale in its U.S. and home markets. PDM at 8. Commerce stated, however, that it would "examine Siam Metal's purchase orders in correlation with the date of sale and . . . make adjustments for the final determination, if appropriate." Id.

24.    During Commerce's verification of SMT's reported sales information, SMT officials explained that a "sales contract" issued by the unaffiliated trading company to the affiliated trading company noted "the price and quantity." IDM at 11. In addition to the sales contract, "SMT officials stated that the first document generated during the sales process is the purchase order," generated after "an agreement between the affiliated and unaffiliated trading companies regarding the quantity and price." Memorandum to The File re: Boltless Steel Shelving Units Prepackaged for Sale from Thailand; Investigation of Sales at Less-than-Fair Value: Verification of the Sales Response of Siam Metal Tech Co., Ltd at 6 (Mar. 12, 2024). Nonetheless, in its final determination, Commerce continued to use the commercial invoice date (specifically, the second commercial invoice issued by SMT's affiliated trading company to the unaffiliated trading company) as the date of sale. IDM at 9-11.

25.    Commerce's determination that the commercial invoice date is the appropriate date of sale for SMT's sales is not supported by substantial evidence and is otherwise not in accordance

with law.  Commerce failed to adequately explain why the sales contract/purchase order, which reflect the agreed-upon "quantity, prices etc.," does not represent the point at which the material terms of sale were agreed to by SMT and its customers.  Record evidence demonstrates that material terms of sales, quantity and price, were agreed to before the issuance of any commercial invoices.  Commerce wrongly ruled out the sales contract/purchase order date as the appropriate date of sale on the basis that the sales contract "does not identify the destination of shipment," which is contrary to the agency's prior practice of treating delivery terms as non-material terms of sale as well as record evidence that the destination of SMT's shipments were not material terms. See IDM at 11.  Thus, Commerce's use of the commercial invoice date as the date of sale for SMT's U.S. sales is not supported by substantial evidence and is otherwise not in accordance with law.

## COUNT IV

26.     Paragraphs 1 through 25 are re-alleged and incorporated herein by reference.

27.     The statute instructs that "costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the GAAP of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise."  19 U.S.C. § 1677b(f)(1)(A).

28.     BSM reports actual costs in its normal books and records and in its GAAP-compliant audited financial statements.  Letter from deKieffer & Horgan, PLLC to Sec'y of Commerce re: Boltless Steel Shelving Units Prepackaged for Sale from Thailand: Section D Questionnaire Response at 6 (Aug. 4, 2023) (hereinafter "BSM DQR").  BSM reconciled its finished goods inventory movement schedule for the merchandise under consideration to BSM's normal accounting books and records and to its Thai GAAP-compliant audited financial

statements.  Id. at Exh. D-15; Letter from deKieffer & Horgan, PLLC to Sec'y of Commerce re:

Boltless Steel Shelving Units Prepackaged for Sale from Thailand: Section D Supplemental

Questionnaire Response at 2-3 (Oct. 31, 2023) (hereinafter "BSM Supp DQR").  However, BSM

reported a significantly lower total cost of manufacture ("TOTCOM") value in its cost file than its

actual costs data submitted to Commerce supports.  See BSM Supp DQR at 1.  Commerce

instructed BSM to explain, demonstrate, and document its cost reporting in light of this significant

discrepancy, but BSM failed to do so.  See id. at 1-2; Edsal Case Brief Concerning BSM at 26-27

(Mar. 20, 2024).

29.    In the Final Determination, Commerce relied on the significantly lower TOTCOM

value supplied by BSM in its cost file rather than the actual costs of the merchandise under

consideration as maintained in BSM's normal books and records and audited financial statements,

which also reconciled with BSM's finished goods inventory movement schedule.  As a result,

Commerce's Final Determination is not supported by substantial evidence and is inconsistent with

the statute's plain-language, Commerce's past practice, and precedent.  Thus, the Final

Determination is not in accordance with law.

## COUNT V

30.    Paragraphs 1 though 29 are re-alleged and incorporated here by reference.

31.    SMT reports actual costs in its normal books and records and in its GAAP-

compliant audited financial statements.  Letter from deKieffer & Horgan, PLLC to Sec'y of

Commerce re: Boltless Steel Shelving Units Prepackaged for Sale from Thailand: Section D

Questionnaire Responses at 8, 10, 14 (Aug. 4, 2023) (hereinafter "SMT DQR").  SMT reconciled

its finished goods inventory movement schedule for the merchandise under consideration to

SMT's normal accounting books and records and to its Thai GAAP-compliant audited financial

statements.  Id. at 14, Exh. D-14; Letter from deKieffer & Horgan, PLLC to Sec'y of Commerce

re: <u>Boltless Steel Shelving Units Prepackaged for Sale from Thailand: Second Section D</u> <u>Supplemental Questionnaire Response</u> at Exhs. SQ5-18, SQ5-21 (Nov. 6, 2023) (hereinafter "SMT Second Supp DQR"). However, SMT reported a significantly lower total cost of manufacture ("TOTCOM") value in its cost file than its actual costs data submitted to Commerce supports. <u>See</u> SMT Second Supp DQR at Exh. SQ5-20.

32.    In the <u>Final Determination</u>, Commerce relied on the significantly lower TOTCOM value supplied by SMT in its cost file rather than the actual costs of the merchandise under consideration as maintained in SMT's normal books and records and audited financial statements, which also reconciled with SMT's finished goods inventory movement schedule. As a result, Commerce's <u>Final Determination</u> is not supported by substantial evidence and is inconsistent with the statute's plain-language, Commerce's past practice, and precedent. Thus, the <u>Final</u> <u>Determination</u> is not in accordance with law.

## **DEMAND FOR JUDGMENT AND PRAYER FOR RELIEF**

33.    WHEREFORE, Plaintiff respectfully requests that this Court:

(a)    enter judgment in its favor and against Defendant;

(b)    hold that Commerce's Final Affirmative Determination is not supported by substantial evidence and is otherwise not in accordance with law with respect to the claims advanced by Plaintiff in this Complaint;

(c)    remand the Final Affirmative Determination to Commerce with instructions to correct the errors set forth in this Complaint; and

(d)    provide such other relief as this Court deems just and appropriate.

Respectfully submitted,

/s/ Joshua R. Morey
KATHLEEN W. CANNON
JOSHUA R. MOREY
MATTHEW T. MARTIN
KELLEY DRYE & WARREN LLP
3050 K Street NW, Suite 400
Washington, DC  20007
(202) 342-8867
kcannon@kelleydrye.com
jmorey@kelleydrye.com
mmartin@kelleydrye.com

Counsel to Plaintiff Edsal Manufacturing Co., Ltd.

Dated: July 11, 2024

**CERTIFICATE OF SERVICE AND NOTICE TO INTERESTED PARTIES**

**Edsal Manufacturing Co., Ltd. v. United States**
**CIT Court No. 24-00108**

Pursuant to Rule 3(f) of the Rules of the U.S. Court of International Trade, I, Joshua R. Morey, hereby certify that on July 11, 2024, copies of the foregoing Complaint were served upon the following individuals and notified all the interested parties who were a party to the proceeding below, by certified or registered mail, return receipt requested unless otherwise indicated:

**UPON THE UNITED STATES**

Attorney-In-Charge
International Trade Field Office
Commercial Litigation Branch
U.S. Department of Justice
26 Federal Plaza
New York, NY 10278-0001

Director, Civil Division
Commercial Litigation Branch
U.S. Department of Justice
1100 L Street, N.W., Room 12124
Washington, DC 20530

**UPON THE U.S. DEPARTMENT OF COMMERCE**

General Counsel
U.S. Department of Commerce
14th Street & Constitution Avenue, N.W.
Washington, DC 20230

Ms. Evangeline Keenan, Esq.
Director, APO/Dockets Unit
U.S. Department of Commerce
14th Street & Constitution Avenue, N.W.
Room 1874
Washington, DC 20230

**On behalf of Fuding Industries Company Limited**

David Craven, Esq.
Craven Trade Law LLC
3744 N Ashland
Chicago, IL 60613
Email: david.craven@tradelaw.com


**On behalf of Bangkok Sheet Metal Public Co., Ltd.; Siam Metal Tech Co., Ltd.**

Gregory S. Menegaz, Esq.
deKieffer & Horgan, PLLC
1156 15th Street, NW
Suite 1101
Washington, DC 20005
Email: gmenegaz@dhlaw.com


/s/ Joshua R. Morey
JOSHUA R. MOREY
KELLEY DRYE & WARREN LLP
