UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| EDSAL MANUFACTURING CO., LTD., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | Court No. 24-00108 |
| ) | |
| Defendant, ) | |
| ) | |
| BANGKOK SHEET METAL PUBLIC CO., ) | |
| LTD. AND SIAM METAL TECH CO., LTD., ) | |
| ) | |
| Defendant-Intervenors. ) | |
| ) | |

PLAINTIFF'S RULE 56.2 MOTION
FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of this Court, Plaintiff Edsal Manufacturing Co., Ltd. ("Edsal") hereby moves for judgment upon the agency record with respect to the U.S. Department of Commerce's final determination in the less-than-fair-value investigation of boltless steel shelving units prepackaged for sale from Thailand, published as Boltless Steel Shelving Units Prepackaged for Sale From Thailand: Final Affirmative Determination of Sales at Less Than Fair Value, 89 Fed. Reg. 28,738 (Apr. 19, 2024) ("Final Determination"), and the accompanying Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Boltless Steel Shelving Units Prepackaged for Sale from Thailand (Apr. 12, 2024) ("IDM").

For the reasons explained in the accompanying Rule 56.2 Brief in Support of Plaintiff's Motion for Judgment on the Agency Record, Plaintiff respectfully moves that this Court find that the Final Determination is not supported by substantial evidence and is otherwise not in

accordance with law. Plaintiff respectfully moves that this Court remand the <u>Final</u> <u>Determination</u> to the U.S. Department of Commerce with instructions to correct its <u>Final</u> <u>Determination</u> in accordance with the proposed order.

Respectfully submitted,

<u>/s/ Joshua R. Morey</u>

KATHLEEN W. CANNON
JOSHUA R. MOREY
GRACE W. KIM
MATTHEW T. MARTIN
KELLEY DRYE & WARREN LLP
3050 K Street NW, Suite 400
Washington, DC 20007
(202) 342-8867
kcannon@kelleydrye.com
jmorey@kelleydrye.com
gkim@kelleydrye.com
mmartin@kelleydrye.com

Counsel to Plaintiff Edsal Manufacturing Co., Ltd.

Dated: December 2, 2024

## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| EDSAL MANUFACTURING CO., LTD., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | Court No. 24-00108 |
| ) | |
| Defendant, ) | |
| ) | |
| BANGKOK SHEET METAL PUBLIC CO., ) | |
| LTD. AND SIAM METAL TECH CO., LTD., ) | |
| ) | |
| Defendant-Intervenors. ) | |
| ) | |

## <u>ORDER</u>

Upon consideration of Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record and the accompanying Rule 56.2 Brief in Support of Plaintiff's Motion for Judgment on the Agency Record, and all other papers and proceedings herein, it is hereby

**ORDERED** that Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record is **GRANTED**; and it is further

**ORDERED** that the U.S. Department of Commerce's final determination in the less-than-fair-value investigation of boltless steel shelving units prepackaged for sale from Thailand, <u>Boltless Steel Shelving Units Prepackaged for Sale From Thailand: Final Affirmative Determination of Sales at Less Than Fair Value</u>, 89 Fed. Reg. 28,738 (Apr. 19, 2024), is unsupported by substantial evidence and is otherwise not in accordance with law; and it is further

**ORDERED** that this action is remanded to the Department for proceedings consistent with this Court's opinion.

**SO ORDERED**.

_____
Mark A. Barnett, Chief Judge

Dated: _____
        New York, New York

NONCONFIDENTIAL

## UNITED STATES COURT OF INTERNATIONAL TRADE

### BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| EDSAL MANUFACTURING CO., LTD.,<br><br>      Plaintiff,<br><br>      v.<br><br>UNITED STATES,<br><br>      Defendant,<br><br>BANGKOK SHEET METAL PUBLIC CO.,<br>LTD. AND SIAM METAL TECH CO., LTD.,<br><br>      Defendant-Intervenors. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Court No. 24-00108 |

## RULE 56.2 BRIEF IN SUPPORT OF PLAINTIFF'S
## MOTION FOR JUDGMENT ON THE AGENCY RECORD

KATHLEEN W. CANNON
JOSHUA R. MOREY
GRACE W. KIM
MATTHEW T. MARTIN
**KELLEY DRYE & WARREN LLP**
3050 K Street NW, Suite 400
Washington, DC 20007
(202) 342-8867
kcannon@kelleydrye.com
jmorey@kelleydrye.com
gkim@kelleydrye.com
mmartin@kelleydrye.com

Counsel to Plaintiff Edsal Manufacturing Co., Ltd.

December 2, 2024

**NONCONFIDENTIAL**

## Table of Contents

**Page**

ADMINISTRATIVE DETERMINATION UNDER REVIEW ........................................1

ISSUES PRESENTED AND SUMMARY OF ARGUMENT ....................................1

STANDARD OF REVIEW ................................................................................4

STATEMENT OF FACTS ................................................................................5

ARGUMENT ...............................................................................................12

I.     THE DEPARTMENT UNLAWFULLY REJECTED SAHAMITR'S
       FINANCIAL STATEMENTS ..............................................................12

       A.     The Department's Rejection of Sahamitr's Financial Statements
              On the Basis That They Indicate Receipt of Countervailable
              Subsidies Is Unlawful ...........................................................13

              1.     Legal Standard .............................................................13

              2.     The Department's Rejection of Sahamitr's Financial
                     Statements as Unusable for CV Profit Calculations Because
                     There Is an Indication the Company Received
                     Countervailable Subsidies Is Unlawful..............................14

       B.     The Department's Conclusion that Sahamitr Does Not Produce
              Shelving, and Therefore Is Unsuitable for CV Profit Calculations,
              Is Unlawful..........................................................................21

       C.     The Department Also Failed to Address Edsal's Arguments that
              PNS's Financial Statements Are Inferior In Terms of the Detail
              Needed To Calculate CV Profit and Selling Expenses......................24

II.    THE DEPARTMENT'S DEVIATION FROM ITS PRACTICE OF
       RELYING ON MULTIPLE FINANCIAL STATEMENTS IS
       UNLAWFUL .................................................................................26

III.   THE DEPARTMENT USED THE INCORRECT DATE OF SALE FOR
       SMT'S U.S. SALES ........................................................................29

       A.     Legal Standard ......................................................................30

NONCONFIDENTIAL

**Table of Contents (continued)**

<div align="right"><u>Page</u></div>

B.     The Department's Use of the Second Commercial Invoice Date Reported (SALINDTU1) as SMT's Date of Sale Is Unlawful Because SMT's Material Terms of Sale Are Determined at an Earlier Date ...........................................................................................32

        1.     The Sales Contract Establishes the Price of SMT's U.S. Sales ...........................................................................................33

        2.     The Sales Contract Establishes the Quantity of SMT's U.S. Sales ...........................................................................................34

        3.     The Department's Claimed Justification For Relying On an Alternative Date of Sale Is Unlawful ...........................................36

IV.   THE DEPARTMENT UNLAWFULLY DEFERRED TO SMT'S AND BSM'S TOTAL COST OF MANUFACTURING ("TOTCOM") AS STATED IN THEIR COST DATABASES ...........................................37

     A.     Legal Standard ...........................................................................38

     B.     The Department Failed to Account for the Fact that SMT's TOTCOM Reported in its Cost File Does Not Reconcile to the Actual TOTCOM as Recorded in SMT's Normal Books and Records and Audited Financial Statements ...........................40

     C.     The Department Failed to Account for the Fact that BSM's TOTCOM Reported in its Cost File Does Not Reconcile to the Actual TOTCOM as Recorded in BSM's Normal Books and Records and Audited Financial Statements ...........................42

CONCLUSION...........................................................................................45

**NONCONFIDENTIAL**

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

Al Tech Specialty Steel Corp. v. United States,
22 CIT 941 (Ct. Int'l Trade Sept. 24, 1998) .......................................................32

Allied Tube & Conduit Corp. v. United States,
132 F. Supp. 2d 1087 (Ct. Int'l Trade 2001) .......................................................32

Best Mattresses Int'l Co. v. United States,
703 F. Supp. 3d 1382 (Ct. Int'l Trade 2024) ...............................................18, 28

Bldg. Sys. de Mexico, S.A. de C.V. v. United States,
567 F. Supp. 3d 1306 (Ct. Int'l Trade 2022) ..........................................13, 19, 27

Consol. Edison Co. v. NLRB,
305 U.S. 197 (1938)........................................................................................4, 38

CP Kelco US, Inc. v. United States,
949 F.3d 1348 (Fed. Cir. 2020),
rev'g in relevant part CP Kelco US, Inc. v. United States,
2018 WL 4469912 (Ct. Int'l Trade Sept. 17, 2018)..................................4, 13, 18

Eregli Demir ve Celik Fabrikalari T.A.S v. United States,
308 F. Supp. 3d 1297 (Ct. Int'l Trade 2018) ...................................................3, 30

Juancheng Kangtai Chem. Co. v. United States,
Consol. Ct. No. 14-00056, Slip Op. 15-93, 2015 WL 4999476
(Ct. Int'l Trade Aug. 21, 2015)............................................................................13

Marmen Inc. v. United States,
545 F. Supp. 3d 1305 (Ct. Int'l Trade 2021) ..........................................29-30, 32

Mid Continent Steel & Wire, Inc. v. United States,
203 F. Supp. 3d 1295 (Ct. Int'l Trade 2017) .......................................................15

Mid Continent Steel & Wire, Inc. v. United States,
273 F. Supp. 3d 1348 (Ct. Int'l Trade 2017) .......................................................15

Mid Continent Steel & Wire, Inc. v. United States,
551 F. Supp. 3d 1360 (Ct. Int'l Trade 2021) .......................................................17

Mid Continent Steel & Wire, Inc. v. United States,
  586 F. Supp. 3d 1349 (Ct. Int'l Trade 2022), appeal pending, Mid Continent
  Steel & Wire Inc. v. United States, Appeal No. 23-1039 (Fed. Cir.) (submitted
  after oral argument to Panel on Nov. 7, 2024)..........................................................17

Mid Continent Steel & Wire, Inc. v. United States,
  941 F.3d 530 (Fed. Cir. 2019)...........................................................................13, 16, 18

Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,
  463 U.S. 29 (1983)..........................................................................................4, 29, 38

NTSF Seafoods Jt. Stock Co. v. United States,
  487 F. Supp. 3d 1310 (Ct. Int'l Trade 2020) ..........................................................27

Nucor Corp. v. United States,
  612 F. Supp. 2d 1264 (Ct. Int'l Trade 2009) ...................................................... 31-33

PT Zinus Glob. Indon. v. United States,
  628 F. Supp. 3d 1252 (Ct. Int'l Trade 2023) ................................................ 18, 24-25

Rebar Trade Action Coal. v. United States,
  Ct. No. 14-00268, Slip Op. 15-130, 2015 WL 7573326
  (Ct. Int'l Trade Nov. 23, 2015)..............................................................................36

SeAH Steel Corp. v. United States,
  539 F. Supp. 3d 1341 (Ct. Int'l Trade 2021) .....................................................13, 19

SKF USA v. United States,
  630 F.3d 1365 (Fed. Cir. 2011).....................................................................4, 12, 26

Universal Camera Corp. v. NLRB,
  340 U.S. 474 (1951)............................................................................................4, 12

Yieh Phui Enter. Co. v. United States,
  791 F. Supp. 2d 1319 (Ct. Int'l Trade 2011) ......................................................3, 30

## Statutes and Regulations

19 U.S.C. § 1516a(a)(2)(B)(ii)..........................................................................................4

19 U.S.C. § 1516a(b)(1)(B)(i)...........................................................................................4

19 U.S.C. § 1677b(a)(1)(B)(ii)..........................................................................................6

19 U.S.C. § 1677b(a)(1)(B)(ii)(II).....................................................................................5

19 U.S.C. § 1677b(a)(1)(C)(ii)..........................................................................................6

**NONCONFIDENTIAL**

19 U.S.C. § 1677b(a)(1)(C)(iii) ......................................................................5

19 U.S.C. § 1677b(a)(4) .................................................................................6

19 U.S.C. § 1677b(e)(2)(B)(iii) .....................................................................2

19 U.S.C. § 1677b(f)(1)(A)..............................................................3, 39, 42, 44

19 C.F.R. § 351.401(i) ..............................................................................3, 30

## Legislative Authorities

Statement of Administrative Action Accompanying the Uruguay Round
    Agreements Act, H.R. Doc. No. 103-316, vol. I (1994), reprinted in 1994
    U.S.C.C.A.N. 4040 ................................................................................21, 30

## Administrative Determinations

Antidumping Duties; Countervailing Duties: Final Rule,
    62 Fed. Reg. 27,296 (Dep't Commerce May 19, 1997) .........................30

Boltless Steel Shelving Units Prepackaged for Sale From India, Malaysia,
    Taiwan, Thailand and the Socialist Republic of Vietnam:
    Initiation of Less-Than-Fair-Value Investigations, 88 Fed. Reg. 32,188
    (Dep't Commerce May 19, 2023) (P.R. 35) ...........................................5

Boltless Steel Shelving Units Prepackaged for Sale From Thailand:
    Final Affirmative Determination of Sales at Less Than Fair Value,
    89 Fed. Reg. 28,738 (Apr. 19, 2024) ("Final Determination") (P.R. 332), and
    accompanying Decision Memorandum for the Final Affirmative
    Determination in the Less-Than-Fair-Value Investigation of Boltless Steel
    Shelving Units Prepackaged for Sale from Thailand (Apr. 12, 2024) ("IDM")
    (P.R. 330) .......................................................................................... passim

Boltless Steel Shelving Units Prepackaged for Sale From Thailand:
    Preliminary Affirmative Determination of Sales at Less Than Fair Value,
    Postponement of Final Determination, and Extension of Provisional Measures,
    88 Fed. Reg. 83,389 (Dep't Commerce Nov. 29, 2023)
    ("Preliminary Determination") (P.R. 249), and accompanying Decision
    Memorandum for the Preliminary Affirmative Determination in the
    Less-Than-Fair-Value Investigation of Boltless Steel Shelving Units
    Prepackaged for Sale from Thailand (Nov. 21, 2023) ("PDM") (P.R. 237)...................5, 9, 21

NONCONFIDENTIAL

Boltless Steel Shelving Units Prepackaged for Sale From the People's Republic of
    China: Final Determination of Sales at Less Than Fair Value,
    80 Fed. Reg. 51,779 (Dep't Commerce Aug. 26, 2015), and accompanying
    Issues and Decision Memorandum for the Final Determination of the
    Antidumping Duty Investigation of Boltless Steel Shelving Units Prepackaged
    for Sale from the People's Republic of China (Aug. 14, 2015)..............................................22

Carbon and Alloy Steel Threaded Rod From India:
    Final Affirmative Determination of Sales at Less Than Fair Value,
    85 Fed. Reg. 8,818 (Dep't Commerce Feb. 18, 2020), and accompanying
    Decision Memorandum for the Final Determination in the Less-Than-Fair-
    Value Investigation of Carbon and Alloy Steel Threaded Rod from India
    (Feb. 7, 2020) ("Threaded Rod from India IDM") ............................................. 26-27

Certain Activated Carbon From the People's Republic of China:
    Final Results of Antidumping Duty Administrative Review; and Final
    Determination of No Shipments; 2021–2022, 88 Fed. Reg. 77,552
    (Dep't Commerce Nov. 13, 2023), and accompanying Issues and Decision
    Memorandum for the Final Results of the 2021-2022 Administrative Review
    of the Antidumping Duty Order on Certain Activated Carbon from the
    People's Republic of China (Nov. 3, 2023) ...................................................................28

Certain Fabricated Structural Steel From Mexico:
    Final Determination of Sales at Less Than Fair Value, 85 Fed. Reg. 5,390
    (Dep't Commerce Jan. 30, 2020), and accompanying Issues and Decision
    Memorandum for the Final Affirmative Determination in the Less-Than-Fair-
    Value Investigation of Certain Fabricated Structural Steel from Mexico
    (Jan. 23, 2020), aff'd as modified upon remand, Bldg. Sys. de Mexico, S.A. de
    C.V. v. United States, 609 F. Supp. 3d 1369 (Ct. Int'l Trade 2022) ................................ 14-15

Certain Lemon Juice From the Republic of South Africa:
    Preliminary Affirmative Determination of Sales at Less Than Fair Value, 87
    Fed. Reg. 47,707 (Dep't Commerce Aug. 4, 2022), and accompanying
    Decision Memorandum for the Preliminary Affirmative Determination in the
    Less-Than-Fair-Value Investigation of Certain Lemon Juice from the
    Republic of South Africa (July 28, 2022), unchanged in Certain Lemon Juice
    From the Republic of South Africa: Final Affirmative Determination of Sales
    at Less Than Fair Value, 87 Fed. Reg. 78,928 (Dep't Commerce Dec. 23,
    2022) ...................................................................................................................40

Certain Pasta From Turkey;
    2010–2011; Final Results of Antidumping Duty Administrative Review, 78
    Fed Reg. 9,672 (Dep't Commerce Feb. 11, 2013), and accompanying Issues
    and Decision Memorandum for the Final Results of the Antidumping Duty
    Administrative Review: Certain Pasta from Turkey; 2010 - 2011
    (Feb. 4, 2013) .....................................................................................................40

**NONCONFIDENTIAL**

Certain Steel Nails From the Sultanate of Oman:
    Final Determination of Sales at Less Than Fair Value, 80 Fed. Reg. 28,972
    (Dep't Commerce May 20, 2015), and accompanying Issues and Decision
    Memorandum for the Final Determination of Sales at Less Than Fair Value
    (May 13, 2015).........................................................................................................15

Certain Steel Nails From the Sultanate of Oman:
    Final Results of Antidumping Duty Administrative Review and Final
    Determination of No Shipments; 2018–2019, 86 Fed. Reg. 14,309
    (Dep't Commerce Mar. 15, 2021), and accompanying Issues and Decision
    Memorandum for the Final Results of the 2018-2019 Administrative Review
    of the Antidumping Duty Order on Certain Steel Nails from the Sultanate of
    Oman (Feb. 24, 2021).............................................................................................25

Final Results of Redetermination Pursuant to Court Order;
    Mid Continent Steel & Wire, Inc. v. United States, Consol. Ct. No. 15-00214
    (Dep't Commerce May 23, 2017) (ECF No. 95).....................................................15

Final Results of Redetermination Pursuant to Court Remand;
    Mid Continent Steel & Wire Inc. v. United States, Consol. Ct. No. 15-00214
    (Dep't Commerce Apr. 12, 2022) (ECF No. 150) ..................................................18

Light-Walled Rectangular Pipe and Tube From Mexico:
    Final Results of Antidumping Duty Administrative Review; 2019–2020,
    87 Fed. Reg. 13,973 (Dep't Commerce Mar. 11, 2022), and accompanying
    Issues and Decision Memorandum for the Final Results of Antidumping Duty
    Administrative Review; 2019-2020 (Mar. 4, 2022)................................................39

Light-Walled Rectangular Pipe and Tube From Mexico:
    Final Results of Antidumping Duty Administrative Review; 2021–2022,
    89 Fed. Reg. 17,815 (Dep't Commerce Mar. 12, 2024), and accompanying
    Issues and Decision Memorandum for the Final Results of Antidumping Duty
    Administrative Review; 2021-2022 (Mar. 6, 2024)................................................39

Mattresses From Indonesia:
    Final Results of Antidumping duty Administrative Review; 2020–2021,
    88 Fed. Reg. 85,240 (Dep't Commerce Dec. 7, 2023), and accompanying
    Issues and Decision Memorandum for the Final Results of the 2020-2022
    Antidumping Duty Administrative Review: Mattresses from Indonesia
    (Dec. 1, 2023) ........................................................................................................26

Notice of Final Determination of Sales at Less Than Fair Value: Certain Large
    Diameter Carbon and Alloy Seamless Standard, Line and Pressure Pipe From
    Mexico, 65 Fed. Reg. 39,358 (Dep't Commerce June 26, 2000), and
    accompanying Issues and Decision Memorandum for the Final Determination
    in the Antidumping Duty Investigation of Certain Large Diameter Carbon and
    Alloy Seamless Standard, Line and Pressure Pipe from Mexico – April 1,
    1998, through March 31, 1999 ................................................................................ 31

Notice of Final Determination of Sales at Less Than Fair Value: Pure Magnesium
    From Israel, 66 Fed. Reg. 49,349 (Dep't Commerce Sept. 27, 2001), and
    accompanying Issues and Decision Memorandum for the Final Determination
    in the Antidumping Duty Investigation of Pure Magnesium from Israel Issues
    and Decision Memorandum (Sept. 14, 2001) .......................................................... 21

Notice of Final Determination of Sales at Less Than Fair Value and Negative
    Final Determination of Critical Circumstances: Certain Frozen and Canned
    Warmwater Shrimp From Thailand, 69 Fed. Reg. 76,918 (Dep't Commerce
    Dec. 23, 2004), and accompanying Issues and Decision Memorandum for the
    Antidumping Duty Investigation of Certain Frozen and Canned Warmwater
    Shrimp From Thailand ............................................................................................ 37

Notice of Final Determination of Sales at Not Less Than Fair Value: Certain
    Color Television Receivers from Malaysia, 69 Fed. Reg. 20,592 (Apr. 16,
    2004), and accompanying Issues and Decision Memorandum for the
    Antidumping Duty Investigation of Certain Color Television Receivers from
    Malaysia .................................................................................................................. 21

Persulfates from the People's Republic of China:
    Final Results of Antidumping Duty Administrative Review, 68 Fed. Reg.
    68,030 (Dep't Commerce Dec. 5, 2003), and accompanying Issues and
    Decision Memorandum for the 2001-2002 Antidumping Duty Administrative
    Review of Persulfates from the People's Republic of China (Nov. 28, 2003) ......... 14

Stainless Steel Bar From India:
    Final Results of Antidumping Duty Administrative Review, 62 Fed. Reg.
    37,030 (Dep't Commerce July 10, 1997) .......................................................... 34, 36

Stainless Steel Bar from India:
    Final Results of the Antidumping Duty Administrative Review, and
    Revocation of the Order, in Part, 76 Fed. Reg. 56,401 (Dep't Commerce Sept.
    13, 2011), and accompanying Issues and Decision Memorandum for the 2009-
    2010 Administrative Review of Stainless Steel Bar from India
    (Aug. 31, 2011) ...................................................................................................... 39

NONCONFIDENTIAL

Steel Wire Garment Hangers From the People's Republic of China:
Final Results of Antidumping Duty Administrative Review, 78 Fed. Reg.
28,803 (Dep't Commerce May 16, 2013), and accompanying Issues and
Decision Memorandum for the Final Results of the Third Antidumping Duty
Administrative Review (May 7, 2013) ...................................................................27

Utility Scale Wind Towers From Malaysia:
Preliminary Results of Antidumping Duty Administrative Review, 2021–
2022, 89 Fed. Reg. 461 (Dep't Commerce Jan. 4, 2024), and accompanying
Decision Memorandum for the Preliminary Results of the Antidumping Duty
Administrative Review of Utility Scale Wind Towers from Malaysia; 2021–
2022 (Dec. 28, 2023), unchanged in Utility Scale Wind Towers From
Malaysia: Final Results of Antidumping Duty Administrative Review; 2021–
2022, 89 Fed. Reg. 56,735 (Dep't Commerce July 10, 2024) ................................22

NONCONFIDENTIAL

On behalf of Plaintiff Edsal Manufacturing Co., Ltd. ("Edsal"), we submit this Rule 56.2 Brief in Support of Plaintiff's Motion for Judgment on the Agency Record.  As set forth below, Plaintiff urges this Court to determine that certain aspects of the U.S. Department of Commerce's ("the Department") final determination in the less-than-fair-value investigation of boltless steel shelving units prepackaged for sale from Thailand are not supported by substantial evidence and are otherwise not in accordance with law and to remand the Department's final determination for further proceedings.

## ADMINISTRATIVE DETERMINATION UNDER REVIEW

Plaintiff challenges certain aspects of the Department's final determination in the less-than-fair-value investigation of boltless steel shelving units prepackaged for sale from Thailand. Boltless Steel Shelving Units Prepackaged for Sale From Thailand: Final Affirmative Determination of Sales at Less Than Fair Value, 89 Fed. Reg. 28,738 (Apr. 19, 2024) ("Final Determination") (P.R. 332),[1] and the accompanying Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Boltless Steel Shelving Units Prepackaged for Sale from Thailand (Apr. 12, 2024) ("IDM") (P.R. 330).

## ISSUES PRESENTED AND SUMMARY OF ARGUMENT

The Department's Final Determination is unsupported by substantial evidence and is not otherwise in accordance with law because the Department:

1. Refused to consider a set of financial statements for purpose of calculating constructed value ("CV") profit because the entity produced comparable instead of identical merchandise and because the financial statements reflected the receipt of countervailable subsidies;

---

[1]    Documents in the administrative record are cited using the Public Record ("P.R.") or Confidential Record ("C.R.") number corresponding to the record documents identified in the Index to the Administrative Record filed with this Court on August 20, 2024 (ECF No. 18).

NONCONFIDENTIAL

2. Declined to average the profit data from suitable sources for the Department's calculation of both mandatory respondents' CV profit and selling expenses ratios;

3. Used an incorrect date of sale for Siam Metal Tech Co., Ltd.'s ("SMT") U.S. sales; and

4. Relied on incorrect total cost of manufacturing figures for SMT and Bangkok Sheet Metal Public Co., Ltd. ("BSM").

First, the Department unlawfully determined that Sahamitr Pressure Container PLC's ("Sahamitr") financial statements are unusable for calculating CV profit.  See Mid Continent Steel & Wire, Inc. v. United States, 941 F.3d 530, 543-46 (Fed. Cir. 2019).  Contrary to the Department's determination, evidence of countervailable subsidies does not automatically render financial statements unusable for calculating CV profit under 19 U.S.C. § 1677b(e)(2)(B)(iii). The statute authorizes the Department to calculate profit based on any "reasonable method," and does not require the Department to dismiss financial statements solely because they demonstrate receipt of a countervailable subsidy.  See 19 U.S.C. § 1677b(e)(2)(B)(iii).  Importantly, the Department failed to acknowledge that the subsidies had minimal, if any, impact on Sahamitr's profit data.  The Department also unlawfully concluded that Sahamitr's data was unusable because Sahamitr does not produce merchandise identical to the subject merchandise.  The Department's analysis is wrong because the Department ignored evidence of the similarity of Sahamitr's products with steel shelving, and the source of CV profit the Department did rely on reflects products and business operations that are entirely different from the subject merchandise and the respondents' operations.

Second, the Department's failure to, in the alternative, average the Sahamitr and PNS Manufacturing Co., Ltd. ("PNS") financial statements is inconsistent with the Department's preference and practice of relying on multiple financial statements to calculate surrogate profit

NONCONFIDENTIAL

and selling expenses ratios.  Relying on an average of multiple sources for CV profit data would result in a fairer comparison between normal value and respondents' prices, would reflect a broader market average and thus would be more representative of the Thai economy as a whole.

Third, the Department used an incorrect date of sale for SMT's U.S. sales.  In antidumping proceedings, the date of sale is the date which best reflects the time at which the exporter or producer established the material terms of sale.  See 19 C.F.R. § 351.401(i); Eregli Demir ve Celik Fabrikalari T.A.S v. United States, 308 F. Supp. 3d 1297, 1306 (Ct. Int'l Trade 2018); Yieh Phui Enter. Co. v. United States, 791 F. Supp. 2d 1319, 1323 (Ct. Int'l Trade 2011). The material terms of SMT's U.S. sales, which are negotiated between an unaffiliated trading company and SMT's customers, are first reduced to writing in a sales contract.  The Department's use of the second commercial invoice between SMT's unaffiliated trading company to the affiliated trading company is unlawful because that document is generated after the sales contract, meaning after the material terms of sale – including price and quantity – are established.  Further, contrary to the Department's assertion, the second commercial invoice does not better reflect the final material terms of sale by virtue of also including the sales destination because the sales destination is not a material term of sale.

Last, the Department relied on incorrect total cost of manufacturing ("TOTCOM") figures for both respondents.  Pursuant to 19 U.S.C. § 1677b(f)(1)(A), "{c}osts shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise."  SMT and BSM submitted inventory movement schedules reflecting actual costs, consistent with and reconciled to their audited Thai GAAP

NONCONFIDENTIAL

compliant financial statements. Both respondents, however, submitted cost databases reflecting derived TOTCOM figures that are [                    ] lower than their other record data supports. Contrary to the statute and the agency's well-established, consistent practice, the Department used the understated TOTCOM figures derived by SMT and BSM and stated in their cost databases.

**STANDARD OF REVIEW**

When reviewing a challenge to a final determination in a less-than-fair-value investigation by the Department, this Court "shall hold unlawful any determination, finding, or conclusion" that is "unsupported by substantial evidence on the record, or otherwise is not in accordance with law." 19 U.S.C. § 1516a(a)(2)(B)(ii), (b)(1)(B)(i). The substantial evidence standard requires "more than a mere scintilla" of evidence. Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" considering the record as a whole. Id.; CP Kelco US, Inc. v. United States, 949 F.3d 1348, 1356 (Fed. Cir. 2020). Further, to be supported by substantial evidence, the Department's determination, findings, and conclusions "must take into account whatever in the record fairly detracts" from their weight. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); see also SKF USA v. United States, 630 F.3d 1365, 1374 (Fed. Cir. 2011) ("Commerce has an 'obligation' to address important factors raised by comments from petitioners and respondents.") (citations omitted). In addition, the Department "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, (1983) (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).

NONCONFIDENTIAL

## STATEMENT OF FACTS

On May 15, 2023, the Department initiated the less-than-fair-value investigation of boltless steel shelving units prepackaged for sale from Thailand after Edsal filed a petition for antidumping duties on imports of boltless steel shelving from India, Malaysia, Taiwan, Thailand, and Vietnam. Boltless Steel Shelving Units Prepackaged for Sale From India, Malaysia, Taiwan, Thailand and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations, 88 Fed. Reg. 32,188 (Dep't Commerce May 19, 2023) (P.R. 33). The Department selected Bangkok Sheet Metal Public Co., Ltd. ("BSM") and Siam Metal Tech Co., Ltd. ("SMT") as the respondents to individually examine. Boltless Steel Shelving Units Prepackaged for Sale From Thailand: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures, 88 Fed. Reg. 83,389 (Dep't Commerce Nov. 29, 2023) (hereinafter, "Preliminary Determination") (P.R. 249), and accompanying Decision Memorandum for the Preliminary Affirmative Determination in the Less-Than-Fair-Value Investigation of Boltless Steel Shelving Units Prepackaged for Sale from Thailand (Nov. 21, 2023) ("PDM") at 2 (P.R. 237).

Pursuant to 19 U.S.C. § 1677b(a)(1)(C)(iii), (a)(1)(B)(ii)(II), the Department found that both respondents' home market and third-country market sales were not viable. PDM at 8-12 (P.R. 237). When the Department "determines that the aggregate quantity (or, if quantity is not appropriate, value) of the foreign like product sold in the exporting country is insufficient to permit a proper comparison with the sales of the subject merchandise to the United States," the agency may use "the price at which the foreign like product is so sold (or offered for sale) for consumption in a country other than the exporting country or the United States," i.e., a third

NONCONFIDENTIAL

country, or "the constructed value of that merchandise." 19 U.S.C. § 1677b(a)(1)(C)(ii), (a)(1)(B)(ii), (a)(4).

Edsal submitted constructed value ("CV") profit and expense information, including the financial statements of three companies: two Thai producers of comparable merchandise, Sahamitr Pressure Container PLC ("Sahamitr") and PNS Manufacturing Co., Ltd. ("PNS"), and a Malaysian producer of identical and comparable merchandise, Eonmetall Group Berhad. Letter from Kelley Drye & Warren LLP to Sec'y of Commerce Pertaining to Petitioner CV Profit and Selling Expense Submission at 3-4, Attachs. 1-9 (P.R. 132-34) (hereinafter, "Edsal CV Profit Cmts"). Sahamitr is a Thai company engaged solely in the production of fabricated steel products: steel cylinders. See id. at 3-4, Attachs. 1, 4-5 (P.R. 132-34). PNS is a Thai company that produces a wide array of products, including wooden furniture, plastic baskets, general equipment, and other products in addition to steel shelving. See id. at Attach. 3 (P.R. 132-34); Letter from deKieffer & Horgan to Sec'y of Commerce Pertaining to Respondents Rebuttal CV Profit and Selling Expenses Cmts at Ex. CVR-6 (P.R. 148-51) (hereinafter, "Respondents Rebuttal CV Profit Cmts"). BSM and SMT submitted combined CV profit and expense information, including the financial statements of three Thai producers of non-comparable merchandise, and a Malaysian producer of identical merchandise. Letter from deKieffer & Horgan to Sec'y of Commerce Pertaining to Respondents' CV Profit and Selling Expenses (P.R. 126-31).

The Department also instructed SMT to report its date of sale – meaning the date the material terms of sale are established – for its sales of subject merchandise. See Response from deKieffer & Horgan to Sec'y of Commerce Pertaining to SMT Sec A QR at 12-13 (C.R. 21-22; P.R. 89) (hereinafter, "SMT AQR"). For its U.S. sales, SMT explained that the sales process

NONCONFIDENTIAL

involves negotiations leading to an "agreement" reached "for quantity, prices etc." between an unrelated trading company and the customers. Id. at 12-13 (C.R. 21-22; P.R. 89). Despite the agreement "for quantity, price etc.," however, SMT claimed the date of sale should be "the dates of its Commercial Invoice." Id. at 12 (C.R. 21-22; P.R. 89); see Response from deKieffer & Horgan to Sec'y of Commerce Pertaining to SMT Sec C QR at 17-18 (C.R. 33-41; P.R. 106) (hereinafter, "SMT CQR"). The invoice that SMT argued marked the appropriate date of sale is one of two types of commercial invoices that are issued after the agreement is reached on quantity and price for SMT's sales. SMT AQR at 12-13 (C.R. 21-22; P.R. 89). SMT issues an invoice to a related third-country trading company at the time the subject merchandise is shipped to the United States. Id. (C.R. 21-22; P.R. 89). The price on this invoice reflects an internal transfer price. Id. (C.R. 21-22; P.R. 89). The third-country trading company also issues an invoice to unrelated trading companies at the time for the collection of payment. Id. (C.R. 21-22; P.R. 89); see also SMT CQR at 17-18 (C.R. 33-41; P.R. 106) (noting that, for this reason, "the dates of these invoices are not appropriate dates for the date of sale"). While not initially mentioned or disclosed by SMT, a "sales contracts" is also generated for SMT's U.S. sales.

The Department instructed SMT to clarify its sales process and provide additional information, including all sales documents for a sample U.S. sale. Response from deKieffer & Horgan to Sec'y of Commerce Pertaining to SMT 2nd Supp QR at 18-19 (C.R. 103-10; P.R. 201) (hereinafter, "SMT 2nd Supp QR"). With respect to the "agreement . . . reached for price, quantity, etc.," and SMT's receipt of the "confirmation of the quantities and prices for the upcoming several months," the Department instructed SMT to better explain the nature of these sales documents. Id. at 20-21 (C.R. 103-10; P.R. 201). In response, and for the first time during the proceeding, SMT submitted [

**NONCONFIDENTIAL**

       **]** Id. at Ex. SQ2-8b (C.R. 103-10; P.R. 201).

This **[**

       **]** Id. (C.R. 103-10; P.R. 201).  SMT also

provided in this same submission **[**

       **]**

See id. (C.R. 103-10; P.R. 201).

      Both respondents also informed the Department that they "relie{d} on actual costs as recorded in the financial accounting system to derive the costs associated with production." Response from deKieffer & Horgan to Sec'y of Commerce Pertaining to SMT Sec D QR at 10-11 (C.R. 53-67; P.R. 109) (hereinafter, "SMT DQR"); Response from deKieffer & Horgan to Sec'y of Commerce Pertaining to BSM Sec D QR at 9 (C.R. 50-52; P.R. 108) (hereinafter, "BSM DQR"); see also SMT DQR at 14 (C.R. 53-67; P.R. 109) ("For reporting purposes, as explained in the response above, SMT relied upon the relevant information in its normal business accounting and operating system to calculate the cost of manufacturing. The costs and expenses recorded in SMT's system are actual costs and expenses, so the reported cost of production is based on actual costs and expenses.").  In addition, SMT and BSM reported that their "financial accounting practices are in accordance with GAAP in Thailand."  SMT DQR at 8 (C.R. 53-67; P.R. 109); BSM DQR at 6 (C.R. 50-52; P.R. 108); see also BSM DQR at 6 (C.R. 50-52; P.R. 108) (stating that BSM's "financial statements are prepared in Thai baht at the actual cost incurred").

      Both respondents, however, submitted cost databases reflecting **[**                    **]** production costs compared to their finished goods inventory movements schedules, which both

**NONCONFIDENTIAL**

respondents asserted were based on actual costs and were reconciled with their normal accounting books and records and audited financial statements. <u>Compare</u> Response from deKieffer & Horgan to Sec'y of Commerce Pertaining to SMT 2nd Sec D Supp QR at Exs. SQ5-11, SQ5-20 (C.R. 138-56; P.R. 228) (hereinafter, "SMT Second Sec D Supp QR"), <u>with</u> SMT DQR at 8, 10 (C.R. 53-67; P.R. 109); <u>and</u> <u>compare</u> BSM DQR at Ex. D-15 (C.R. 50-52; P.R. 108), <u>with</u> Response from deKieffer & Horgan to Sec'y of Commerce Pertaining to BSM 2nd Supp Qnaire Resp at File BMCP03 (field TOTCOM) (C.R. 93-99; P.R. 228) (hereinafter, "BSM Second Supp D QR").

On November 21, 2023, the Department issued its preliminary determination. <u>Preliminary Determination</u>, 88 Fed. Reg. at 83,389 (P.R. 249). First, the Department preliminarily calculated CV profit under 19 U.S.C. § 1677b(e)(2)(B)(iii) based solely on PNS's financial statements. <u>PDM</u> at 11-12 (P.R. 237). The Department preliminarily rejected Sahamitr's financial statements because Sahamitr was "largely engaged in the production and sales of non-comparable merchandise," <u>i.e.</u>, steel cylinders. <u>Id.</u> at 11 (P.R. 237).

Second, while the Department preliminarily accepted SMT's reporting of the invoice date as the date of sale in its U.S. and home market databases, the Department noted that "{b}ased on the petitioner's pre-preliminary comments," it intended to further examine the appropriate date of sale. <u>Id.</u> at 8 (P.R. 237) (citing Letter from Kelley Drye & Warren LLP to Sec'y of Commerce Pertaining to Petitioner Pre-Prelim Cmts at 8 (C.R. 170; P.R. 231) (hereinafter, "Edsal Pre-Prelim Cmts re: SMT")).

Third, the Department relied on both respondents' total cost of manufacturing ("TOTCOM") reported in their cost databases even though those amounts conflict with their respective finished goods inventory movement schedules and audited financial statements. Brief

NONCONFIDENTIAL

from Kelley Drye & Warren LLP to Sec'y of Commerce Pertaining to Petitioner Case Brief at 31-37 (C.R. 311; P.R. 311) (hereinafter, "Edsal Case Brief re: SMT"); Brief from Kelley Drye & Warren LLP to Sec'y of Commerce Pertaining to Petitioner Case Brief at 18-32 (C.R. 310; P.R. 310) (hereinafter, "Edsal Case Brief re: BSM").

During SMT's sales verification, SMT officials acknowledged that before various sales documents are generated – such as the booking confirmation slip, the SMT-issued invoice, and the invoice between SMT's affiliated and unaffiliated trading companies – "the sales process starts with an agreement between the affiliated and unaffiliated trading companies regarding the quantity and price." Verification from USDOC to File Pertaining to SMT Verification Report at 6-7 (C.R. 307; P.R. 305) (hereinafter, "SMT Sales Verification Report"). The Department also conducted verification of both respondents' cost of production reporting and documentation. Verification from USDOC to Director of Accounting Pertaining to BSS Cost Verification Report (C.R. 305; P.R. 303) (hereinafter, "Cost Verification Report re: SMT"); Verification from USDOC to File Pertaining to BSM Cost Verification Report (C.R. 308; P.R. 307) (hereinafter, "Cost Verification Report re: BSM").

During the briefing stage of the investigation, Edsal explained that the presence of countervailable subsidies did not render Sahamitr's financial statements unusable for CV profit calculations. See, e.g., Edsal Case Brief re: SMT at 8-11 (C.R. 311; P.R. 311). In addition, Edsal demonstrated that the Department's practice and the comparative deficiencies of Sahamitr's and PNS's financial statements supported using either Sahamitr's financial statements alone, or an average of the data from both sources. Id. at 12-18 (C.R. 311; P.R. 311). For example, even though Sahamitr does not produce merchandise *identical* to boltless steel shelving, Sahamitr does produce exclusively comparable merchandise (fabricated steel

NONCONFIDENTIAL

products), in contrast with PNS, which produces steel shelving but also entirely different merchandise, such as plastic baskets and wooden furniture.  Id. at 13 (C.R. 311; P.R. 311); see also Edsal CV Profit Cmts at 3-4, Attachs. 1, 3-5 (P.R. 132-34); Respondents Rebuttal CV Profit Cmts at Ex. CVR-6 (P.R. 148-51).  Edsal also pointed out the comparative lack of detail in PNS's financial statements compared to Sahamitr's financial statements.  Edsal Case Brief re: SMT at 13-14 (C.R. 311; P.R. 311).  Concerning the date of sale, Edsal explained that the record shows that the final material terms of sale for SMT's U.S. sales are established before the issuance of the invoices and thus, that the sales contract date is the proper date of sale.  Id. at 18-31 (C.R. 311; P.R. 311).  As to the TOTCOM calculations, Edsal explained that neither the record nor the Department's observations during verification support deferring to SMT's and BSM's TOTCOM amounts as reported in their cost databases.  Id. at 31-37 (C.R. 311; P.R. 311); Edsal Case Brief re: BSM at 18-32 (C.R. 310; P.R. 310).

On April 12, 2024, the Department issued its final determination.  Final Determination, 89 Fed. Reg. 28,738 (P.R. 332).  The Department continued to rely solely on PNS's financial statements to calculate CV profit.  IDM at 5-7 (P.R. 330).  The Department maintained its position that Sahamitr's financial statements were unusable and relied solely on PNS's financial statements because "Sahamitr does not produce shelving."  Id. at 6 (P.R. 330) (citing Edsal CV Profit Cmts at Attach. 5 (P.R. 132-34)).  The Department, however, did not address or respond to Edsal's arguments and the record evidence showing that: (1) Sahamitr produces solely comparable merchandise manufactured using a production process that is nearly identical to the respondents' production process; and (2) PNS produces a wide array of non-comparable merchandise in addition to shelving.  In addition, the Department stated it would be equally "inappropriate" to average Sahamitr's profit rate because "Sahamitr received countervailable

-11-

**NONCONFIDENTIAL**

subsidies from the Thai government" but did not address Edsal's arguments that: (1) countervailable subsidies do not disqualify potential surrogate financial statements in general; and (2) the subsidies at issue did not distort Sahamitr's profit in this instance. Id. at 7 (P.R. 330) (citing Edsal CV Profit Cmts at Attach. 1, Note 22 (P.R. 132-34)).

For SMT's date of sale, even though Edsal demonstrated that the sales contracts are the first documents generated that reflect the material terms of sale (price and quantity), the Department declined to use the sales contract date because the "document does not include the final destination of the order," a term of sale the Department did not establish is material. Id. at 11 (P.R. 330). Therefore, the Department continued to rely on the date of the second commercial invoice as the date of sale. Id. (P.R. 330).

The Department also continued to accept and use the TOTCOM figures reported by the respondents in their costs databases rather than the TOTCOM amounts supported by the finished goods inventory movement schedules that reconciled to the normal books and records and audited financial statements of each respondent despite making no finding that these latter figures did not reasonably reflect the cost of producing the subject merchandise. Id. at 13-17 (P.R. 330). This appeal followed.

## ARGUMENT

## I.    THE DEPARTMENT UNLAWFULLY REJECTED SAHAMITR'S FINANCIAL STATEMENTS

The Department failed to "take into account whatever in the record fairly detracts" from its Final Determination by rejecting Sahamitr's financial statements because they reflected receipt of countervailable subsidies, and by overlooking comparative deficiencies in PNS's financial statements in relation to Sahamitr's financial statements. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); SKF USA v. United States, 630 F.3d 1365, 1374 (Fed. Cir.

NONCONFIDENTIAL

2011). Thus, and as explained further below, the <u>Final Determination</u> is not supported by substantial evidence and otherwise not in accordance with law.

**A.    The Department's Rejection of Sahamitr's Financial Statements On the Basis That They Indicate Receipt of Countervailable Subsidies Is Unlawful**

**1.    Legal Standard**

When calculating constructed value profit and selling expenses ratios under 19 U.S.C. § 1677b(e)(2)(B)(iii), the Department's "objective is to find a good proxy (or surrogate) for the profits that the respondent can fairly be expected to build into a fair sales price for the particular merchandise." <u>Mid Continent Steel & Wire, Inc. v. United States</u>, 941 F.3d 530, 542 (Fed. Cir. 2019) (hereinafter, "<u>Mid Continent III</u>"); <u>see</u> <u>SeAH Steel Corp. v. United States</u>, 539 F. Supp. 3d 1341, 1358-59 (Ct. Int'l Trade 2021). Accordingly, the Department "must consider whether the data it uses to calculate constructed value profit results in a fair comparison between normal value and export price." <u>Bldg. Sys. de Mexico, S.A. de C.V. v. United States</u>, 567 F. Supp. 3d 1306, 1311-12 (Ct. Int'l Trade 2022) (hereinafter, "<u>Building Systems de Mexico I</u>").

The Department is not required to reject a company's financial statements for the purpose of calculating constructed value under 19 U.S.C. § 1677b(e)(2)(B)(iii) because it indicates receipt of countervailable subsidies. <u>See</u> <u>Mid Continent III</u>, 941 F.3d at 543-46; <u>CP Kelco US, Inc. v. United States</u>, 949 F.3d 1348, 1358-59 (Fed. Cir. 2020), <u>rev'g in relevant part</u> <u>CP Kelco US, Inc. v. United States</u>, 2018 WL 4469912 at *1-3 (Ct. Int'l Trade Sept. 17, 2018). Evidence of the receipt of such subsidies is not dispositive in the Department's analysis of the relative suitability of the financial statements on the record. <u>See, e.g.</u>, <u>Mid Continent III</u>, 941 F.3d at 543-46; <u>CP Kelco</u>, F.3d at 1358-59; <u>SeAH Steel</u>, 539 F. Supp. 3d at 1359-62; <u>Juancheng Kangtai Chem. Co. v. United States</u>, Consol. Ct. No. 14-00056, Slip Op. 15-93 at 25, 2015 WL 4999476 at *13 (Ct. Int'l Trade Aug. 21, 2015) ("The decision on whether to rely on a particular financial

NONCONFIDENTIAL

statement (even one tainted, *arguendo*, by subsidies) is record-dependent.") (citation omitted); <u>Certain Fabricated Structural Steel From Mexico: Final Determination of Sales at Less Than Fair Value</u>, 85 Fed. Reg. 5,390 (Dep't Commerce Jan. 30, 2020), and accompanying <u>Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Fabricated Structural Steel from Mexico</u> at cmt. 13 (Jan. 23, 2020) (finding "no evidence" to support the assertion that a company's home market profit data "is distorted by the receipt of a countervailable export subsidy" because such subsidies "relate to export sales, not {home market} sales, which is what the CV profit calculation is based on"), <u>aff'd</u> <u>as</u> <u>modified</u> <u>upon</u> <u>remand</u>, <u>Bldg. Sys. de Mexico, S.A. de C.V. v. United States</u>, 609 F. Supp. 3d 1369 (Ct. Int'l Trade 2022).  Indeed, the Department has explained that "the mere fact that a company may receive a government subsidy is {an} insufficient basis upon which to reject its financial statements," and the Department will consider "the totality of the circumstances rather than the sole fact that the surrogate producer was being subsidized."  <u>Persulfates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review</u>, 68 Fed. Reg. 68,030 (Dep't Commerce Dec. 5, 2003), and accompanying <u>Issues and Decision Memorandum for the 2001-2002 Antidumping Duty Administrative Review of Persulfates from the People's Republic of China</u> at cmt. 3 (Nov. 28, 2003).

**2.    The Department's Rejection of Sahamitr's Financial Statements as Unusable for CV Profit Calculations Because There Is an Indication the Company Received Countervailable Subsidies Is Unlawful**

The Department's conclusion that the Sahamitr financial statements are unusable for calculating CV profit due to an indication the company received countervailable subsidies is unlawful and contrary to the Department's use of financial statements indicating receipt of countervailable subsidies in other proceedings.  <u>See</u> <u>IDM</u> at 7 (P.R. 330).  In the less-than-fair-

NONCONFIDENTIAL

value investigation of steel nails from Oman, the Department used the financial statements of Hitech, a Thai producer of steel screws, as a source for CV profit and selling expenses under 19 U.S.C. § 1677b(e)(2)(B)(iii) even though the financial statements indicated receipt of a countervailable subsidy. <u>Certain Steel Nails From the Sultanate of Oman: Final Determination of Sales at Less Than Fair Value</u>, 80 Fed. Reg. 28,972 (Dep't Commerce May 20, 2015), and accompanying <u>Issues and Decision Memorandum for the Final Determination of Sales at Less Than Fair Value</u> at cmt. 1 (May 13, 2015). The U.S. Court of International Trade remanded the Department's final determination in that case for further explanation of its use of Hitech's financial statements and non-use of other financial statements. <u>See Mid Continent Steel & Wire, Inc. v. United States</u>, 203 F. Supp. 3d 1295, 1314-16 (Ct. Int'l Trade 2017). In its remand redetermination, the Department explained that a surrogate company's receipt of countervailable subsidies "does not preclude the use of that company's financial statements for the calculation of CV profit." <u>Final Results of Redetermination Pursuant to Court Order; *Mid Continent Steel & Wire, Inc. v. United States*</u>, Consol. Ct. No. 15-00214 (Dep't Commerce May 23, 2017) at 29-30 (ECF No. 95). The Department also explained that "relying on a financial statement for CV profit that may include countervailable subsidies is consistent with how the Department calculates the cost of production to which it applies the profit rate." <u>Id.</u> at 30. The court sustained the Department's remand redetermination on this issue and concluded "Commerce thoroughly and reasonably explained that its use of the Hitech statements here (i) in fact accounts for, and offsets, any countervailing subsidies and (ii) is in accordance with well-established past practice." <u>Mid Continent Steel & Wire, Inc. v. United States</u>, 273 F. Supp. 3d 1348, 1350-53 n.1 (Ct. Int'l Trade 2017) (hereinafter, "<u>Mid Continent II</u>").

NONCONFIDENTIAL

The U.S. Court of Appeals for the Federal Circuit ("CAFC") vacated the portion of Mid Continent II sustaining the Department's remand redetermination on the issue of Hitech's receipt of countervailable subsidies. Mid Continent III, 941 F.3d at 543-46. Importantly, the CAFC did not hold that the presence of countervailable subsidies necessarily renders a source unsuitable for the Department's CV profit calculations. The court held that evidence of the receipt of countervailable subsidies is relevant but not dispositive of financial statements' suitability for CV profit calculations:

> A company that receives government subsidies to produce certain merchandise **may** have "expenses separately recouped by income other than receipts from selling that merchandise." Subsidies **may** increase recorded profit, for example, **if** they are included on the receipt side of a profit calculation **or if** they take the form of artificially lower input costs. Thus, government subsidies are precisely the kind of factor that **could** distort the accuracy of a surrogate company's information.

> As a logical matter, Hitech would be a weaker surrogate for constructed value **if** government subsidies **heavily** distort its profits. It **might** be so much weaker that Commerce would no longer have a sound reason to choose Hitech over another proposed source of profit information, whether from {Oman Fasteners'} home country or elsewhere. The **size of any subsidies would obviously be relevant, as would the comparative deficiencies of the alternative sources**. **Choice of a different source is not the only possible response** to a determination of the existence, likelihood, or magnitude of subsidies that artificially increase a surrogate's profit. If the statute permits, **Commerce might determine the amount of subsidies and adjust its calculation of constructed value downward to eliminate the effect of the subsidies. Or Commerce might decide that the subsidies are so insignificant that no change needs to be made at all**.

> Practical considerations might play a role in the reasonableness of Commerce's choice. . . .

> We do not prescribe an ultimate result.

Id. at 544-45 (emphases added) (quotations and citation omitted).

NONCONFIDENTIAL

After continuing to find Hitech's financial statements suitable for the Department's CV profit calculation in its second remand redetermination, the U.S. Court of International Trade remanded the Department's determination on this issue for more thorough analysis of the comparative deficiencies in the sources for CV profit and the impact of countervailable subsidies on Hitech's profit data. Mid Continent Steel & Wire, Inc. v. United States, 551 F. Supp. 3d 1360 (Ct. Int'l Trade 2021) (hereinafter, "Mid Continent IV"). Notably, the court explained that pursuant to Mid Continent III, "Commerce may need to engage in a comparative analysis of the deficiencies of multiple financial statements," analysis which cannot be merely conclusory. Id. at 1367 (citing Mid Continent III, 941 F.3d at 544). In addition, the court explained that "the quantity of the potential subsidy is an important consideration because 'Hitech would be a weaker surrogate for constructed value if government subsidies heavily distort its profits.'" Id. (quoting Mid Continent III, 941 F.3d at 544).

Ultimately, the U.S. Court of International Trade sustained the Department's third remand redetermination in which the Department analyzed the financial statements on the record and selected Sundram Fasteners Limited's ("Sundram") financial statements instead of Hitech's even though both companies received countervailable subsidies. Mid Continent Steel & Wire, Inc. v. United States, 586 F. Supp. 3d 1349 (Ct. Int'l Trade 2022) (hereinafter, "Mid Continent V"), appeal pending, Mid Continent Steel & Wire Inc. v. United States, Appeal No. 23-1039 (Fed. Cir.) (submitted after oral argument to Panel on Nov. 7, 2024). Notably, respondent Oman Fasteners' argument that "Commerce should have rejected {Sundram's and Hitech's financial statements} in favor of another financial statement on the record" because they both contained evidence of subsidies was unavailing. Id. at 1355; see Final Results of Redetermination Pursuant to Court Remand; Mid Continent Steel & Wire Inc. v. United States, Consol. Ct. No. 15-00214

NONCONFIDENTIAL

(Dep't Commerce Apr. 12, 2022) at 16 (ECF No. 150)  ("We acknowledged that both Hitech and Sundram received subsidies, however, these subsidies do not negate the fact that each company produces comparable merchandise.").

Here, consistent with the Mid Continent line of cases and other precedents as explained further below, a remand is necessary to correct the Department's dismissal of Sahamitr's financial statements. See IDM at 7 (P.R. 330). First, the Department wrongly deemed Sahamitr's financial statements to be unsuitable due to the receipt of countervailable subsidies. Id. (P.R. 330). While the presence of countervailable subsidies in potential sources of CV profit data is relevant to the Department's analysis, the mere presence of subsidies does not render a source unsuitable. See Mid Continent III, 941 F.3d at 543-46; CP Kelco, 949 F.3d at 1358-59 (holding the Department reasonably relied on surrogate financial statements in calculating CV profit despite evidence of countervailable subsidies because alternative financial statements were incomplete); Best Mattresses Int'l Co. v. United States, 703 F. Supp. 3d 1382, 1395-96 (Ct. Int'l Trade 2024) (sustaining the Department's use of Emirates' financial statements for calculating CV profit despite indication of countervailable subsidies). Rather than dismissing financial statements containing subsidies outright, the Department is "tasked with comparing the options presented and their 'comparative deficiencies.'" PT Zinus Glob. Indon. v. United States, 628 F. Supp. 3d 1252, 1271 (Ct. Int'l Trade 2023) (emphases added) (quoting Mid Continent III, 941 F.3d at 544). The Department's assertion that the presence of countervailable subsidies renders Sahamitr's data unsuitable is conclusory, contrary to law, and unsupported by substantial evidence. See IDM at 7 (P.R. 330).

Second, neither respondents nor the Department showed that the subsidies had any distortive impact on Sahamitr's profit data. As the CAFC explained in Mid Continent, when

NONCONFIDENTIAL

analyzing a source of CV profit data that reflects countervailable subsidies, the "size of any subsidies would obviously be relevant." Mid Continent III, 941 F.3d at 544-45. Further, the Department can accommodate impacts (if any) of the subsidies on profit data by, for example, "adjust{ing} its calculation of constructed value downward to eliminate the effect of the subsidies" or "decid{ing} that the subsidies are so insignificant that no change needs to be made at all." Id. Accordingly, in Building Systems de Mexico I and SeAH Steel, the court sustained the Department's decisions to use financial statements with countervailable subsidies because the subsidies were not shown to have had distortive impacts on the CV profit data. See Building Systems de Mexico I, 567 F. Supp. 3d at 1314; SeAH Steel, 539 F. Supp. 3d at 1358-62. Because the Department failed to point to any distortive impacts of the subsidies on Sahamitr's profit data that could not be accounted for, the Department's refusal to consider Sahamitr's profit data is unlawful.

Third, the Department ignored the fact that the two subsidies at issue are either (1) irrelevant for the Department's CV profit calculations, in the case of the Board of Investments corporation tax reduction, or (2) represent a miniscule percent of Sahamitr's total revenue, in the case of the Board of Investments subsidy for the exemption on import duty on machinery. See, e.g., Edsal Case Brief re: SMT at 8-10 & n.18 (C.R. 311; P.R. 311). Thus, the impact, if any, of these subsidies on Sahamitr's data for CV profit and selling expenses calculations is negligible. Specifically, the Department has found the machinery import duty exception amount to be below de minimis levels in prior cases: representing benefit amounts of merely **0.04** percent and **0.01** percent. Id. at 9 n.18 (C.R. 311; P.R. 311) (citing Respondents Rebuttal CV Profit Cmts at Ex. CVR-5 (P.R. 148-51)). The only other subsidy at issue (the corporate income tax reduction), is

NONCONFIDENTIAL

irrelevant in this case because the Department calculates CV profit and selling expenses based on profit before taxes. Id. at 8-9 (C.R. 311; P.R. 311).

Fourth, the Department overlooked the critical fact that as of the end of fiscal year 2022, Sahamitr had not even received any benefits from the subsidies. Id. at 9 (C.R. 311; P.R. 311); Respondents Rebuttal CV Profit Cmts at Ex. CVR-4 (P.R. 148-51). Indeed, Sahamitr's fiscal year 2022 financial statements provide that the subsidies at issue were merely prospective in nature:

> The company has received support from the Board of Investments for 2 projects, which are improving production efficiency for the use of renewable energy, and automation or robots. As a result, the company <u>will receive</u> the following rights and benefits:
>
> 1. Exemption of import duty on machinery
>
> 2. Exemption from corporate income tax on net profits derived from operation tasks, not exceeding 50% of the investment of improving production efficiency for renewable energy, not more than 100% of the investment in automation or robots, for a period of 3 years starting from the date of earning income, after receiving supporting certificates.
>
> Both of these projects have completed their installation in 2022. <u>At present (as of December 31, 2022), the company is in the process of submitting documents for operation according to BOI requirements</u>.

Respondents Rebuttal CV Profit Cmts at Ex. CVR-4 (emphases added) (P.R. 148-51). Thus, not only did the respondents and the Department fail to show that the subsidies had any incurable, distortive impact on Sahamitr's data, the record evidence shows that the subsidies had <u>no impact</u> on Sahamitr's profit data.

Thus, the Department's finding that Sahamitr's financial statements were unsuitable due to countervailable subsidies, and the agency's failure to acknowledge the non-existent distortive

NONCONFIDENTIAL

impact of the subsidies on Sahamitr's profit data, renders the <u>Final Determination</u> unsupported by substantial evidence and not in accordance with law.

**B.    <u>The Department's Conclusion that Sahamitr Does Not Produce Shelving, and Therefore Is Unsuitable for CV Profit Calculations, Is Unlawful</u>**

The Department is not required to rely solely on a surrogate company that produces merchandise *identical* to the subject merchandise when calculating CV profit under 19 U.S.C. § 1677b(e)(2)(B)(iii).  Rather, the Department analyzes "the profits 'normally realized' by other companies on merchandise <u>of the same general category</u>."  <u>Statement of Administrative Action Accompanying the Uruguay Round Agreements Act</u>, H.R. Doc. No. 103-316, vol. I, at 841 (1994), <u>reprinted in</u> 1994 U.S.C.C.A.N. 4040, 4176-77 (hereinafter, "SAA") (emphasis added). The Department's well-established practice is to consider, among other factors, "the similarity of the potential surrogate companies' business operations and products to the respondent's business operations and products."  <u>IDM</u> at 6 (P.R. 330); <u>Notice of Final Determination of Sales at Less Than Fair Value: Pure Magnesium From Israel</u>, 66 Fed. Reg. 49,349 (Dep't Commerce Sept. 27, 2001), and accompanying <u>Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Pure Magnesium from Israel Issues and Decision Memorandum</u> at cmt. 8 (Sept. 14, 2001); <u>Notice of Final Determination of Sales at Not Less Than Fair Value: Certain Color Television Receivers from Malaysia</u>, 69 Fed. Reg. 20,592 (Apr. 16, 2004), and accompanying <u>Issues and Decision Memorandum for the Antidumping Duty Investigation of Certain Color Television Receivers from Malaysia</u> at cmt. 26.  Here, the Department unlawfully ruled out Sahamitr when the agency simply stated that Sahamitr is not viable because it "doesn't produce shelving." <u>IDM</u> at 7 (P.R. 330); <u>see also</u> <u>PDM</u> at 11 (P.R. 237).  Further, as explained below, the Department failed to consider important evidence when

NONCONFIDENTIAL

assessing the similarity of PNS's and Sahamitr's products and business operations with that of the respondents.

First, the Department wrongly concluded that Sahamitr's steel cylinders are insufficiently comparable to steel shelving. Again, nothing requires the Department to ignore financial statements for companies that produce merchandise that is comparable albeit not *identical* to the merchandise under consideration. Accordingly, the Department has previously found two companies that produced steel pipes to be suitable sources for CV profit data under 19 U.S.C. § 1677b(e)(2)(B)(iii) in an antidumping proceeding on imports of utility scale wind towers. See Utility Scale Wind Towers From Malaysia: Preliminary Results of Antidumping Duty Administrative Review, 2021–2022, 89 Fed. Reg. 461 (Dep't Commerce Jan. 4, 2024), and accompanying Decision Memorandum for the Preliminary Results of the Antidumping Duty Administrative Review of Utility Scale Wind Towers from Malaysia; 2021-2022 at 14-15 (Dec. 28, 2023), unchanged in Utility Scale Wind Towers From Malaysia: Final Results of Antidumping Duty Administrative Review; 2021–2022, 89 Fed. Reg. 56,735 (Dep't Commerce July 10, 2024). If the Department could find steel pipe to be sufficiently similar to utility scale wind towers, then Sahamitr's steel cylinders should be deemed sufficiently comparable to steel shelving for the purpose of this case. See also Boltless Steel Shelving Units Prepackaged for Sale From the People's Republic of China: Final Determination of Sales at Less Than Fair Value, 80 Fed. Reg. 51,779 (Dep't Commerce Aug. 26, 2015), and accompanying Issues and Decision Memorandum for the Final Determination of the Antidumping Duty Investigation of Boltless Steel Shelving Units Prepackaged for Sale from the People's Republic of China at cmt. 1 (Aug. 14, 2015) (finding fabricated metal products comparable to steel shelving and using the financial statements of the producer of those products and finding them preferable to the

NONCONFIDENTIAL

financial statements of a producer of merchandise identical to steel shelving, and noting the similarities in the production processes).

Indeed, Edsal explained the numerous ways in which Sahamitr's steel products are in fact comparable to the subject steel shelving products. For example, the main Standard Industrial Classification codes of Sahamitr and BSM are very similar and the production processes for steel cylinders and steel shelving begin with the same major input (steel coils) and include the same manufacturing steps. See, e.g., Edsal Case Brief re: SMT at 6-7 (C.R. 311; P.R. 311); Edsal CV Profit Cmts at Attachs. 4-5 (P.R. 132-34). The Department failed to consider or address any of these facts and comparisons of Sahamitr's products and business operations with that of the respondents, instead fixating almost entirely on the presence of subsidies in Sahamitr's financial statements – subsidies which, as explained above, should not disqualify Sahamitr's profit data. See IDM at 6-7 (P.R. 330). Thus, the Department's conclusion is contrary to precedent and unsupported by substantial evidence.

Second, the Department ignored the fact that PNS's products and business operations reflect a wide variety of non-comparable merchandise, whereas Sahamitr exclusively produces comparable merchandise: steel cylinders. Edsal CV Profit Cmts at Attach. 3 (P.R. 132-34); Respondents Rebuttal CV Profit Cmts at Ex. CVR-6 (P.R. 148-51). Indeed, PNS produces "wooden furniture," "general equipment," plastic baskets, and other products that are entirely different from boltless steel shelving. Edsal CV Profit Cmts at Attach. 3 (P.R. 132-34); Respondents Rebuttal CV Profit Cmts at Ex. CVR-6 (P.R. 148-51). Under similar circumstances in Mattresses from Indonesia, when assessing sources of CV profit data under 19 U.S.C. § 1677b(e)(2)(B)(iii), the Department reasoned that a surrogate producer that made mattresses but also made non-comparable merchandise was inferior to a company that made exclusively

-23-

NONCONFIDENTIAL

comparable merchandise.  See Mattresses From Indonesia: Final Affirmative Determination of Sales at Less Than Fair Value, 86 Fed. Reg. 15,899 (Dep't Commerce Mar. 25, 2021), and accompanying Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Mattresses from Indonesia at cmt. 4 (Mar. 18, 2021), aff'd in relevant part, PT Zinus Glob. Indon. v. United States, 628 F. Supp. 3d 1252, 1265-71 (Ct. Int'l Trade 2023).  The Department applied similar reasoning in Steel Nails from Taiwan. See Certain Steel Nails from Taiwan: Final Determination of Sales at Less Than Fair Value, 80 Fed. Reg. 28,959 (Dep't Commerce May 20, 2015), and accompanying Issues and Decision Memorandum for the Affirmative Final Determination in the Less than Fair Value Investigation of Certain Nails from Taiwan at cmt. 1 (May 13, 2015) ("We also have on the record third country financial statements for Sundram. . . .  However, its production also consists of various automotive products which are not comparable to steel nails (i.e., a mix of products versus all comparable products).").  The Department should have applied reasoning consistent with these precedents in this case.

**C.    The Department Also Failed to Address Edsal's Arguments that PNS's Financial Statements Are Inferior In Terms of the Detail Needed To Calculate CV Profit and Selling Expenses**

As discussed, the Department's rejection of Sahamtr's financial statements solely on the bases that there is evidence Sahamitr was in receipt of subsidies and did not produce boltless steel shelving without addressing Edsal's alternative arguments and evidence that undermined these findings is unlawful.  In addition, the Department failed to address another salient argument raised by Edsal concerning the comparative detail of PNS's and Sahamtir's financial statements.

**NONCONFIDENTIAL**

Specifically, Edsal argued that PNS's financial statements are inferior to Sahamitr's because they are less detailed and comprehensive, thereby preventing a robust comparison of PNS's selling expenses with respondents' expenses.  See, e.g., Edsal Case Brief re: SMT at 14 (C.R. 311; P.R. 311).  The Department's failure to consider and account for this comparative deficiency of the PNS financial statements compared to Sahamitr's financial statements is contrary to its obligation as explained above to "compar{e} the options presented and their 'comparative deficiencies.'"  See PT Zinus, 628 F. Supp. 3d at 1271 (quoting Mid Continent III, 941 F.3d at 544).  Further, the Department previously considered a comparative lack of detail in a company's financial statements to be so significant as to contribute to it being less suitable than an alternative source for CV profit information.  For example, in Steel Nails from Oman, the Department found a company's financial statements to be inferior to another source of CV profit information, in part, because they did not provide a sufficient "level of detail to reasonably breakdown selling expenses between direct and indirect, i.e., to derive the ISEs which {the company} accrued during the fiscal period."  Certain Steel Nails From the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018–2019, 86 Fed. Reg. 14,309 (Dep't Commerce Mar. 15, 2021), and accompanying Issues and Decision Memorandum for the Final Results of the 2018-2019 Administrative Review of the Antidumping Duty Order on Certain Steel Nails from the Sultanate of Oman at cmt. 2 (Feb. 24, 2021).  Here, compared to PNS's financial statements, Sahamitr's financial statements are much more comprehensive and include clear expense reporting breakouts, permitting a more reliable calculation of CV profit and selling expenses.  See Edsal CV Profit Cmts at Attach. 1 (P.R. 132-34).  Because the Department "has an 'obligation' to address important factors raised" by interested parties, the agency's failure to consider the

NONCONFIDENTIAL

superiority of Sahamitr's financial statements in this regard renders the <u>Final Determination</u> unsupported by substantial evidence. <u>SKF USA</u>, 630 F.3d at 1374 ("Commerce has an 'obligation' to address important factors raised by comments from petitioners and respondents.").

<center>*    *    *</center>

Thus, the Department's cursory conclusion that Sahamitr is an unsuitable source for CV profit because it does not produce steel shelving and may be in receipt of subsidies, and the agency's failure to consider and address the record evidence and arguments demonstrating that PNS's financial statements are inferior to Sahamitr's financial statements, renders the <u>Final Determination</u> unlawful.

## II.    THE DEPARTMENT'S DEVIATION FROM ITS PRACTICE OF RELYING ON MULTIPLE FINANCIAL STATEMENTS IS UNLAWFUL

Pursuant to its preference and practice, the Department normally relies on multiple financial statements to calculate surrogate profit and selling expenses ratios. <u>See</u> <u>Carbon and Alloy Steel Threaded Rod From India: Final Affirmative Determination of Sales at Less Than Fair Value</u>, 85 Fed. Reg. 8,818 (Dep't Commerce Feb. 18, 2020), and accompanying <u>Decision Memorandum for the Final Determination in the Less-Than-Fair-Value Investigation of Carbon and Alloy Steel Threaded Rod from India</u> at cmt. 1 (Feb. 7, 2020) (hereinafter, "<u>Threaded Rod from India IDM</u>"); <u>Mattresses From Indonesia: Final Results of Antidumping duty Administrative Review; 2020–2021</u>, 88 Fed. Reg. 85,240 (Dep't Commerce Dec. 7, 2023), and accompanying <u>Issues and Decision Memorandum for the Final Results of the 2020-2022 Antidumping Duty Administrative Review: Mattresses from Indonesia</u> at cmt. 1 (Dec. 1, 2023). The purpose of this practice is that the Department "end{s} up with a more representative result," and thus, a more accurate CV profit and selling expenses calculation and antidumping

NONCONFIDENTIAL

margin. Threaded Rod from India IDM at cmt. 1; see NTSF Seafoods Jt. Stock Co. v. United States, 487 F. Supp. 3d 1310, 1318-19 (Ct. Int'l Trade 2020) ("Commerce explained that it prefers to use multiple financial statements in order to normalize any potential distortions that may arise from using the statements of a single producer.") (citation omitted); Steel Wire Garment Hangers From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 78 Fed. Reg. 28,803 (Dep't Commerce May 16, 2013), and accompanying Issues and Decision Memorandum for the Final Results of the Third Antidumping Duty Administrative Review at cmt. 1D (May 7, 2013) ("Using multiple financial statements in this review is consistent with the Department's preference of using multiple financial statements to determine surrogate financial ratios.") (citing Certain Oil Country Tubular Goods from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, Affirmative Final Determination of Critical Circumstances and Final Determination of Targeted Dumping, 75 Fed. Reg. 20,335 (Dep't Commerce Apr. 19, 2010), and accompanying Issues and Decision Memorandum at cmt. 13).

Here, the Department unjustifiably deviated from its practice by declining to average the profit data of PNS and Sahamitr. See IDM at 7 (P.R. 330). The Department claimed that doing so "would be equally inappropriate" to relying solely on Sahamitr's financial statements because "Sahamitr received countervailable subsidies from the Thai government." Id. (P.R. 330). As explained above in Section II.A.2, however, that conclusion is incorrect and unlawful. Using an average of sources of CV profit data would result in a fairer comparison between normal value and SMT's and BSM's prices. See Building Systems de Mexico I, 567 F. Supp. 3d at 1311-12 ("Commerce must consider whether the data it uses to calculate constructed value profit results in a fair comparison between normal value and export price."). In addition, the court has

NONCONFIDENTIAL

sustained the Department's use of multiple companies' financial statements to calculate financial ratios, including when those sources indicated receipt of countervailable subsidies. See Best Mattresses Int'l Co. v. United States, 703 F. Supp. 3d 1382, 1395-96 (Ct. Int'l Trade 2024) ("Commerce's decision to average the Emirates and GTI statements to account for flaws in both datasets is . . . supported by substantial evidence and otherwise in accordance with law.").

Further, the Department's long-standing preference supports using more than just one set of financial statements so that the CV profit calculation would reflect a broader market average and thus be more representative of the Thai economy as a whole. See Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; and Final Determination of No Shipments; 2021–2022, 88 Fed. Reg. 77,552 (Dep't Commerce Nov. 13, 2023), and accompanying Issues and Decision Memorandum for the Final Results of the 2021-2022 Administrative Review of the Antidumping Duty Order on Certain Activated Carbon from the People's Republic of China at cmt. 4 (Nov. 3, 2023) ("{I}t is Commerce's long-standing standing preference to use multiple companies' financial statements whenever practicable, because 'using the greatest number of financial statements possible will yield the most representative data from the relevant manufacturing sector to calculate accurate surrogate financial ratios.'") (quoting Amended Final Results of Antidumping Duty Administrative Review and New Shipper Reviews: Wooden Bedroom Furniture from the People's Republic of China, 72 Fed. Reg. 46,957 (Dep't Commerce Aug. 22, 2007), and accompanying Issues and Decision Memorandum for the 2004–2005 Administrative Review of Wooden Bedroom Furniture from the People's Republic of China at cmt. 17 (Aug. 8, 2007)).

The Department failed to address these arguments in its Final Determination. Thus, and because Sahamitr's financial data is not distorted by subsidies and because PNS's financial

NONCONFIDENTIAL

statements also present shortcomings – such as reflecting the business operations and profit data pertaining to noncomparable merchandise and lacking detail – the Department's refusal to use an average of the two company's profit data is not supported by substantial evidence and otherwise not in accordance with law.

## III.    THE DEPARTMENT USED THE INCORRECT DATE OF SALE FOR SMT'S U.S. SALES

The Department's decision to rely on the second commercial invoice date as SMT's date of sale for its U.S. sales is unlawful.  The date of sale is the date that best reflects when the material terms of sale are established.  The U.S. Court of International Trade has previously held that price, quantity, payment, and delivery terms are material terms of sale for the purpose of the Department's date of sale analysis.  See, e.g., Marmen Inc. v. United States, 545 F. Supp. 3d 1305, 1320 (Ct. Int'l Trade 2021).  Based on the record of this case, these material terms are established well before the second commercial invoice is issued.  However, Commerce departed from its practice and definition of "material terms" by finding that destination is also a material term and is not established until the second invoice date.  The Department's determination that destination is a material term is contrary to its longstanding practice and the agency provided no justification for its decision to depart from its established practice in this case.  Accordingly, the Department failed to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'" by failing to account for the fact that SMT's sales contracts first establish the final quantity and price of its U.S. sales.  Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, (1983) (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).

A.    **Legal Standard**

While the statute does not prescribe a particular methodology for determining the date of sale in antidumping proceedings, the Statement of Administrative Action accompanying the Uruguay Round Agreements Act defines "date of sale" as the "date when the material terms of sale are established."  SAA at 810; see also Eregli Demir ve Celik Fabrikalari T.A.S v. United States, 308 F. Supp. 3d 1297, 1306 (Ct. Int'l Trade 2018).  Pursuant to the Department's regulations, "{i}n identifying the date of sale of the subject merchandise or foreign like product, the Secretary normally will use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business."  19 C.F.R. § 351.401(i).  However, if record evidence establishes that an alternative date "better reflects the date on which the exporter or producer establishes the material terms of sale," the Department may use that alternative date. Id.; see also Yieh Phui Enter. Co. v. United States, 791 F. Supp. 2d 1319, 1323 (Ct. Int'l Trade 2011) (noting if the Department "is presented with satisfactory evidence that the material terms of sale are finally established on a date other than the date of invoice, the Department will use that alternative date as the date of sale"); Antidumping Duties; Countervailing Duties: Final Rule, 62 Fed. Reg. 27,296, 27,349 (Dep't Commerce May 19, 1997).

The "important factor to determine is when the parties have reached a 'meeting of the minds.'"  Marmen, 545 F. Supp. 3d at 1320 (quoting Nucor Corp. v. United States, 612 F. Supp. 2d 1264, 1307 (Ct. Int'l Trade 2009)).  As previously explained by the court:

> although Commerce "normally" presumes that invoice date is the date of sale, the **invoice date in fact is merely the starting point** of Commerce's analysis. It is by no means intended to "foreclose{} the possibility that another date could be chosen as the date of sale."
>
> Commerce itself has labeled as "**untenable**" the "blanket use {of invoice date} as the date of sale in an antidumping analysis" **where**

NONCONFIDENTIAL

> **"the invoice date does not reasonably approximate the date on which the material terms of the sale were {established}."** And Commerce itself has recognized that its regulations do not tie the agency's hands, but instead afford Commerce the "flexibility" needed to determine, and to use in its analysis as the date of sale, that date which best reflects the date on which the parties reached a meeting of the minds on the material terms of sale.

Nucor Corp. v. United States, 612 F. Supp. 2d 1264, 1307 (Ct. Int'l Trade 2009) (alterations in original) (emphases added) (citations omitted) (first quoting Allied Tube & Conduit Corp. v. United States, 127 F. Supp. 2d 207, 219 (Ct. Int'l Trade 2000); and then quoting Circular Welded Non-Alloy Steel Pipe from the Republic of Korea; Final Results of Antidumping Duty Administrative Review, 63 Fed. Reg. 32,833, 32,835-36 (Dep't Commerce June 16, 1998)) (citing Colakoglu Metalurji A.S. v. United States, 394 F. Supp. 2d 1379, 1380 (Ct. Int'l Trade 2005)); see also Notice of Final Determination of Sales at Less Than Fair Value: Certain Large Diameter Carbon and Alloy Seamless Standard, Line and Pressure Pipe From Mexico, 65 Fed. Reg. 39,358 (Dep't Commerce June 26, 2000), and accompanying Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Certain Large Diameter Carbon and Alloy Seamless Standard, Line and Pressure Pipe from Mexico – April 1, 1998, through March 31, 1999 at cmt. 2 (concluding the "sales acknowledgment date is the more appropriate date of sale, as opposed to the invoice, because the invoice is reflective of the material terms identified on the sales acknowledgment form that is generated before the invoice"). Further, a party "seeking to have the invoice date deemed the date of sale is entitled to this regulatory presumption only if that party records the invoice date as the date of sale in the company's 'records kept in the ordinary course of business.'" Allied Tube & Conduit Corp. v. United States, 132 F. Supp. 2d 1087, 1090 (Ct. Int'l Trade 2001) (emphasis added) (quoting 19 C.F.R. § 351.401(i)).

**NONCONFIDENTIAL**

The Department's longstanding practice is to treat quantity and price as the "material terms of sale." See Al Tech Specialty Steel Corp. v. United States, 22 CIT 941, 943 (Ct. Int'l Trade Sept. 24, 1998) ("{I}t has been Commerce's practice to determine that date of sale as the date on which the essential terms of sale, specifically price and quantity, are finalized."). The Department has also previously considered payment and delivery terms to be material terms. See Marmen, 545 F. Supp. 3d at 1320. The Department did not explain why in this investigation, destination of sale was a material term that required deviating from the contract date as the date of sale.

**B.    The Department's Use of the Second Commercial Invoice Date Reported (SALINDTU1) as SMT's Date of Sale Is Unlawful Because SMT's Material Terms of Sale Are Determined at an Earlier Date**

The material terms of sale (price and quantity) for all of SMT's subject U.S. sales were established in writing prior to the issuance of the second commercial invoice. Specifically, the sales contract issued by SMT's unaffiliated trading company to an affiliated trading company reflects the date on which the final material terms of sale are first recorded in SMT's records kept in the ordinary course of business. In addition, SMT acknowledged that the material terms (price and quantity) did not change to an extent that warrants rejecting the sales contract date as the date establishing the material terms of sale. As a result, "the invoice date does not reasonably approximate the date on which the material terms of the sale were {established}." Nucor Corp., 612 F. Supp. 2d at 1307 (alteration in original).

The Department's sole reason for declining to use the sales contract date is that the sales contract, according to the Department, "does not include the final destination of the order." See IDM at 11 (P.R. 330). However, the Department did not explain or cite any record evidence establishing that "final destination" of the order is a material term of sale. Thus, the

NONCONFIDENTIAL

Department's use of the second commercial invoice date as SMT's date of sale is not supported by substantial evidence and is not in accordance with law.

### 1. The Sales Contract Establishes the Price of SMT's U.S. Sales

The sales contract – not the commercial invoice issued by SMT nor the second commercial invoice issued by the affiliated trading company – is the first document reflecting the final price of SMT's U.S. sales of subject merchandise. SMT's subject U.S. sales arose from an "agreement" reached "for quantity, prices etc." between the unaffiliated trading company and the customer. SMT AQR at 12-13 (C.R. 21-22; P.R. 89). Thus, the agreement represents the "meeting of the minds on the material terms of sale," quantity and price, for the purpose of the Department's date of sale analysis. See Nucor Corp., 612 F. Supp. 2d at 1307. This agreement was reached "with the customer for the upcoming several months." SMT AQR at 12-13 (C.R. 21-22; P.R. 89). Indeed, SMT explained that "{a}t the time of the agreement covering multiple months, **the price was set** and the period covered by the price was set." Id. at 14 (emphasis added) (C.R. 21-22; P.R. 89). "The **final price** and period covered by the multi-month order is informed to SMT by the unaffiliated trading company." SMT 2nd Supp QR at 13 (emphasis added) (C.R. 103-10; P.R. 201). At verification, SMT "officials reiterated that the **price is confirmed** in a verbal agreement between the affiliated and unaffiliated trading companies" before the generation of additional documents during the sales process, such as the booking confirmation slip and the invoices. SMT Sales Verification Report at 6-7 (emphasis added) (C.R. 307; P.R. 305); see also id. (C.R. 307; P.R. 305) (further noting "{c}ompany officials reiterated that the price is discussed before{}" the booking confirmation slip is generated).

SMT also confirmed that "{t}here has **not been any changes** relating **to price**" after SMT received confirmation of the multi-month orders agreed to. SMT 2nd Supp QR at 21

**NONCONFIDENTIAL**

(emphases added) (C.R. 103-10; P.R. 201).  Indeed, as Edsal demonstrated – and the Department failed to acknowledge – **[**



**]**  Edsal Case Brief re: SMT at 27 (C.R. 311; P.R. 311); Verification from deKieffer & Horgan to Sec'y of Commerce Pertaining to SMT Sales Verification Exhibits at Ex. SVE-IX (pdf pp. 315, 446, 488, 547, 607, 674, 735, 772) (C.R. 238-83; P.R. 301) (hereinafter, "SMT Sales Verification Exhibits").  Thus, like the Department's reasoning in <u>Stainless Steel Bar from India</u>, the lack of any changes to price between the sales contract and the second commercial invoice further confirms that the sales contract date is the only suitable date of sale:

> Isibars says that price and quantity were set with the purchase order, the quantity ordered was delivered within the delivery allowance range and the customer paid for the order. Therefore, Isibars argues that the date of sale should be based on the purchase order date. . . . We agree with respondent. . . .

> We found no evidence in the course of this review suggesting that the essential terms of sale changed between the purchase order date and delivery. While the quantity specified in the purchase order differed from the quantity delivered to the customer, this variance was permitted in the terms of the purchase order.

<u>Stainless Steel Bar From India: Final Results of Antidumping Duty Administrative Review</u>, 62 Fed. Reg. 37,030, 37,031 (Depot Commerce July 10, 1997).  Thus, the sales contract is the first document reflecting the final price of SMT's U.S. sales of subject merchandise.

### 2.    <u>The Sales Contract Establishes the Quantity of SMT's U.S. Sales</u>

The sales contract – not the commercial invoice issued by SMT nor the second commercial invoice issued by the affiliated trading company – is the first document reflecting the final quantity of SMT's U.S. sales of subject merchandise.  Again, SMT's subject U.S. sales

NONCONFIDENTIAL

arose from an "agreement" reached "for quantity, prices etc." between the unaffiliated trading

company and the customer.  SMT AQR at 12-13 (C.R. 21-22; P.R. 89).  In addition, [



]

SMT Sales Verification Exhibits at Ex. SVE-IX (C.R. 238-83; P.R. 301).  While SMT claimed

that the "final quantity shipped at the agreed price would only be finalized by the actual

shipments during the period," nothing in the record demonstrates any changes in the agreed-to

quantity.  See SMT AQR at 14 (C.R. 21-22; P.R. 89).  In fact, the sales documents and

admissions by SMT officials during verification confirm that the quantity is fixed:

> Company officials also provided an example of a booking
> confirmation slip, the forwarder's cargo receipt, and the
> commercial invoice pertaining to one purchase order number from
> the unaffiliated trading company. They explained that **the
> quantity will remain the same across all these documents**, but the
> scheduled shipment date on the booking confirmation slip and the
> actual shipment date may differ. According to company officials,
> **the quantity listed in the booking confirmation will always be
> one shipping container or [      ] sets of boltless steel shelving
> units**. Even in cases where two shipping containers are ordered, for
> example, two booking confirmation slips will be generated to
> cover each shipping container. However, the company officials
> maintained that the date of sale should still be based on the
> commercial invoices, because this is the date when the
> merchandise leaves the factory.

SMT Sales Verification Report at 5-6 (emphases added) (C.R. 307; P.R. 305).  Consistent with

this explanation of a set quantity, SMT's sales database shows [

]  See Response from deKieffer & Horgan to Sec'y of Commerce

Pertaining to SMT Sec C Supp QR at Ex. SQ3-15 (pdf p. 178) (C.R. 157-69; P.R. 230).

As with the lack of any changes in price between the sales contracts and the invoices, the

lack of any changes in quantity underscores the fact that the sales contract is the first document

NONCONFIDENTIAL

in the sales process identifying the final material terms. Moreover, the finality of the material terms is even more evident here than in Stainless Steel Bar from India and numerous other cases where the Department used the contract date as the date of sale despite finding that "the quantity specified in the purchase order differed from the quantity delivered to the customer." Stainless Steel Bar From India: Final Results of Antidumping Duty Administrative Review, 62 Fed. Reg. 37,030, 37,031 (Dep't Commerce July 10, 1997); see Rebar Trade Action Coal. v. United States, Ct. No. 14-00268, Slip Op. 15-130 at 19-20 & n.5, 2015 WL 7573326 at *7-9 & n.5 (Ct. Int'l Trade Nov. 23, 2015) (collecting cases and remanding determination of invoice date as date of sale). Thus, the sales contracts – which reflect a fixed, unchanged quantity – are the first documents establishing the final quantity of SMT's U.S. sales of subject merchandise. Accordingly, the material terms of sale (price and quantity) are set and reflected by the sales contracts for SMT's subject U.S. sales, meaning the sales contract date is the proper date of sale.

### 3.  The Department's Claimed Justification For Relying On an Alternative Date of Sale Is Unlawful

The Department's reliance on the date of the second commercial invoice issued by SMT's affiliated trading company to an unaffiliated trading company as the date of sale is unlawful and contrary to the agency's practice. IDM at 11 (P.R. 330). Even SMT explained that "the dates of these invoices are not appropriate dates for the date of sale." SMT CQR at 17-18 (emphasis added) (C.R. 33-41; P.R. 106) (noting these second invoices are not issued until "close to the time for the collection of payments from unrelated third country trading companies"). According to the Department, the sales contract – dated before the invoices – cannot serve as the date of sale because the "document does not include the final destination of the order." See IDM at 11 (P.R. 330). Therefore, and because the first commercial invoice merely reflects a transfer price between SMT and an affiliated trading company, the Department reasoned that "*all*

NONCONFIDENTIAL

material terms of sale are finalized within the second commercial invoice (*i.e.*, price, quantity, and destination)." Id. (P.R. 330). The Department's analysis is contrary to precedent and unsupported by the record.

In the less-than-fair-value investigation of frozen and canned warmwater shrimp from Thailand, the Department explicitly rejected the notion that destination is a material term of sale affecting the Department's date of sale analysis. See Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Frozen and Canned Warmwater Shrimp From Thailand, 69 Fed. Reg. 76,918 (Dep't Commerce Dec. 23, 2004), and accompanying Issues and Decision Memorandum for the Antidumping Duty Investigation of Certain Frozen and Canned Warmwater Shrimp From Thailand at 36. Specifically, the Department stated that "regarding Thai I-Mei's claim that changes to delivery location constitute changes to the terms of sale, we disagree." Id. (emphasis added). Accordingly, the Department's analysis here is unsupported by substantial evidence and contrary to precedent. The Department did not provide any explanation for departing from its established practice of treating price and quantity as the material terms of sale and thus, its reliance on destination as a material term in this investigation is contrary to law.

## IV. THE DEPARTMENT UNLAWFULLY DEFERRED TO SMT'S AND BSM'S TOTAL COST OF MANUFACTURING ("TOTCOM") AS STATED IN THEIR COST DATABASES

The Department's failure to follow its well-established, consistent practice in accounting for unreconciled differences between a respondent's reported costs and the costs reflected in its normal books and records is unlawful. While the Department attempted to invoke "some measure of deference" for its analysis, deference is unwarranted under these circumstances. See IDM at 16 (P.R. 330). In fact, the Department appeared to reveal some level of awareness of its

misunderstanding and flawed analysis of SMT's and BSM's reporting, stating "Commerce is not required by the statute to collect detailed documentation supporting every statement made regarding its verification findings and methods," and stating that the verification report reflects the agency's observations at that moment in time.  Id. (P.R. 330).  As explained further below, the Department failed to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, (1983) (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).   In addition, the Department's deferral to SMT's and BSM's reported costs that conflict with the companies' normal books and records is both contrary to law and unsupported by record evidence.   The agency failed to contend with conflicting TOTCOM amounts and relied on an unsubstantiated and inexplicable assertion that the TOTCOM discrepancies should be dismissed because the "movement schedule relies on the purchase prices."  See IDM at 16 (P.R. 330).  In short, the Department's refusal to account for respondents' unreconciled TOTCOM differences is not supported by "such relevant evidence as a reasonable mind might accept as adequate" to support the agency's conclusion.  Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938).

A.    **Legal Standard**

Pursuant to the statute, a respondent's "costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the GAAP of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise."  19 U.S.C. § 1677b(f)(1)(A).  The Department's well-established, consistent practice is to account for discrepancies between a respondent's reported costs and the costs recorded in the

respondent's records by "increas{ing} costs by the amount of unreconciled differences that indicate understatement of reported costs unless the respondent identifies and documents why the amount does not relate to the {merchandise under consideration}." Light-Walled Rectangular Pipe and Tube From Mexico: Final Results of Antidumping Duty Administrative Review; 2019–2020, 87 Fed. Reg. 13,973 (Dep't Commerce Mar. 11, 2022), and accompanying Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative Review; 2019-2020 at cmt. 6 (Mar. 4, 2022); see also Light-Walled Rectangular Pipe and Tube From Mexico: Final Results of Antidumping Duty Administrative Review; 2021–2022, 89 Fed. Reg. 17,815 (Dep't Commerce Mar. 12, 2024), and accompanying Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative Review; 2021-2022 at cmt. 10 (Mar. 6, 2024) (agreeing that the Department "should use the amount of direct material costs that is consistent within Regiopytsa's inventory movement schedule and financial statements" pursuant to 19 U.S.C. § 1677b(f)(1)(A)); Stainless Steel Bar from India: Final Results of the Antidumping Duty Administrative Review, and Revocation of the Order, in Part, 76 Fed. Reg. 56,401 (Dep't Commerce Sept. 13, 2011), and accompanying Issues and Decision Memorandum for the 2009-2010 Administrative Review of Stainless Steel Bar from India at 2 (Aug. 31, 2011) ("{W}e increased Hindustan's reported cost of manufacture ('COM') to include the unreconciled difference between the COM from its normal books and records and the reported COM."); Certain Lemon Juice From the Republic of South Africa: Preliminary Affirmative Determination of Sales at Less Than Fair Value, 87 Fed. Reg. 47,707 (Dep't Commerce Aug. 4, 2022), and accompanying Decision Memorandum for the Preliminary Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Lemon Juice from the Republic of South Africa at 19 (July 28, 2022) ("We increased Cape Fruit's and Citrus Juice's TOTCOM for the

NONCONFIDENTIAL

unreconciled differences between the companies' TOTCOM reflected in their normal books and records and the summation of the companies' extended reported per-unit costs."), unchanged in Certain Lemon Juice From the Republic of South Africa: Final Affirmative Determination of Sales at Less Than Fair Value, 87 Fed. Reg. 78,928 (Dep't Commerce Dec. 23, 2022); Certain Pasta From Turkey; 2010–2011; Final Results of Antidumping Duty Administrative Review, 78 Fed Reg. 9,672 (Dep't Commerce Feb. 11, 2013), and accompanying Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review: Certain Pasta from Turkey; 2010 - 2011 at cmt. 5 (Feb. 4, 2013) ("We have continued to make an upward adjustment to Bellini's reported costs to account for the unreconciled difference between the extended total cost of manufacturing and the total cost of goods sold in Bellini's financial statements for these final results.").

> **B.** **The Department Failed to Account for the Fact that SMT's TOTCOM Reported in its Cost File Does Not Reconcile to the Actual TOTCOM as Recorded in SMT's Normal Books and Records and Audited Financial Statements**

The Department unjustifiably deviated from its practice by deferring to SMT's TOTCOM reported in its cost file rather than adjusting the figure to align with actual costs recorded in SMT's normal books and records and audited financial statements.

First, the Department failed to address Edsal's argument that "nothing on the record supports the conclusion that the finished goods inventory values were recorded at purchase price." See IDM at 16 (P.R. 330); Edsal Case Brief re: SMT at 34 (C.R. 311; P.R. 311). Without citing any record evidence, the Department provided a conclusory, circular assertion that SMT "demonstrated that the unit values . . . reflect the purchase price rather than the company's actual costs," and that, "as {SMT} explained," the inventory movement values differ from SMT's derived TOTCOM because "the movement schedule relies on the purchase prices."

NONCONFIDENTIAL

IDM at 16 (P.R. 330). This explanation and the Department's observation that the "stock card report for the POI" shows the same, falls short of the substantial evidence needed to support the Department's Final Determination. See Cost Verification Report re: SMT at 11 (C.R. 305; P.R. 303).[2] As Edsal explained, and the Department failed to address, the fact that "SMT records the production cost of raw materials based on the purchase price" is immaterial because the TOTCOM calculation pertains "to the production cost of finished goods, not the production cost of raw materials." Edsal Case Brief re: SMT at 34 (C.R. 311; P.R. 311).

Second, the Department improperly relied on SMT's classifications and cost reporting used to "trace{} the consumption values" of direct materials assigned by SMT to "reporting categories." See Cost Verification Report re: SMT at 7-12 (C.R. 305; P.R. 303); IDM at 17 (P.R. 330) (citing id. at 11-12 (C.R. 305; P.R. 303)); Verification from deKieffer & Horgan to Sec'y of Commerce Pertaining to SMT Cost Verification Exhibits at Ex. CVE-7 (C.R. 197-218; P.R. 289). Nothing in the record, nor the observation that SMT officials "were able to identify the type of direct materials" used in the production of nonsubject merchandise, justified the Department's acceptance of SMT's unreconciled and unexplained cost reporting. See Cost Verification Report re: SMT at 7 (C.R. 305; P.R. 303). Thus, the Department failed to adequately explain how disregarding the TOTCOM amount based on SMT's finished goods inventory movement schedule is consistent with the Department's requirement to rely on the costs "based on the records of the exporter or producer" that "reasonably reflect the costs associated with the production and sale of the merchandise." See 19 U.S.C. § 1677b(f)(1)(A).

---

[2]    In addition, the Department was not bound to accept as true representations or explanations made by SMT officials during verification. See, e.g., Cost Verification Report re: SMT at 1 (C.R. 305; P.R. 303) ("This report does not draw conclusions as to whether the reported information was successfully verified and does not make findings or conclusions regarding how the facts obtained at verification will ultimately be treated in the Commerce's determinations.").

NONCONFIDENTIAL

Ultimately, neither SMT nor the Department properly explained or accounted for the [                    ] discrepancy between (1) SMT's production cost of [          ] reported in its finished goods inventory movement schedule and the basis for its audited, GAAP-compliant financial statements based on actual costs, and (2) the alternative production cost of [                    ] that SMT reported in its cost database.  See SMT Second Sec D Supp QR at Exs. SQ5-11, SQ5-20 (C.R. 138-56; P.R. 228); SMT DQR at 8, 10 (C.R. 53-67; P.R. 109).  Thus, pursuant to the statute and the Department's well-established, consistent practice, the Department should have used SMT's actual production cost of [                    ] for the TOTCOM calculation for SMT.  See Edsal Case Brief re: SMT at 35 & n.92 (C.R. 311; P.R. 311) (citing SMT Second Sec D Supp QR at Exs. SQ5-11, SQ5-20, SQ5-21 (C.R. 138-56; P.R. 228)).

C. **The Department Failed to Account for the Fact that BSM's TOTCOM Reported in its Cost File Does Not Reconcile to the Actual TOTCOM as Recorded in BSM's Normal Books and Records and Audited Financial Statements**

The Department also unjustifiably deviated from its well-established, consistent practice by deferring to BSM's TOTCOM reported in its cost file rather than adjusting the figure to align with actual costs recorded in BSM's normal books and records and audited financial statements.

First, similar to its flawed analysis of this issue pertaining to SMT's reported TOTCOM, the Department failed to adequately address Edsal's extensive explanation of why using BSM's understated reported TOTCOM in its cost database is unjustifiable.  See Edsal Case Brief re: BSM at 18-32 (C.R. 310; P.R. 310).  In a supplemental questionnaire, the Department instructed BSM to "{e}xplain why {its} reported cost is significantly less that the cost shown in the inventory movement schedule."  Response from deKieffer & Horgan to Sec'y of Commerce Pertaining to BSM Sec D Supp QR at 1 (C.R. 115-21; P.R. 218) (hereinafter, "BSM Supp

NONCONFIDENTIAL

DQR"). The Department also directed BSM to explain, demonstrate, and document how its actual costs reflected in its finished goods inventory movement schedule could differ so significantly from the TOTCOM stated in BSM's cost database. <u>See id.</u> at 1-3 (C.R. 115-21; P.R. 218). BSM failed to do so. <u>Id.</u> (C.R. 115-21; P.R. 218). Accordingly, and because BSM (1) provided the costs in its finished goods inventory movement schedule based on its normal books and records, (2) reconciled those values to its audited financial statements, and (3) confirmed that its Thai GAAP-compliant "financial statements are prepared in Thai baht at the actual cost incurred," the Department should have used the correct TOTCOM for BSM of [

] rather than the understated TOTCOM figure in its cost file of [

] <u>See</u> Edsal Case Brief re: BSM at 20-24 (C.R. 310; P.R. 310); BSM DQR at 6, 23, Ex. D-15 (C.R. 50-52; P.R. 108); BSM Supp DQR at File BMCP03 (field TOTCOM) (C.R. 115-21; P.R. 218).

Second, as with the Department's insufficient analysis of this issue pertaining to SMT's TOTCOM, the Department failed to adequately explain how disregarding the TOTCOM amount based on BSM's finished goods inventory movement schedule is consistent with the Department's requirement to rely on the costs "based on the records of the exporter or producer" that "reasonably reflect the costs associated with the production and sale of the merchandise." <u>See</u> 19 U.S.C. § 1677b(f)(1)(A). As with its flawed reasoning for this issue pertaining to SMT's TOTCOM, the Department unreasonably deferred to explanations by BSM officials during verification to dismiss the significant discrepancy between the TOTCOM as reflected by BSM's normal books and records and its TOTCOM stated in the cost file. <u>See IDM</u> at 14-15 (P.R. 330). For example, the Department appears to reason that because BSM's finished goods inventory movement data "do not appropriately reflect" certain costs – although BSM's finished goods

inventory movement schedule is still otherwise relied upon by the Department for the purposes of this investigation – the TOTCOM in BSM's cost file understandably conflicts with that data. See id. at 15 (P.R. 330); see also Cost Verification Report re: BSM at 3 (C.R. 308; P.R. 307) ("The finished goods inventory in the financial statements is an estimate of the value of inventory at year end. It is not an actual calculated amount.").[3] The Department inexplicably deferred to BSM's explanation that its actual cost data reconciled with its normal books and records should be disregarded for the TOTCOM calculation in favor of a lower TOTCOM derived by BSM officials and provided in its cost database. The Department's dismissal of Edsal's argument that BSM failed to explain how the finished goods inventory data are mere "estimates" similarly fails to acknowledge that BSM otherwise defended, reconciled, and tied its finished goods inventory data to its normal books and records and audited financial statements. See IDM at 15 (P.R. 330); Edsal Case Brief re: BSM at 24-28 (C.R. 310; P.R. 310). In sum, the Department failed to articulate a sufficient explanation for using the understated TOTCOM figure, and failed to adequately address Edsal's arguments that doing so is contrary to the statute and the agency's precedent.

Therefore, and pursuant to the statute and the Department's well-established, consistent practice, the Department should have used BSM's actual production cost of **[**

**]** for the TOTCOM calculation for BSM. See Edsal Case Brief re: BSM at 24 (C.R. 310; P.R. 310).

---

[3] Again, the Department was not bound to accept as true representations or explanations made by BSM officials during verification. See, e.g., Cost Verification Report re: BSM at 1 (C.R. 308; P.R. 307) ("The report does not draw conclusions as to whether the reported information was successfully verified, and does not make findings or conclusions regarding how the facts obtained at verification will ultimately be treated in Commerce's determinations.").

NONCONFIDENTIAL

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully urges this Court to determine that the Department's <u>Final Determination</u> is not supported by substantial evidence and is otherwise not in accordance with law and remand the <u>Final Determination</u> to the Department with instructions to correct the errors set forth above.

Respectfully submitted,

<u>/s/ Joshua R. Morey</u>

KATHLEEN W. CANNON
JOSHUA R. MOREY
GRACE W. KIM
MATTHEW T. MARTIN
KELLEY DRYE & WARREN LLP
3050 K Street NW, Suite 400
Washington, DC 20007
(202) 342-8867
kcannon@kelleydrye.com
jmorey@kelleydrye.com
gkim@kelleydrye.com
mmartin@kelleydrye.com

Counsel to Plaintiff Edsal Manufacturing Co., Ltd.

Dated: December 2, 2024

## <u>CERTIFICATE OF COMPLIANCE WITH CHAMBERS PROCEDURES</u>

Pursuant to Court of International Trade Standard Chambers Procedures and this Court's September 18, 2024 Order (ECF No. 21) setting the word limitation of Plaintiff's Rule 56.2 Brief to 14,000 words, counsel for Plaintiff, Edsal Manufacturing, Co., Ltd., certifies that the attached Rule 56.2 Brief contains 13,823 words, including footnotes.  This word count certification is made in reliance on the word-count feature contained in Microsoft 365 - Enterprise.


Respectfully submitted,

/s/ Joshua R. Morey
JOSHUA R. MOREY


December 2, 2024