## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE
_____

|  |  |  |
|---|---|---|
| EDSAL MANUFACTURING CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 24-00108 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BANGKOK SHEET METAL PUBLIC CO., LTD. | ) | |
| and SIAM METAL TECH CO., LTD., | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

_____ )

## DEFENDANT'S RESPONSE TO PLAINTIFF'S
## MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Of Counsel:

JESUS N. SAENZ
Senior Attorney
U.S. Department of Commerce
Office of the Chief Counsel for Trade
   Enforcement and Compliance
1401 Constitution Avenue, NW
Washington, DC 20005

YAAKOV M. ROTH
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

AN HOANG
Trial Attorney
Commercial Litigation Branch
United States Department of Justice
P.O. Box 480 | Ben Franklin Station
Washington, DC 20044
(202) 616-3226 | An.Hoang@usdoj.gov

February 28, 2025

*Attorneys for the Defendant*

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... iii

DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE
AGENCY RECORD ............................................................................................................ 1

STATEMENT PURSUANT TO RULE 56.2 ....................................................................... 2

     I.    Administrative Determination Under Review ........................................................ 2

     II.   Issues Presented For Review .................................................................................. 2

STATEMENT OF FACTS ................................................................................................... 2

     I.    Questionnaire Responses ........................................................................................ 3

     II.   Preliminary Determination ...................................................................................... 5

     III.  Final Determination ................................................................................................ 7

SUMMARY OF ARGUMENT .......................................................................................... 10

ARGUMENT ..................................................................................................................... 10

     I.    Standard of Review .............................................................................................. 10

     II.   Commerce's Calculation of Constructed Value Profit Is Supported By Substantial
          Evidence And In Accordance With Law ............................................................... 11

          A.  Legal Standard ........................................................................................ 11

          B.  Substantial Evidence Supports Commerce's Determination That PNS's
              Financial Statements Is The Best Source Available For Calculating CV Profit
              ........................................................................................................... 13

          C.  Edsal Fails To Demonstrate That Commerce Unlawfully Relied On PNS's
              Financial Statement ................................................................................ 15

     III.  Commerce's Determination To Rely On The Commercial Invoice Date As The
          Date Of Sale Is Supported By Substantial Evidence And Otherwise Lawful ...... 21

          A.  Legal Standard ........................................................................................ 21

      B.    Edsal Fails To Demonstrate Error In Commerce's Determination To Rely On The Commercial Invoice Date ................................................................... 23

IV.    Commerce's Determination to Rely on Their Cost of Manufacturing is Supported by Substantial Evidence and in Accordance with Law ......................................... 25

CONCLUSION ................................................................................................................. 29

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Allied Tube*,
   127 F. Supp. 2d .................................................................................................. 22, 23, 25

*Atl. Sugar, Ltd. v. United States*,
   744 F.2d 1556 (Fed. Cir. 1984) ............................................................................. 11

*Consol. Edison Co. v. NLRB*,
   305 U.S. 197 (1938) ............................................................................................... 11

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966) .......................................................................................... 11, 16

*Dillinger France S.A. v. United States*,
   981 F.3d 1318 (Fed. Cir. 2020) .......................................................................... 25, 26

*Ellwood City Forge Co. v. United States*,
   600 F. Supp. 3d 1281 (Ct. Int'l Trade 2022) ........................................................ 28

*Eregli Demir v. Celik Fabrikalari T.A.S*,
   308 F. Supp. 3d 1297 (Ct. Int'l Trade 2018) ........................................................ 24

*Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States*,
   28 F. Supp. 3d 1317 (Ct. Int'l Trade 2014) .......................................................... 19

*Micron Technology, Inc. v. United States*,
   117 F.3d 1386 (Fed. Cir. 1997) ............................................................................. 27

*Mid Continent Steel & Wire, Inc. v. United States*,
   586 F. Supp. 3d 1349 (Ct. Int'l Trade 2022) ........................................................ 20

*Mid Continent Steel & Wire, Inc. v. United States*,
   941 F.3d 530 (Fed. Cir. 2019) ............................................................................... 20

*Mittal Steel Point Lisas Ltd. v. United States*,
   548 F.3d 1375  (Fed. Cir. 2008) ............................................................................ 22

*Nakornthai Strip Mill Pub. Co. Ltd. v. United States*,
   614 F. Supp. 2d 1323 (Ct. Int'l Trade 2009) ........................................................ 22

*Nippon Steel Corp. v. United States,*
    458 F.3d 1345 (Fed. Cir. 2006) ............................................... 11

*PSC VSMPO-Avisma Corp.,*
    688 F.3d ................................................................................ 18

*Sahaviriya Steel Indus. Public Co. v. United States,*
    714 F. Supp. 2d 1263 (Ct. Int'l Trade 2010) ................. 21, 22, 23, 24

*United States v. Eurodif S.A.,*
    555 U.S. 305 (2009) ............................................................... 10

*Viraj Group, Ltd. v. United States,*
    343 F.3d 1371 (Fed. Cir. 2003) ......................................... 22, 25

Statutes

19 U.S.C. § 1677b(a)(4) ............................................................. 11, 12

19 U.S.C. § 1677b(c)(4) ................................................................. 17

19 U.S.C. § 1677b(e)(2)(B) ............................................................ 13

19 U.S.C. § 1677b(f)(1)(A) ................................................. 25, 26, 28

19 U.S.C. § 3512(d) ....................................................................... 13

19 U.S.C. §§ 1677(35) .................................................................... 11

Rules

United States Court of International Trade Rule 56.2 .......................... 1

Regulations

19 C.F.R. § 351.401(i) ............................................................. passim

19 C.F.R. § 351.408 ....................................................................... 17

Federal Register Notices

*Pure Magnesium from Israel,* 66 Fed. Reg. 49349 (Dep't of Commerce Sept. 21, 2001) ........... 14

*Certain Frozen and Canned Warmwater Shrimp From Thailand,* 69 Fed. Reg. 76918 (Dep't
    Commerce Dec. 23, 2004) ....................................................... 24

*Boltless Steel Shelving Units Prepackaged for Sale From the People's Republic of China,* 80
    Fed. Reg. 51779 (Dep't of Commerce Aug. 26, 2015) ................ 16

*Boltless Steel Shelving Units Prepackaged for Sale From India, Malaysia, Taiwan, Thailand and the Socialist Republic of Vietnam,* 88 Fed. Reg. 32188 (Dep't of Commerce May 19, 2023) ... 3

*Boltless Steel Shelving Units Prepackaged for Sale From Thailand,* 88 Fed. Reg. 83389 (Dep't of Commerce Nov. 29, 2023) .................................................................................... 5

*Utility Scale Wind Towers From Malaysia,* 89 Fed. Reg. 461 (Dep't Commerce Jan. 4, 2024).. 16

*Boltless Steel Shelving Units Prepackaged for Sale From Thailand,* 89 Fed. Reg. 28738 (Dep't of Commerce Apr. 19, 2024)....................................................................................... 2

*Boltless Steel Shelving Units Prepackaged for Sale From Malaysia, Taiwan, Thailand, and the Socialist Republic of Vietnam,* 89 Fed. Reg. 48555 (Dep't of Commerce Jun. 7, 2024) ........ 2, 9

<u>Other Authorities</u>

1994 U.S.C.C.A.N. 4040 ........................................................................................................... 13

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

_____

|  |  |  |
|---|---|---|
| EDSAL MANUFACTURING CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 24-00108 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BANGKOK SHEET METAL PUBLIC CO., LTD. | ) | |
| and SIAM METAL TECH CO., LTD., | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

_____)

## DEFENDANT'S RESPONSE TO PLAINTIFF'S
## MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to United States Court of International Trade Rule 56.2, defendant, the United States, respectfully submits this response to the motion for judgment on the agency record filed by plaintiff Edsal Manufacturing Co. (Edsal), ECF No. 24 (Edsal Br.).  Edsal challenges the Department of Commerce's  final affirmative determination issued in the less-than-fair value duty investigation on boltless steel shelving units prepackaged for sale from Thailand.  As explained below, Edsal's motion should be denied because the final determination is supported by substantial evidence and is otherwise in accordance with law.

## STATEMENT PURSUANT TO RULE 56.2

### I.      Administrative Determination Under Review

The administrative determination under review is *Boltless Steel Shelving Units Prepackaged for Sale From Thailand*, 89 Fed. Reg. 28738 (Dep't of Commerce Apr. 19, 2024) (Final Determination) (P.R. 332), as amended by *Boltless Steel Shelving Units Prepackaged for Sale From Malaysia, Taiwan, Thailand, and the Socialist Republic of Vietnam: Amended Final Affirmative Antidumping Duty Determination for Taiwan and Antidumping Duty Orders*, 89 Fed. Reg. 48555 (Dep't of Commerce Jun. 7, 2024) (amended final determination) (P.R. 338), and accompanying Issues and Decision Memorandum (IDM) (P.R. 330).  The period of investigation is April 1, 2022, through March 31, 2023.

### II.      Issues Presented For Review

1.      Whether Commerce's determination to select PNS's financial statements over Sahamitr's financial statements for the purposes of calculating constructed value (CV) profit is supported by substantial evidence and in accordance with law.

2.      Whether Commerce's determination to use the commercial invoice date as the date of sale for Siam Metal's U.S. sales is supported by substantial evidence and in accordance with law.

3.      Whether Commerce's determination to rely on the cost of manufacturing data reported by Siam Metal and Bangkok Sheet is supported by substantial evidence and in accordance with law.

### STATEMENT OF FACTS

In May 2023, Commerce initiated a less-than-fair value investigation on boltless steel shelving from Thailand.  *Boltless Steel Shelving Units Prepackaged for Sale From India, Malaysia, Taiwan, Thailand and the Socialist Republic of Vietnam:  Initiation of Less-Than-*

2

*Fair-Value Investigations*, 88 Fed. Reg. 32188 (Dep't of Commerce May 19, 2023) (P.R. 33).  In

June 2023, Commerce selected Bangkok Sheet Metal Public Co., Ltd (Bangkok Sheet) and Siam

Metal Tech Co., Ltd. (Siam Metal) as mandatory respondents to this investigation.  *See*

Respondent Selection Memorandum (June 7, 2023) (C.R. 18, P.R. 42).  Bangkok Sheet and Siam

Metal were selected as mandatory respondents because they were the largest exporters or

producers of boltless steel shelving from Thailand during the period of investigation.  *Id.*

## I.     <u>Questionnaire Responses</u>

In response to a questionnaire issued by Commerce, Siam Metal stated that it relied on

the dates of its commercial invoices as the date of sale relevant for U.S. sales reporting.  *See*

Siam Metal Section A Questionnaire Response (Jul. 10, 2023) (C.R. 21-22, P.R. 89) at 12.  Siam

Metal also explained its process for U.S. sales, which began with a negotiation with its U.S.

customers through unaffiliated third-country trading companies.  *Id.* at 12-13.  Each unaffiliated

trading company would negotiate a price and quantity with the U.S. customer before notifying

Siam Metal of those terms.  *Id.*  Then, for each shipment, Siam Metal would issue invoices to

affiliated third-country trading companies at internal transfer prices.  *Id.*  In turn, each affiliated

third-country trading company would issue its own invoices to the unaffiliated third-country

trading companies at the negotiated price at the time of collection of payment, which Siam Metal

reported as the date of sale.  *Id.*  The unaffiliated third-country trading companies would collect

payment from the U.S. customer, and provide payment back to Siam Metal through its affiliated

third-country trading companies.  *Id.*

Additionally, Bangkok Sheet and Siam Metal both reported information related to the

cost of manufacture for the subject merchandise.  *See* Bangkok Sheet Section D Questionnaire

Response (Aug. 7, 2023) (C.R. 50-52, P.R. 108); Siam Metal Section D Questionnaire Response

(Aug. 7, 2023) (C.R. 53-67, P.R. 109).  Both producers explained that they did not have cost

accounting systems, but were able to report manufacturing costs derived from "actual costs as recorded in the{ir} financial accounting system." P.R. 108 at 9; P.R. 109 at 10-11. Both producers also confirmed that their financial accounting systems provide the necessary amount of detail to determine the cost of manufacturing of the merchandise under consideration. P.R. 108 at 9; P.R. 109 at 10-11. Specifically, Bangkok Sheet explained that its sales of boltless steel shelving represented a significant portion of its sales revenue. P.R. 108 at 9. Moreover, the raw material inputs, powder coating, and packing material for producing boltless steel shelving were all exclusive to the merchandise under consideration, which allowed Bangkok Sheet to report "actual, unallocated raw material and packing costs." *Id.* Similarly, Siam Metal reported that sales of boltless steel shelving accounted for "the vast majority of {its} total sales and costs." P.R. 109 at 11. Siam Metal was able to identify "the main materials, auxiliary materials, and packing materials used in the production of {boltless steel shelving}" without having to allocate the costs of those materials across different products. *Id.* Certain components are sold both as part of boltless steel shelving and as a separate finished product—for these components, Siam Metal allocated proportional amounts of material inputs and labor costs to sales of boltless steel shelving. P.R. 109 at 11-12. For energy and certain categories of variable and fixed overhead, Siam Metal assigned all costs to production of boltless steel shelving. *Id.*

　　　Siam Metal and Bangkok Sheet both also reported inventory movement schedules. Bangkok Sheet reported an inventory movement schedule which contained estimated production costs based on finished goods value. Bangkok Sheet Section D Questionnaire Response at 23, Exhibit D-15 (C.R. 50, P.R. 108). In a follow-up questionnaire response, Bangkok Sheet explained that its reported cost was less than shown in its finished goods inventory movement schedule because the inventory movement schedule was based on estimates. Bangkok Sheet

Section D Supplemental Questionnaire Response (Oct. 31, 2023) at 1-2 (C.R. 115, P.R. 218).

Siam Metal also reported a finished goods inventory movement schedule.  Siam Metal Section D

Questionnaire Response at 5, Exhibit D-3 (C.R. 53, P.R. 109).

## II.    Preliminary Determination

In November 2023, Commerce published its preliminary determination.  *Boltless Steel*

*Shelving Units Prepackaged for Sale From Thailand: Preliminary Affirmative Determination of*

*Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of*

*Provisional Measures*, 88 Fed. Reg. 83389 (Dep't of Commerce Nov. 29, 2023) (Preliminary

Determination) (P.R. 249) and accompanying Issues and Decision Memorandum (PDM) (P.R.

237).  Commerce preliminarily determined that boltless steel shelving from Thailand is being, or

likely to be sold in the United States at less-than-fair value.  Preliminary Determination at

83,389.  Accordingly, it calculated weighted average dumping margins of 2.54 percent for

Bangkok Sheet, 7.58 percent for Siam Metal, and 5.55 percent for all other companies not

individually examined.  *Id.* at 83,390.

In making its preliminary determination, Commerce found that neither Bangkok Sheet

and Siam Metal had a viable home or third country market during the period of investigation.

PDM at 10.  As a result, Commerce could not determine CV profit and selling expenses using

the "preferred method" based on the respondent's own home-market or third-country sales made

in the ordinary course of trade.  *Id*.  Commerce therefore relied on "any other reasonable

method" under 19 U.S.C. § 1677b(e)(2)(B)(iii) to determine Bangkok Sheet's and Siam Metal's

CV selling expenses and profit.  *Id*. at 11.  Commerce examined seven different fiscal year 2022

financial statements, contemporaneous with the period of investigation, placed on the record by

the parties, to use as potential surrogate values to calculate financial ratios.

Edsal submitted the financial statements of:  Sahamitr Pressure Container PLC

5

(Sahamitr), Eonmetall Group Berhad (Eonmetall Group), and PNS Manufacturing Co., Ltd. (PNS). Edsal's CV Profit Comments (Aug. 25, 2023) (P.R. 132-134) at Attachments 1 (Sahamitr Financial Statements, P.R. 132), 2 (Eonmetall Group Financial Statements, P.R. 132-133), and 3 (PNS Financial Statements, P.R. 133-134).

Respondents submitted the financial statements of: Bangsaphan Barmill Public Company Limited (BSBM), Millcon Steel Public Company Limited, (Millcon), Tata Steel (Thailand) Public Company Limited (Tata Steel), and Eonmetall Systems Sdn Bhd (Eonmetall Systems). Respondents' CV Profit Comments (Aug. 25, 2023) (P.R. 126-130) at Exhibits 1 (BSBM Financial Statements, P.R. 126), 2 (Millcon Financial Statements, P.R. 126), 3 (Tata Steel Financial Statements, P.R. 126-127), and 4 (Eonmetall Systems Financial Statements, P.R. 127).

Ultimately, Commerce determined that the financial statement of PNS was the most appropriate surrogate financial statement for calculating CV profit and selling expenses. PDM at 11-12. Commerce reasoned that the PNS financial statement was the only submitted financial statement of a Thai company that produced identical or comparable merchandise. *Id.* Commerce concluded that the other financial statements on the record were not appropriate sources for CV profit data because those companies were "largely engaged in the production and sales of non-comparable merchandise." *Id.* Specifically, Commerce found that Sahamitr produced liquefied petroleum gas and other pressure cylinders; BSBM produced steel bars floor concrete building structures; Millcon produced steel bars, pipes, rebar; and Tata Steel produced long steel products such as rebar, wire rod, small sections, and bright bar. *Id.* And, while Eonmetall Systems did produce identical merchandise, it was not a Thai producer. *Id.* Thus, Commerce relied on the financial statement of PNS because it was the only financial data on the record from a Thai producer of identical or comparable merchandise (*i.e.*, shelving products). *Id.*

Additionally, in accordance with 19 C.F.R. § 351.401(i), Commerce preliminarily accepted Bangkok Sheet's and Siam Metal's reported commercial invoice date as the date of sale in U.S. and home markets. *Id.* at 7-8. Commerce noted in its preliminary determination memorandum that it would "examine Siam Metal's purchase orders" to verify the invoice date as the date of sale and make any necessary adjustments for the final determination. *Id.* at 8.

Following the preliminary determination, Commerce verified Siam Metal's sales reporting and specifically verified the date of sale information reported by Siam Metal. Siam Metal Sales Verification Report (Mar. 13, 2024) (C.R. 307, P.R. 305). Commerce also verified Bangkok Sheet's and Siam Metal's cost reporting. Siam Metal Cost Verification Report (Mar. 12, 2024) (C.R. 305, P.R. 303); Bangkok Sheet Cost Verification Report (March 13, 2024) (C.R. 308, P.R. 307). At verification, Commerce found that raw materials reported in Siam Metal's finished goods inventory movement schedule were reported at purchase price. P.R. 303 at 4.

## III.    <u>Final Determination</u>

In April 2024, Commerce published its final affirmative determination wherein it continued to find that boltless steel shelving from Thailand was sold at less-than-fair value in the United States during the period of investigation. *See* Final Determination. Commerce addressed issues raised in case briefs filed by Edsal and Bangkok Sheet. IDM at 2-3; *see* Bangkok Sheet Case Brief (Mar. 20, 2024) (P.R. 309); Edsal Case Brief re: Bangkok Sheet (Mar. 20, 2024) (P.R. 310); Edsal Case Brief re: Siam Metal (Mar. 20, 2024) (P.R. 311).

Edsal argued that Commerce "should rely solely on the financial statements of Sahamitr," or in the alternative, "rely on the financial statements of both Sahamitr and PNS to calculate CV profit and selling expenses." IDM at 4. However, Commerce explained that, for the same rationale provided in the preliminary determination, it would continue to rely on the PNS financial statements submitted by Edsal as the best available financial statements for calculating

7

constructed value profit and selling expenses.  *Id*. at 5-7.  Similarly, Commerce continued to find

Sahamitr's financial statements "not a viable option for calculating CV profit" because Sahamitr

did not produce identical or comparable merchandise.  *Id*. at 7; *see also* PDM at 11.  Commerce

also noted that Sahamitr's financial statements were further unsuitable for use because it

received countervailable subsidies.  IDM at 6-7; *see also* Sahamitr Financial Statement at

Attachment 1, Note 22 (P.R. 132).  In view of the foregoing, Commerce found it "equally

inappropriate to include Sahamitr's profit rate in any averaging of a CV profit ratio."  *Id*. at 7.

Edsal also argued that "the date of the sales invoice issued by Siam Metal to the affiliated

trading company is the incorrect date of sale"; instead, Edsal asserted the date of sale should be

the "contract date."  *Id*. at 8.  However, in accordance with its standard practice, Commerce

continued to rely on the commercial invoice date as the date of sale for the purposes of valuing

Siam Metal's U.S. sales.  IDM at 9-11.  For the final determination, Commerce specifically used

the commercial invoices issued by Siam Metal's affiliated trading companies to unaffiliated

trading companies to determine the date of sale.  *Id.* at 9-10.  This represented a slight change

from the preliminary determination, in which Commerce used the invoice issued from Siam

Metal to its affiliated trading company to determine the date of sale.  *Id.* at 10.  Commerce

explained that it made this change so as to reflect the final invoice paid by the U.S. customer for

the subject merchandise.  *Id*.

Commerce also explained why it did not use the "sales contract" —a document "issued

by the unaffiliated trading company to the affiliated trading company when the unaffiliated

trading company is ready to receive shipments."  IDM at 10-11.  Citing information from Siam

Metal's verification report, Commerce explained that the "sales contract" does not establish the

material terms of sale because it does not identify shipment destination.  *Id*.  Therefore, the

"sales contract" could not "be relied upon to determine whether shipment was bound for the

United States or a third country or whether a sale should be included in the U.S. sales database."

*Id.* at 11 (citing Siam Metal Sales Verification Report, P.R. 305 at 7).  Moreover, the final price

is not established until the date of the commercial invoice issued to the unaffiliated trading

company, and therefore all material terms of sale are finalized in the commercial invoice which

Commerce used for the date of sale.  *Id.*

Finally, Edsal argued that Commerce should revise both Bangkok Sheet's and Siam

Metal's reported costs to reflect both producers' finished inventory movement schedules.  *See*

Edsal's Bangkok Sheet Case Brief at 18-28 (P.R. 310); Edsal's Siam Metal Case Brief at 31-36

(P.R. 311).  Commerce disagreed and continued to rely on the cost of manufacturing reported by

Bangkok Sheet and Siam Metal.  IDM at 13-17.  Commerce found that the finished goods

inventory schedules reported by both companies are not reasonably reflective of the costs

associated with the production of subject merchandise.  *Id*. at 16.  Accordingly, an adjustment to

both companies' reported cost of production was not warranted.  *Id*. at 17; *see also* Siam Metal

Cost Verification Report (C.R. 305, P.R. 303); Bangkok Sheet Cost Verification Report (C.R.

308 P.R. 307).

Therefore, Commerce calculated a final weighted-average dumping margin for Bangkok

Sheet Metal of 2.75 percent, Siam Metal Tech of 0.00 percent, and an all-others rate for

companies not individually examined of 2.75 percent.  *Final Determination*, 89 Fed. Reg. at

28739.  In June 2024, Commerce published the antidumping duty order covering boltless steel

shelving from Thailand.  *Boltless Steel Shelving Units Prepackaged for Sale From Malaysia,*

*Taiwan, Thailand, and the Socialist Republic of Vietnam: Amended Final Affirmative*

*Antidumping Duty Determination for Taiwan and Antidumping Duty Orders*, 89 Fed. Reg. 48555

(Dep't of Commerce Jun. 7, 2024).

<div align="center">**SUMMARY OF ARGUMENT**</div>

The Court should sustain Commerce's final determination.

First, Commerce's determination to rely on PNS's financial statements to calculate constructive value profit  is supported by substantial evidence.  Specifically, Commerce found PNS's financial statements to be the best source available under the criteria of 19 U.S.C. § 1677(e)(1)(B)(iii), and that Sahamitr's financial statements were not viable because Sahamitr did not produce comparable products.

Second, Commerce's determination to rely on the date of commercial invoice as the date of sale was in accordance with law.   By regulation, 19 C.F.R. § 351.401(i), Commerce will normally use the date of invoice.  Moreover, Commerce's determination is supported by substantial evidence because the material terms of sale were not established until the date of commercial invoice.

Third, Commerce's determination to rely on Siam Metal and Bangkok Sheet's cost of manufacturing was supported by substantial evidence because the costs of manufacturing were correctly reported.  Moreover, inventory movement schedules were based on price estimates or purchase price, rather than actual cost, so Commerce reasonably declined to rely on the schedules.

<div align="center">**ARGUMENT**</div>

I.    **Standard of Review**

This Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial evidence, or otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i); *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial

evidence may be "less than the weight of the evidence," and the possibility of drawing

inconsistent conclusions does not make Commerce's findings unsupported by substantial

evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Thus, a party challenging

an agency determination under the substantial evidence standard "has chosen a course with a

high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir.

2006) (cleaned up), and the Court sustains Commerce's factual determinations as long as they

are reasonable and supported by the record as a whole, even if some evidence detracts from the

agency's conclusions. *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

## II. Commerce's Calculation of Constructed Value Profit Is Supported By Substantial Evidence And In Accordance With Law

Commerce's determination to calculate Bangkok Sheet's and Siam Metal's constructed

value profit and expenses based on the financial statements of PNS is supported by substantial

evidence and in accordance with law.

### A. Legal Standard

Pursuant to 19 U.S.C. § 1677b(a)(4), Commerce determined there were no above-cost

sales of boltless steel shelving in the Thai market. PDM at 10; IDM at 5. In calculating

dumping margins, Commerce normally compares the export price or constructed export price

(*i.e.*, the price in the U.S. market) of the merchandise under investigation to the normal value

(*i.e.*, the price in the home market or to a third-country market). 19 U.S.C. §§ 1677(35),

1677b(a)(1)(A)-(C). In other words, Commerce normally would compare the price of boltless

steel shelving in the United States to the price in Thailand or in a third country (*i.e.*, a country

other than Thailand or the United States). However, because normal value could not be

determined on this basis – as there were no above-cost sales of boltless steel shelving in the

11

comparison market during the period of investigation – Commerce relied on CV to determine normal value. 19 U.S.C. § 1677b(a)(4). PDM at 5; IDM at 5.

Section 1677b(e) instructs Commerce to calculate the "constructed value of imported merchandise" based on the sum of: (1) the cost of materials and fabrication or other processing in producing merchandise; and (2) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative costs and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country. 19 U.S.C. § 1677(e)(1)-(2)(A). Therefore, the statutorily preferred method is to use the producer's actual profits in connection with home market sales of like product in the ordinary course of trade. *Id.*

If the preferred method is unavailable, the statute permits Commerce to calculate selling, general and administrative expenses, and profit under one of the following alternatives:

> (i) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review {… } for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise,
>
> (ii) the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) { . . .}for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or
>
> (iii) the amounts incurred and realized {…} for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise; {(*i.e.,* the "profit

cap")}.

19 U.S.C. § 1677b(e)(2)(B). The statute does not establish a hierarchy for selecting among the alternatives for calculating CV profit and expenses. *See* Statement of Administrative Action for Uruguay Round Agreements Act (SAA), H.R. Rep. No. 103-316, vol. I, at 840 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4176 ("At the outset, it should be emphasized that, consistent with the Antidumping Agreement, new section {1677b}(e)(2)(B)} does not establish a hierarchy or preference among these alternative methods. Further, no one approach is necessarily appropriate for use in all cases.").[1] Moreover, "the selection of an alternative will be made on a case-by-case basis, and will depend, to an extent, on available data." SAA at 840. Accordingly, the statute provides Commerce with discretion to select from any of the three alternative methods, depending on the information available on the record.

### B. Substantial Evidence Supports Commerce's Determination That PNS's Financial Statements Is The Best Source Available For Calculating CV Profit

In the preliminary determination, Commerce applied "any other reasonable method" under 19 U.S.C. § 1677b(e)(1)(B)(iii). *See* PDM at 11. Commerce determined that alternatives (i) and (ii) were unavailable because Bangkok Sheet's and Siam Metal's sales of non-merchandise under consideration were not in the "same general category" as boltless steel shelving and because there were no other exporters or producers subject to this investigation, respectively. *Id.*

In determining the financial statements to select under Section 1677(e)(1)(B)(iii), Commerce considered four criteria: (1) the similarity of the potential surrogate companies'

---

[1] 19 U.S.C. § 3512(d) adopts the SAA as "an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements Act . . . in any judicial proceeding in which a question arises concerning such interpretation or application."

business operations and products to the respondents'; (2) the extent to which the financial data of the surrogate company reflects sales in the United States as well as the home market; and (3) the contemporaneity of the surrogate data to the period of investigation; and (4) the similarity of the customer base between a potential surrogate company and the respondent. *See* IDM at 6 (citing *Notice of Final Determination of Sales at Less Than Fair Value: Certain Color Television Receivers from Malaysia*, 69 Fed. Reg. 20592 (Dep't of Commerce April 16, 2004) (*CTVs Malaysia*), and accompanying Issues and Decision Memorandum at Comment 26; *Notice of Final Determination of Sales at Less Than Fair Value: Pure Magnesium from Israel*, 66 Fed. Reg. 49349 (Dep't of Commerce Sept. 21, 2001) (*Israel Magnesium*), and accompanying Issues and Decision Memorandum at Comment 8).

Commerce explained that, consistent with the above factors, the financial statements of PNS constituted the best source available for calculating the respondents' CV profit. IDM at 5; *see also* PDM at 11-12. In response to comments filed by Edsal, Commerce explained that the financial statements of PNS were preferable to those of Sahamitr, because PNS is a significant producer of boltless steel shelving, whereas Sahamitr is a producer of liquefied petroleum gas cylinders. IDM at 6 (citing PNS Financial Statements at Attachment 3 (P.R. 133); Respondents Rebuttal CV Profit Submission (Sep. 5, 2023) at CVR-1-CVR-3 (P.R. 148) (providing further information regarding PNS's production and business operations)). Specifically, Commerce found that, because Sahamitr does not produce boltless steel shelving, Sahamitr's financial statements were "not a viable option" for calculating CV profit. *Id.* at 7. Commerce's finding is consistent with its practice of selecting CV profit information based on "the similarity of the potential surrogate companies' business operations and products to the respondent's business operations and products," and is supported by record information which shows that the

merchandise produced by Sahamitr is distinct from that of Bangkok Sheet and Siam Metal. *Id.*; *see also* Respondents' Rebuttal CV Profit Submission (P.R. 148).

In addition to the findings made in the preliminary determination, Commerce also determined that Sahamitr received countervailable subsidies from the government of Thailand. IDM at 7 (citing Sahamitr Financial Statements at Attachment 1, Note 22 (P.R. 132) (identifying promotional privileges including the exemption from income taxes and exemptions from import duties)). Commerce "generally does not rely on financial statements where there is evidence that the company received countervailable subsidies when there are other sufficiently reliable and representative sources of data on the record for purposes of calculating the CV profit or other financial ratios." *Id.* For that additional reason, Commerce found that Sahamitr's financial statements were further unusable for the purposes of calculating CV profit, and that it would be inappropriate to include Sahamitr's profit rate in an average of a CV profit ratio. *Id.* Therefore, substantial evidence supports Commerce's determination to rely on PNS's financial statements instead of Sahamitr's.

### C.    Edsal Fails To Demonstrate That Commerce Unlawfully Relied On PNS's Financial Statement

Edsal challenges Commerce's determination not to use Sahamitr's financial statements and argues that Commerce should not have disregarded Sahamitr's financial statements because Sahamitr makes merchandise in the "same general category" as boltless steel shelving. Edsal Br. at 21 (citing SAA at 841). In doing so, though, Edsal adopts a broad definition of the "same general category," and effectively asks this Court to substitute its judgment for Commerce's. The SAA provides:

> With respect to {§ 1677b(e)(1)(B)(iii)}, which provides for the use of "any other reasonable method," given the absence of a comparable standard in existing law, the Administration does not believe that it is appropriate at this time to establish particular methods and benchmarks for applying this alternative. Instead, the Administration

intends that Commerce will develop this alternative through practice and that Commerce will determine on a case- by-case basis the profits 'normally realized' by other companies on merchandise of the same general category.

SAA at 841.  Therefore, while  Commerce must calculate CV profit based on sales of merchandise "in the same general category," the SAA also provides that Commerce be given wide discretion in establishing a practice and determining on a case-by-case basis the most appropriate means to calculate CV profit.  Neither the statute nor the SAA define "same general category," other than that the term "encompasses a category of merchandise broader than the foreign like product."  *Id.* at 841.  Commerce, consistent with that provision, found that the liquefied petroleum gas cylinders produced by Sahamitr were "non-comparable" merchandise for the purposes of calculating CV profit.  *See* PDM at 11.  Commerce also found that the financial statements of BSBM, Millcon, and Tata Steel were likewise unusable for the purposes of calculating CV profit, because each of those companies produce a variety of steel products including steel bars, pipes, and rebar.  *Id.*  Edsal does not argue that any of those producers' financial statements should have been selected here.

Yet, Edsal argues that liquefied petroleum cylinders and boltless steel shelving are both steel products, and therefore both must be in the "same general category" of merchandise.  Edsal Br. at 23.  Edsal provides two examples of prior investigations as evidence of precedent supporting its claim.  Edsal Br. at 22 (citing *Utility Scale Wind Towers From Malaysia: Preliminary Results of Antidumping Duty Administrative Review*, 2021-2022, 89 Fed. Reg. 461 (Dep't Commerce Jan. 4, 2024) (*Malaysia Wind Towers*) and accompanying Issues and Decision Memorandum (IDM) at 14-15; *Boltless Steel Shelving Units Prepackaged for Sale From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 80 Fed. Reg. 51779 (Dep't of Commerce Aug. 26, 2015) (*BSS from China*) and

accompanying Issues and Decision Memorandum (IDM) at Comment 1). Neither case

undermines Commerce's determination here.

In *BSS from China*, Commerce selected a Bulgarian producer of coated metal products as

a surrogate producer pursuant to 19 U.S.C. § 1677b(c)(4) (under which Commerce will

determine factors of production in non-market economy cases based on data from a surrogate

market economy country or countries) and 19 C.F.R. § 351.408 (under which Commerce will

normally value factors of production using data from a single surrogate country). That

determination has no relevance to this case because Commerce's selections of surrogate

producers are conducted pursuant to distinct legal authorities and require different considerations

than those at question here. *Compare* 19 U.S.C. § 1677b(c)(4) *with* 19 U.S.C. §

1677b(e)(1)(B)(iii). In *Malaysia Wind Towers,* Commerce found that steel pipes were

comparable to wind towers where the record contained no financial statements for producers of

comparable merchandise. *Malaysia Wind Towers* IDM at 14-15. Contrary to Edsal's argument,

Commerce did not establish a rule that all steel products are in the same general category of

merchandise, nor is there any analysis or explanation in the *Malaysia Wind Towers PDM* which

would support such a conclusion. *See* Edsal Br. at 23 ("{i}f {Commerce} could find steel pipe

to be sufficiently similar to utility scale wind towers, then Sahamitr's steel cylinders should be

deemed sufficiently comparable to steel shelving for the purpose of this case."). Edsal disregards

the fact that selections of surrogate financial statements for CV profit are to be made on a "case-

by-case basis," and dependent on available data. *See* SAA at 841.

Here, Commerce evaluated the two potential sources – the financial statements of PNS

and Sahamitr – pursuant to the criteria developed in its administrative practice. *See* IDM at 5-7.

Commerce determined that both sources were similar under three of the four criteria, but that

PNS's financial statements are preferable based upon "the similarity of the potential surrogate companies' business operations and products to the respondent's business operations and products." IDM at 6 (citing *Israel Magnesium* IDM at Comment 8). Commerce's fact-specific determination with respect to that criterion is reasonable and should not be second-guessed. *PSC VSMPO-Avisma Corp.*, 688 F.3d at 764 ("Commerce is entitled to substantial deference in its choice of accounting methodology."). That the merchandise produced by Sahamitr may be similar under the broad criteria articulated by Edsal is no reason to second-guess Commerce's determination. As Commerce explained, PNS produces boltless steel shelving, which is the merchandise under consideration, and plainly more similar to that merchandise than the liquefied petroleum gas cylinders produced by Sahamitr. IDM at 6-7. There is no requirement that Commerce must use any financial statements from producers that meet some arbitrary threshold of comparability. 19 U.S.C. § 1677b(e)(1)(B)(iii). Therefore, when all other considerations are equal, Commerce's determination to rely on the financial statements of a producer of identical merchandise rather than a producer of merchandise which Commerce finds to be non-comparable is reasonable.

Edsal's remaining criticisms of the PNS financial statements are unconvincing. Edsal argues that Commerce erred in selecting the PNS financial statements, because PNS produces merchandise other than the merchandise under consideration. Edsal Br. at 23-24. It is unclear, though, why this fact would be relevant when Commerce has already found that Sahamitr produces non-comparable merchandise. And, even if PNS does produce a certain amount of non-comparable merchandise, the fact that it is a producer of boltless steel shelving was the factor that guided Commerce's decision-making. PDM at 12. Likewise, Edsal argues that Commerce failed to address certain alleged deficiencies in PNS's financial statements, and that

18

those deficiencies prevented a "robust comparison of PNS's selling expenses with respondents' expenses." Edsal Br. at 24-26. But Edsal fails to identify a particular deficiency which prevented Commerce from calculating CV profit and selling expenses based on PNS's financial statements. Edsal Br. at 24-26. And the overall quality of financial statements, absent such a deficiency, is not one of the criteria Commerce considers when determining which source to use for CV profit and selling expenses. *See* IDM at 6 (citing *Malaysia CTVs* IDM at Comment 4). Edsal's arguments amount to disagreement with Commerce's weighing of the evidence. *See Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States*, 28 F. Supp. 3d 1317 (Ct. Int'l Trade 2014) ("{b}ecause Commerce possesses both expertise and relevant first-hand knowledge – sending follow-up questionnaires and conducting on-sight verification as needed – the court will not reweigh the evidence before the agency.").

Finally, Edsal fails to demonstrate any error in Commerce's analysis regarding evidence of countervailable subsidies in Sahamitr's financial statements. *See* IDM at 7 (citing Sahamitr Financial Statements at Attachment 1, Note 22 (P.R. 132)). Edsal argues that Commerce's analysis is "fixat{ed} almost entirely on the presence of subsidies in Sahamitr's financial statements." Edsal Br. at 23. But this misstates Commerce's analysis. Before Commerce reached the matter of countervailable subsidies in Sahamitr's financial statements, it first evaluated the financial statements under the four criteria for choosing among surrogate data. IDM at 6. Based solely on that evaluation, Commerce determined that Sahamitr's financial statements were "not a viable option for calculating CV profit" because Sahamitr produces non-comparable merchandise. IDM at 7. Commerce then further "note{d} that Sahamitr received countervailable subsidies." IDM at 7. Therefore, Commerce's finding with respect to the countervailable subsidies is only a secondary consideration supporting Commerce's

determination that the PNS financial statements "represent the best available source of calculating CV profit and selling expenses."  IDM at 6-7.

Indeed, as Edsal acknowledges, the presence of subsidies in a producer's financial statements is a factor that Commerce should consider in its selection of financial statements for the calculation of CV profit and expenses.  *See Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530 (Fed. Cir. 2019).  In *Mid Continent*, the Federal Circuit did not prescribe an outcome on remand and further provided that "{p}ractical considerations might play a role in the reasonableness of Commerce's choice . . . {i}t might be reasonable to avoid methods that demand information that cannot practically be obtained in reliable form."  *Mid Continent*, 941 F.3d at 544-45.  Following the Federal Circuit's holding, and on remand before this Court, Commerce explained that its practice "is to not dissect the {financial statement} of a surrogate company as if the surrogate company were the respondent under investigation/ review in the proceeding, because {Commerce} does not seek information from or verify the information from the surrogate company."  *Final Results of Redetermination Pursuant to Court Remand*, Consol. Ct. No. 15-00214, ECF No. 150 (Ct. Int'l Trade Apr. 12, 2022) at 7 (sustained in *Mid Continent Steel & Wire, Inc. v. United States*, 586 F. Supp. 3d 1349 (Ct. Int'l Trade 2022), *aff'd,* 2025 WL 40344 (Fed. Cir. Jan. 7, 2025)).  But here, Edsal demands exactly that.

Edsal argues that Commerce failed to analyze "any distortive impacts of the subsidies on Sahamitr's profit data."  Edsal Br. 19.  But to "show{} that the subsidies had any distortive impact," Edsal Br. 18, requires a *de facto* countervailable subsidy investigation into the particulars of Sahamitr's financial statements, and goes beyond "engag{ing} in a comparative analysis of the deficiencies of multiple financial statements."  *Mid Continent*, 586 F. Supp. 3d at 1367.  That is far more than what is required under the analysis for choosing among surrogate

data, particularly when Commerce's determination rests on "the similarity of {PNS's} business

operations and products to the respondent{s'} compared to Sahamitr, and therefore

independently based on substantial evidence. *See* 19 U.S.C. § 1677b(e)(1)(B)(iii). Accordingly,

there is no legal support for Edsal's contention. Commerce reasonably relied on the record

before it to determine that such subsidies were evinced by the statements, and applying its

practice, reasonably determined that it should not rely on such statements. Therefore, the Court

should sustain Commerce's determination as supported by substantial evidence and in

accordance with law, including *Mid Continent*.

### III.    Commerce's Determination To Rely On The Commercial Invoice Date As The Date Of Sale Is Supported By Substantial Evidence And Otherwise Lawful

####    A.  Legal Standard

Commerce's antidumping comparisons of United States sales with concurrent home

market or third country sales require Commerce to establish dates of sale for the sales being

compared. Neither the statute nor the SAA provide a methodology for determining date of sale;

however, the SAA instructs that the "date of sale" for purposes of currency conversion should be

understood as the "date when the material terms of sale are established." SAA at 810.

Commerce considers "material terms of sale" to include terms such as price, quantity, delivery,

and payment. *See Sahaviriya Steel Indus. Public Co. v. United States*, 714 F. Supp. 2d 1263,

1279-80 (Ct. Int'l Trade 2010), *aff'd*, 649 F.3d 1371 (Fed. Cir. 2011) (citations omitted).

Consistent with the SSA, to determine on which date a sale occurs, and hence which sales

to compare on a temporal basis, Commerce's regulations establish a presumption that the date of

sale is the invoice date. *See* 19 C.F.R. § 351.401(i). Section 351.401(i) provides that Commerce

normally "will use the date of invoice, as recorded in the exporter or producer's records" to

identify the date of sale. *Id.* Commerce has elaborated that "price and quantity are often subject

21

to continued negotiation between the buyer and the seller until a sale is invoiced," and that the date of an enforceable sale "is not necessarily the date on which the terms of sale actually are established." *Antidumping Duties; Countervailing Duties: Final Rule*, 62 Fed. Reg. 27296, 27348-49 (Dep't of Commerce May 19, 1997) (*Preamble*).  Further, Commerce's longstanding practice is to use a uniform date of sale for each respondent rather than a different date of sale for each sale.  *See id.* at 27349.

This Court has sustained Commerce's date of sale regulation and practice.  *See*, *e.g.*, *Sahaviriya Steel*, 714 F. Supp. 2d at 1279-82; *Nakornthai Strip Mill Pub. Co. Ltd. v. United States*, 614 F. Supp. 2d 1323, 1333-34 (Ct. Int'l Trade 2009); *see also Mittal Steel Point Lisas Ltd. v. United States,* 548 F.3d 1375 1379-80 (Fed. Cir. 2008) (recognizing Commerce's date of sale practice).  Specifically, this Court has held that "unless the party seeking to establish a date of sale other than the invoice date produces sufficient evidence to overcome this presumption, Commerce will use invoice date as the date of sale." *Sahaviriya Steel*, 714 F. Supp. 2d at 1279-80.  In other words, the plaintiff bears the burden of producing sufficient evidence demonstrating that another date "better reflects the date on which the exporter or producer establishes the material terms of sale." *Viraj Group, Ltd. v. United States*, 343 F.3d 1371, 1377, n.1 (Fed. Cir. 2003) (citing 19 C.F.R. § 351.401(i) (2003)).  Moreover, even after a plaintiff produces evidence to overcome the presumption, if "the record indicates that Commerce's decision to use the invoice date as the date of sale was reasonable and was supported by substantial evidence, Plaintiff's arguments must fail." *Allied Tube*, 127 F. Supp. 2d at 220.

Notwithstanding the regulatory presumption to use invoice date as the date of sale, Commerce's date of sale methodology is "flexible," *Allied Tube & Conduit Corp. v. United States*, 127 F. Supp. 2d 207, 219 (Ct. Int'l Trade 2000).  If Commerce "is presented with

satisfactory evidence that the material terms of sale are finally established on a date other than date of invoice, {it} will use the alternative date as the date of sale." *Preamble*, 62 Fed. Reg. at 27349. In these situations, however, "the terms of sale must be firmly established and not merely proposed." *Id.* Therefore, "{a} preliminary agreement on terms, even if reduced to writing, in an industry where renegotiation is common does not provide any reliable indication that the terms are truly 'established' in the minds of the buyer and seller." *Id.*

### B.    Edsal Fails To Demonstrate Error In Commerce's Determination To Rely On The Commercial Invoice Date

In this case, Commerce analyzed and verified Siam Metal's sales data and determined that the commercial invoice date was appropriate as the date of sale for Siam Metal's sales to the U.S. market. IDM at 9-12. Edsal argues that Commerce erred by not using the sales contract established between Siam Metal's affiliated third-country trading company and an unaffiliated third-country trading company to establish the date of sale. *See* Edsal Br. at 29-37. However, these arguments fail to demonstrate error in Commerce's determination to rely on the commercial invoice date.

As an initial matter, Edsal attempts to shift the burden to Commerce to support its finding that the sales contract establishes the material terms of sale. See Edsal Br. at 36. But Commerce is not required to justify using the invoice date, in the absence of evidence identified by Edsal that the material terms of sale were established on an alternative date. *Sahaviriya Steel*, 714 F. Supp. 2d at 1279-80. In that respect, Edsal failed to make this showing in the investigation, and does not identify any record evidence that undermines Commerce's decision.

On the merits, Edsal goes to great lengths to establish that price and quantity were established by the sales contract issued between Siam Metal's unaffiliated trading company and an affiliated third-country trading company. Edsal Br. at 32-36. But Edsal fails to address

Commerce's finding that the destination country was a material term of sale. *See* IDM at 11.

Edsal does not dispute that, as a factual matter, destination country was not included in the sales

contract which it argues Commerce should have used as date of sale. Edsal Br. at 36-37. Edsal

instead proffers that destination cannot be a material term of sale because Commerce "explicitly

rejected" such a notion in a 2004 investigation. *Id.* at 37 (citing *Notice of Final Determination of*

*Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances:*

*Certain Frozen and Canned Warmwater Shrimp From Thailand*, 69 Fed. Reg. 76918 (Dep't

Commerce Dec. 23, 2004) (*Shrimp Thailand*), and accompanying Issues and Decision

Memorandum (IDM) at 36). Edsal takes Commerce's finding in *Shrimp Thailand* out of context.

There, Commerce found that "changes to delivery location" did not constitute changes to terms

of sale. *Shrimp Thailand* IDM at 36. Commerce explained that it "considers delivery terms to

be nonessential terms of sale which do not alter the date of sale," and that the key changes in

delivery terms referenced pertained to "extra freight expenses incurred to ship the merchandise

to a different location." *Id.* (excluding citation). *Shrimp Thailand* says nothing about whether

the *destination country* should be considered a material term of sale when the eventual

destination of a sale is completely unknown by the seller until invoice date.

In any case, this Court's subsequent decisions make clear that "material terms of sale"

include delivery terms such as destination for the purposes of antidumping determinations. *See*

*Eregli Demir v. Celik Fabrikalari T.A.S,* 308 F. Supp. 3d 1297, 1306-07 (Ct. Int'l Trade 2018)

("Material terms of sale may include price, quantity, and delivery and payment terms") (citing

*Sahaviriya Steel*, 714 F. Supp. 2d at 1280). Moreover, Edsal's argument that destination cannot

be a material term of sale would unjustifiably constrain Commerce's discretion. This Court has

recognized that the date of sale, pursuant to the SAA, to be "flexible so as to accurately reflect

the true date on which the material elements of sale were established." *Allied Tube*, 127 F. Supp. 2d at 1370. Commerce exercised its discretion here to find that the country of destination of a sale is a material term of sale. *See* IDM at 11. This is a reasonable application of Commerce's discretion, because the purpose of Commerce's date of sale reporting is, in part, to determine which and in what manner a company's U.S. sales should be reported. *See, e.g.,* Siam Metal's Section A Questionnaire Response at 12 (P.R. 89) (date of sale reported by the respondent "will determine which sales records are reported in response to sections B and C of {Commerce's} questionnaire."). It would make little sense for Commerce to determine that material terms of sale have been established at a time when a producer does not know whether its sale would be destined for the U.S., or any other country.

Therefore, Commerce's application of 19 C.F.R. § 351.401(i) in this instance to find that destination country is a material term of sale comports with this Court's holdings and is therefore reasonable. Because Edsal does not demonstrate that the material terms of sale were established before the date of commercial invoice, Commerce's determination to use the commercial invoice date should be presumed correct. *See Viraj Group*, 343 F.3d at 1377, n.1.

**IV.    Commerce's Determination to Rely on Their Cost of Manufacturing is Supported by Substantial Evidence and in Accordance with Law**

Siam Metal and Bangkok Steel each reported its total costs of manufacturing in accordance with 19 U.S.C. § 1677b(f)(1)(A). The statute imposes two conditions for the use of reported costs in cost calculations: (1) costs are calculated based on records kept in accordance with Generally Accepted Accounting Principles (GAAP); and (2) costs reasonably reflect the costs of producing and selling merchandise. 19 U.S.C. § 1677b(f)(1)(A); *see also Dillinger France S.A. v. United States*, 981 F.3d 1318, 1321 (Fed. Cir. 2020). Commerce found that Siam Metal's and Bangkok Steel's cost reporting satisfied both conditions. Moreover, although

neither respondent maintained a cost accounting system, both allocated costs for materials and overhead as recorded directly in their financial accounting system, and allocated those costs over their finished goods production quantities.  IDM at 17.  Commerce found that both respondents' reporting reconciled to their GAAP-compliant financial statements, and were verified to be reflective of the respondents' actual cost of production.  *See* IDM at 17; Siam Metal Cost Verification Report, P.R. 303; Bangkok Sheet Cost Verification Report, P.R. 307.  Commerce need go no further in its analysis – indeed, when those two conditions are met, Commerce <u>shall</u> <u>normally</u> calculate cost based on a producer's records.  *See* 19 U.S.C. § 1677b(f)(1)(A); *Dillinger*, 981 F.3d at 1321.  Here, Commerce did calculate costs based on GAAP-complaint accounting records.

Edsal does not argue that either respondent's reporting is not based on GAAP-compliant financial statements.  Rather, Edsal argues that each producer's reporting is not "reasonably reflective of the costs associated with the production and sale of merchandise."  Edsal Br. at 37-38 (citing 19 U.S.C. § 1677b(f)(1)(A)).  Although both parties reported costs contained in their inventory movement schedules, Commerce declined to use those costs because those costs were: (1) in the case of Siam Metal, based on purchase price and not actual cost; and (2) in the case of Bangkok Sheet, based on estimates.  *See* IDM at 15-17 (citing Bangkok Sheet Section D Supplemental Questionnaire Response at 1-2 (P.R. 218); Siam Metal Cost Verification Report at 11 (C.R. 305, P.R. 303)).  For Siam Metal, Edsal argues that Commerce failed to establish that Siam Metal's "finished goods inventory values were recorded at purchase price."[2] Edsal Br. at 40-41.  Commerce addressed this argument in its IDM.  The cost verification report for Siam

---

[2]  Edsal does not adequately articulate the salience of this technical point. We presume that Edsal alleges that Siam Metal's finished goods inventory values are the "actual costs reported in its books and records."

Metal states:

> In its inventory system, {Siam Metal} records the production cost of raw materials based on the purchase price while reported {total cost of manufacturing} is based on the actual consumption cost as shown in the accounting system {. . .}. We examined the stock card report for the {period of investigation} that shows the finished goods inventory values were recorded at the purchase price.

Siam Metal Cost Verification Report at 11 (C.R. 305, P.R. 303); *see also* IDM at 16 (citing the same).  The conclusions drawn by verification report are considered record evidence, and Commerce need not add every single substantiating document examined at verification to the record.  *See Micron Technology, Inc. v. United States*, 117 F.3d 1386, 1397 n.2 (Fed. Cir. 1997) ("Commerce is not required to make all of respondent's financial documents part of the record, but is only required to "disclos{e} its methods" of verification").  Edsal claims that Commerce's verification report "falls short of the substantial evidence needed to support" the final determination, but provides no support for this claim and fails to identify evidence contradicting Commerce's finding or any error in Commerce's reasoning.  *See* Edsal Br. at 40-42.

Edsal similarly argues that "{n}othing in the record, nor the observation that SMT officials 'were able to identify the type of direct materials' used in the production of nonsubject merchandise, justified {Commerce's} acceptance of {Siam Metal}'s unreconciled and unexplained cost reporting."  Edsal Br. at 41.  But again, Edsal disregards the conclusions drawn in the verification report, and even questions the veracity of those conclusions.  Edsal Br. at 41 n.2.  Commerce's verification report states clearly that "{t}he purpose of {the} verification report is to provide parties with a <u>factual report</u> of the procedures performed and results obtained during the {Commerce}'s verification exercise."  Siam Metal Cost Verification Report, P.R. 303 at 1 (emphasis added).  That the report does not draw conclusions as to overall success of verification or to the "ultimate treatment of the facts obtained at verification," *see id.*, does not

mean that Edsal is at liberty to question the methods employed by Commerce or the factual

conclusions drawn by Commerce in its report – particularly where Commerce ultimately chose

to adopt such findings in its decision.  IDM at 17.  Edsal does not further identify how the cost of

manufacturing reported by Siam Metal is not reasonably reflective of it's the actual costs of

producing merchandise.  *See* 19 U.S.C. § 1677b(f)(1)(A).  Therefore, Commerce's determination

to use the cost of manufacturing reported by Siam Metal and derived on its GAAP-compliant

financial statements is reasonable and should be sustained.  *See Ellwood City Forge Co. v.

United States*, 600 F. Supp. 3d 1281, 1300 (Ct. Int'l Trade 2022) (finding that "a reasonable

mind could find that sufficient evidence exists to support Commerce's verification results on the

basis of its explanation.").

  In a similar vein, Edsal argues that Commerce erred by "deferring" to the cost of

manufacturing reported by Bangkok Sheet, rather than adjusting Bangkok Sheet's reporting "to

align with actual costs recorded in {its} normal books and records and audited financial

statements."[3]  Edsal Br. at 42.  But Edsal's argument suffers from the same deficiency as its

argument with respect to Siam Metal.  Edsal alleges that Commerce "deferred" to Bangkok

Sheet's explanations, as if the verification report is not a finding of fact compiled by Commerce

officials.  Edsal Br. at 42-44.  Indeed, Bangkok Sheet explained in a questionnaire response that

its finished goods inventory consists of estimates based on "standard raw material consumption

and standard (estimated) production time."  Bangkok Sheet Section D Supplemental

Questionnaire Response, P.R. 218 at 1-2; *see also* IDM at 15.  Commerce verified this same

assertion, and Commerce concluded that Bangkok Sheet's finished goods inventory is an

estimate.  Bangkok Sheet Cost Verification Report at 3 (P.R. 307).  Again, Edsal provides no

---

[3]  We again presume in the context of its broader argument that Edsal views Bangkok
Sheet's finished goods inventory to be the "actual costs reported in its books and records."

basis for this Court to second-guess the conclusions drawn by Commerce in this respect. Because Commerce concluded that Bangkok Sheet's finished goods inventory is an estimate, and not reflective of the "<u>actual</u> costs reported in its books and records," Commerce's determination to disregard the finished goods inventory is supported by substantial evidence and in accordance with law.

## **CONCLUSION**

For these reasons, we respectfully request that the Court deny Edsal's motion for judgment upon the administrative record, sustain Commerce's final determination, and enter judgment for the United States.

<div style="margin-left: 50%;">

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

<u>/s/ Franklin E. White, JR. by Tara K. Hogan</u>
FRANKLIN E. WHITE, JR.
Assistant Director

</div>

Of Counsel:

<table>
<tr><td>JESUS N. SAENZ</td><td><u>/s/ An Hoang</u></td></tr>
<tr><td>Senior Attorney</td><td>AN HOANG</td></tr>
<tr><td>U.S. Department of Commerce</td><td>Trial Attorney</td></tr>
<tr><td>Office of the Chief Counsel for Trade</td><td>Commercial Litigation Branch</td></tr>
<tr><td>  Enforcement and Compliance</td><td>United States Department of Justice</td></tr>
<tr><td>1401 Constitution Avenue, NW</td><td>P.O. Box 480 | Ben Franklin Station</td></tr>
<tr><td>Washington, DC 20005</td><td>Washington, DC 20044</td></tr>
<tr><td></td><td>(202) 616-3226 | An.Hoang@usdoj.gov</td></tr>
<tr><td>February 28, 2025</td><td>*Attorneys for the Defendant*</td></tr>
</table>

<div style="text-align: center;">29</div>

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with the Rules of this Court and the

Court's scheduling order in that it contains no more than 8,682 words, excluding the table of

contents, table of authorities, any addendum containing statutes, rules or regulations, any

certificates of counsel, and counsel's signature, as calculated by the word processing system used

to prepare this brief (Microsoft Word).

<u>/s/ An Hoang</u>

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

———————————————————————

|  |  |  |
|---|---|---|
| EDSAL MANUFACTURING CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 24-00108 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BANGKOK SHEET METAL PUBLIC CO., LTD. | ) | |
| and SIAM METAL TECH CO., LTD., | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

———————————————————————— )

## <u>ORDER</u>

Upon consideration of plaintiff's motion for judgment upon the agency record, responses thereto, plaintiff's reply, the administrative record, and other pertinent papers, it is hereby:

ORDERED that plaintiff's motion is DENIED;

ORDERED that the Department of Commerce's determination is sustained; and it is further

ORDERED that judgment is entered in favor of the United States.


Dated: _____            _____
      New York, NY                        CHIEF JUDGE