## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| EDSAL MANUFACTURING CO., LTD., )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant. ) | Court No. 24-00108 |

### <u>DEFENDANT-INTERVENORS' RESPONSE BRIEF</u>

Gregory S. Menegaz
Alexandra H. Salzman
Vivien Jinghui Wang
THE INTER-GLOBAL TRADE LAW GROUP, PLLC
Suite 1101
1156 Fifteenth Street, N.W.  20005
Tel: (202) 783-6900
email:  gmenegaz@igtlaw.com
*Counsel to Defendant-Intervenors*

Dated: March 31, 2025

## TABLE OF CONTENTS

I.    RULE 56.2 STATEMENT ...................................................................1

    A.  Administrative Determinations Subject to Appeal.......................1

    B.  Issues Presented .................................................................1

II.   Standards of Review ..................................................................2

III.  ARGUMENT ................................................................................3

    A.    The Department Properly Relied Solely on PNS's Financial Statement ......3

    B.    The Department Relied Upon the Correct Date for SMT's U.S. Sales .......10

    C.    The Department Relied on the Most Accurate Information for BSM and SMT's Cost Databases.......................................................14

IV.   Conclusion and Prayer for Relief ................................................18

# TABLE OF AUTHORITIES

**Cases**

*Allied Tube and Conduit Corp. v. United States*, 127 F. Supp. 2d 207, 220 (Ct. Int'l Trade 2000) ...................................................................................................................................................11

*Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1377 (Fed. Cir. 2001)..................................14

*ArcelorMittal USA LLC v. United States*, 302 F. Supp. 3d 1366, 1370 (Ct. Int'l Trade 2018).....11

*Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938) ......................................................2

*Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530 (Fed. Cir. 2019) ................... 3-4

*Mid Continent Steel & Wire, Inc. v. United States*, 586 F. Supp. 3d 1349, 1353-1354 (Ct. Int'l Trade 2022) ............................................................................................................................... 3-4

*Shandong Huarong Gen. Corp. v. United States*, 159 F. Supp. 2d 714, 718 (Ct. Int'l Trade 2001) ......................................................................................................................................................2

*Shandong TTCA Biochemistry Co., Ltd. v. United States*, 774 F. Supp. 2d 1317, 1321 (Ct. Int'l Trade 2011) ......................................................................................................................................2

*Tosçelik Profil Ve Sac Endüstrisi A.Ş. v. United States*, 256 F. Supp. 3d 1260, 1263 (Ct. Int'l Trade 2017); ..................................................................................................................................11

*Torrington Co. v. United States*, 19 C.I.T. 403, 409 (1995), aff'd, 127 F.3d 1077 (Fed. Cir. 1997) ......................................................................................................................................................2

*United States Steel Corp. v. United States*, 712 F. Supp. 2d 1330, 1354-1355 (Ct. Int'l Trade 2010) ......................................................................................................................................................5

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ................................................................2

**Statutes & Regulations**

19 U.S.C. § 1516a(b) .........................................................................................................................2

19 U.S.C. § 1677b(f)(1)(A)..............................................................................................................14

**Administrative Decisions**

*Certain Quartz Surface Products From India: Preliminary Results of Antidumping Duty Administrative Review, Preliminary Determination of No Shipments and Partial Rescission of Antidumping Duty Administrative Review; 2021-2022*, 88 FR 43292 (July 7, 2023) ....................4

*Circular Welded Carbon Steel Pipes and Tubes From Thailand: Preliminary Results and Rescission, in Part, of Antidumping Duty Administrative Review; 2022-2023*, 89 FR 15971 (March 6, 2024) .......................................................................................................10

*Freshwater Crawfish Tail Meat from the People's Republic of China: Notice of Final Results and Rescission, In Part, of 2004/2005 Antidumping Duty Administrative and New Shipper Reviews*, 72 Fed. Reg. 19,174 (Dep't Commerce Apr. 17, 2007) ...................................5

*Stainless Steel Bar From India: Preliminary Results of Antidumping Duty Administrative Review; 2022-2023*, 89 FR 15812 (March 5, 2024) ......................................................10

## I.     RULE 56.2 STATEMENT

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, Defendant-Intervenors Bangkok Sheet Metal Public Co., Ltd. ("BSM") and Siam Metal Tech Co., Ltd. ("SMT") (collectively "Defendant-Intervenors") respectfully submit this response in opposition to Plaintiff Edsal Manufacturing Co. Ltd's ("Petitioner") Motion for Judgment on the Agency Record and Memorandum in Support of Rule 56.2 Motion for Judgment on the Agency Record (December 2, 2024), ECF 14 ("Pet. R.56.2 Br."), PR338.  Pursuant to the scheduling order, Defendant-Intervenors do not repeat arguments made by Defendant.  Defendant generally supports and incorporates by reference the arguments put forward by Defendant United States in opposition to Plaintiff's R56.2 brief.  *See* Defendant United States Response Brief (February 28, 2025); ECF 29 ("U.S. Br.").  Below is the administrative decision subject to appeal and the issues of law presented:

### A.  Administrative Determinations Subject to Appeal

The U.S. Department of Commerce ("Commerce") published the contested final results in the Federal Register on April 19, 2024.  *Boltless Steel Shelving Units Prepackaged for Sale From Thailand: Final Affirmative Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 28,738 (April 19, 2024) (PR338) and accompanying IDM (PR330)**.**

### B.  Issues Presented

**1.**  Whether Commerce's determination to rely solely on PNS's financial statement instead of relying on Sahamitr's financial statement for the purposes of calculating constructed value (CV) profit is supported by substantial evidence and in accordance with law?

1

**2.**    Whether Commerce's determination to use the commercial invoice date instead of the sales contract date as the date of sale for SMT's U.S. sales is supported by substantial evidence and in accordance with law?

**3.**    Whether Commerce's determination to rely on the cost of manufacturing data reported by SMT and BSM is supported by substantial evidence and in accordance with law?

## II.    Standard of Review

The Court will sustain any determination, finding, or conclusion found by an agency that is supported by "substantial evidence on the record," and is otherwise "in accordance with law." 19 U.S.C. § 1516 a(b)(1)(B)(i). "Substantial evidence" is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." C*onsol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938).  Congress intended, and this Court has affirmed that, "Commerce is afforded great latitude in the choice of methodology to be employed in {AD and CVD} investigations." *Torrington Co. v. United States*, 19 C.LT. 403, 409 (1995), aff'd, 127 F.3d 1077 (Fed. Cir. 1997) (citation omitted). As long as Commerce's methodology is reasonable and its conclusions are supported by substantial evidence, "the Court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Id*. (citation omitted).

Thus, under the substantial evidence standard, "{t} he reviewing court may not, 'even as to matters not requiring expertise ... displace the {agency's} choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" *Shandong TTCA Biochemistry Co., Ltd. v. United States*, 774 F. Supp. 2d 1317, 1321 (Ct. Int'l Trade 2011) (citing *Universal Camera Corp. v. Nat 'I Labor Relations Bd.*, 340 U.S. 474,488 (1951)); s*ee also Shandong Huarong Gen. Corp. v. United*

*States*, 159 F. Supp. 2d 714, 718 (Ct. Int'l Trade 2001) (the Court sustains determinations that are reasonable and supported by the record as a whole, "even if there is some evidence that detracts from the agency's conclusion.").

## III.    ARGUMENT

### A.  The Department Properly Relied Solely on PNS's Financial Statement.

In the Preliminary and Final Determination, the Department properly chose to rely solely on the financial statement from PNS for calculating CV profit and expenses.  Petitioner argues the Department should rely upon the financial statement from Sahamitr, or alternatively average the ratios from PNS and Sahamitr. Pet. R.56.2 Br. at 12-28.

Petitioner's first and primary argument regarding financial statements is that the Department improperly "rejected" Sahamitr's financial statements due to receipt of countervailable subsidies.  However, this misstates the Department's actual findings.  The Department relied upon PNS instead of Sahamitr because PNS produced identical merchandise while Sahamitr did <u>not</u> produce comparable merchandise.  Final IDM at 6-7.  The Department also noted that Sahamitr received countervailable subsidies, but this was not the Department's justification for relying on PNS, but rather is a secondary consideration.  Nonetheless, Defendant-Intervenors submit that the Department's decision to rely on PNS, and not Sahamitr, is supported by the record and law with respect to comparability and countervailable subsidies.

### *Countervailable Subsidies*

Petitioner relies heavily on *Mid Continent* for its argument that the presence of countervailable subsidies alone is not adequate to reject a statement.  Pet. R562 Br. at 15-16.  Of course, as detailed more below, this was not the only or primary reason why the Department did not rely upon Sahamitr.  Even so, in *Mid Continent*, while ultimately in a later remand

3

supporting the Department's reliance on a statement with subsidies, the Court specifically

addressed that countervailable subsidies could be a reason not to rely upon a statement even in a

market-economy case.  *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 544

("[G]overnment subsidies are precisely the kind of factor that could distort the accuracy of a

surrogate company's information.").  We also note that in *Mid Continent*, the only usable

financials[1] on the record both had receipt of subsidies, which would result in a very different

weighing of factors compared to the record at hand in this appeal.  The Court expounds that:

> Second, although the statute explicitly provides for the removal of subsidies in
> nonmarket-economy proceedings, it does not follow from that focused
> authorization in one context that Commerce is free to ignore subsidies in market-
> economy proceedings when doing so would be an unreasonable exercise of its
> authority in those proceedings. Third, Commerce has not provided any
> explanation at all of why, either generally or in this case, it is reasonable to
> decline to consider government subsidies to the company whose profits
> Commerce is borrowing for use in calculating a constructed value.

*Mid Continent*, 941 F.3d at 544.  Thus, while Court precedent has found that in market-economy

proceedings the presence of countervailable subsidies is not alone dispositive of whether a

financial statement can be relied upon, it is still relevant.  *See also Certain Quartz Surface*

*Products From India: Preliminary Results of Antidumping Duty Administrative Review,*

*Preliminary Determination of No Shipments and Partial Rescission of Antidumping Duty*

*Administrative Review; 2021-2022*, 88 FR 43292 (July 7, 2023) and accompanying Prelim. IDM

at 15 (Considering whether a company had countervailable subsidies when choosing among

financials in ME cases for the CV profit ratio).

---

[1] The other financials on that record either did not produce comparable merchandise or had incomplete
financials.  *Mid Continent Steel & Wire, Inc. v. United States*, 586 F. Supp. 3d 1349, 1353-1354 (Ct. Int'l
Trade 2022).

Sahamitr received a substantial corporate income tax reduction from the Thailand Board of Investment Program as well as an exemption from import duty on machinery. *See* Respondent Rebuttal CV Comments (September 5, 2023) at Exhibit 4 & 5 (containing information on Department finding that these two specific programs are countervailable); PR148-151. This would distort the ratio calculation and result in a less accurate margin, as the Department has consistently found in non-market economy cases. *Freshwater Crawfish Tail Meat from the People's Republic of China: Notice of Final Results and Rescission, In Part, of 2004/2005 Antidumping Duty Administrative and New Shipper Reviews*, 72 Fed. Reg. 19,174 (Dep't Commerce Apr. 17, 2007) and accompanying IDM at Comment 1 ("{W}here the Department has a reason to believe or suspect that the company may have received subsidies, the Department may consider that the financial ratios derived from that company's financial statements are less representative of the financial experience of that company or the relevant industry than the ratios derived from financial statements that do not contain evidence of subsidization."); *United States Steel Corp. v. United States*, 712 F. Supp. 2d 1330, 1354-1355 (Ct. Int'l Trade 2010) ("It is well-established that Commerce is required to calculate antidumping duty margins as accurately as possible in each segment of a proceeding.").

Petitioner then argues that any potential impact of the subsidies was not distortive on Sahamitr's profit ratio. Pet. R.56.2 Br. at 19-20. While petitioner is correct that the Department is taking the company's profit before tax, petitioner is incorrect to assert that the significant income tax reduction did not impact the company's financials more broadly. The exemption on import duty on machinery would affect the costs and profitability before tax, regardless. Moreover, the concept that a subsidy that impacts the company's profit after tax would not impact the company's general operation is not only illogical but also runs contrary to

Commerce's countervailing duty methodology.  If petitioner's theory were correct, i.e. that a subsidy program in the form of an income tax deduction would only impact the net-of-tax profit margin and would not impact the operation of the company before tax, then in a countervailing investigation, the Department would not allocate such a subsidy to the company's sales revenue to measure the impact of the subsidy on the operation of the company.  However, the Department's general methodology and theory in calculation subsidies in CVD investigation does just that.  Thus, even the Department by practice understands that such subsidies impact the company's overall operation.

Petitioner also tries to argue that the company did not receive benefits from this program in 2022.  Pet. R.56.2 Br. at 19-20.  However, the more complete statements that Respondents submitted for this company discuss that the exemption would apply to machinery imported before January 10, 2023, so this would impact the 2022 statement.  Respondent Rebuttal CV Comments at Exhibit 4, note 22, PR148-151.  Moreover, the nature of any subsidy benefit relating to machinery is that such benefits are non-recurring, i.e., they would provide benefit and therefore impact the performance of the company not only in the year in which the subsidy is received, but during all appreciation years of the machinery.  The dissimilarity of Sahamitr is also further evidenced by the fact that Sahamitr has a substantially higher profit ratio than the other financials on the record, 25.89%.  *See* Respondent CV Comments (Augsut 25, 2023) at Exhibit 1-4 (submitting four financial statements with profit ratios of 0.18%, 0.90%m 2.28% and 6.95%), PR126-131; Petitioner CV Comments at Exhibit 9 (submitting PNS profit ratio of 6.68%), PR132-134.  Notably, the two companies that produces identical merchandise,

Eonmettall Systems[2] and PNS, had very similar profit ratios, 6.95% and 6.68%.  *Id*.

### *Comparability*

In determining which financial to select, the Department considered the similarity between the business operations and products of the surrogate financial company and the respondents.  U.S. Br at 13-14 (quoting all of the factors the Department considers).  Petitioner attempts to argue that Sahamitr's production is similar enough, but this fails to properly consider Sahamitr's production or the fact that PNS produces identical merchandise.  Pet. R56.2 Br. at 23.  SMPC makes cylinders to hold liquefied petroleum gas (LPG).  This is evidently a more complex product than steel racking.  LPG cylinder production involves creating a pressurized cylinder to hold dangerous liquids.  *See* Petitioner CV Comments at Attachment 1 (submitting Sahamitr financial statement), PR132-134; Respondent Rebuttal CV Comments at Exhibit 1, PR148-151.

The production process, while involving metal, is far more complex than steel shelving.  LPG production involves complex manufacturing of a pressurized container and intricate valve.  The significant difference in the production requirements is seen most evidently in the type of certifications required to produce LPG cylinders.  The record contains information on the significant inspection, quality control, and certification processes that Sahamitr must go through for all of its various LPG cylinders products.  *See* Respondent Rebuttal CV Comments at Exhibits 1-4, P PR148-151.  Sahamitr details ten inspection and quality tests that its cylinders must undergo, that include various machinery and expert staff.

---

[2] We note that petitioner submitted a financial statement from Eonmetall Group, but Respondents submitted the financial statement from the individual company with the Eonmetall Group that produced subject merchandise, Eonmetall Systems.

Moreover, to sell the various LPG cylinders, Sahamitr must be certified to follow different standards in various countries.  Their webpage and annual reports detail the long list of different certifications they must follow and by different groups.  The record contains the domestic Thai and US standards (only two of the many standards Sahamitr must be qualified under), which require renewal and onsite visits for qualifications and renewals.  The record establishes how different the production and sale of LPG cylinders is from the production of subject merchandise.  Sahamitr must maintain strict standards and testing for all of its products.  This is an expensive, involved process that impacts sales costs as well as competition.  These cylinders, which find their way onto the decks or patios of most Americans, are inherently dangerous potential explosives and must be strictly tested and regulated.

The USITC likewise discussed the smaller competition given the need for extensive certification/testing/etc. and Sahamitr's own report also discusses its sales of products where there are few world producers and that this has increased its profitability ratio.  Petitioner CV Comments at Attachment 1 (Sahamitr financial statement), PR132-134.  While steel racking does have some safety requirements, as all products do, this is vastly different than the safety requirements for cylinders holding flammable liquids.  Steel racking is not subject to difficult required qualifications with repeated onsite inspections.  The different production and certification protocols of LPG make Sahamitr dissimilar to the Respondents' production process, costs, and competition—all of which impact the profit and selling ratios.

In contrast, PNS produces identical merchandise.  Petitioner argues that PNS is less similar because it produces a wide variety of products, including wooden furniture.  Pet. R56.2 Br. at 24.  However, while PNS may make wooden furniture, this is not a primary product of the company.  PNS describes itself as a leading manufacturer of steel shelving.  Resp. Rebuttal CV

Comments (September 5, 2023) at Exhibit 6, PR152-155. The history of the company shows the evolution of different factories making steel shelving and steel products, with only one factory making wooden counters. The company has six product lines; standardized metal shelving, wire products (that are also wire shelving), metal shelving displays, metal racking (shelving for industrial usage), miscellaneous metal products related to shelving (such as metal shopping cart), and custom order wooden furniture. *Id*. The vast majority of the company business is in identical and highly comparable merchandise. Likewise, an examination of the individual products listed on its webpage support that the overwhelmingly majority of its products are metal shelving units. PNS produces and sells numerous types of identical merchandise. PNS also produces substantially comparable merchandise in the form of other types of racking or shelving units, listing on their webpage product after product of identical and highly comparable merchandise. *Id*. The company only lists a few wooden counter design cabinets/tables that would not be comparable. As such, PNS not only produces identical and comparable merchandise, but its primary business is identical merchandise.

Petitioner also argues that the PNS statement is less detailed than Sahamitr and thus Sahamitr has a more reliable ratio calculation. Pet. R56.2 Br. at 25. However, the Department and indeed petitioner (as they submitted this statement and ratio calculation themselves to the record) were able to calculate financial ratios from the detail in the PNS statement. The statement is adequately detailed to calculate the needed ratios. Further, even if Sahamitr is more detailed, this is not a primary factor the Department considers and is not listed among their primary considerations; rather, the most important criteria is the comparability of the operations and production/products which overwhelmingly favors the selection of PNS and disregard of Sahamitr.

Lastly, petitioner's argument that the Department should average the financial ratios of PNS and Sahamitr is also misguided.  While petitioner cites to examples of the Department preferring to rely upon multiple financial statements, this has been when multiple financial statements were comparable or roughly equal in quality.  Pet. R56.2 Br. at 27-28.  The Department's whole reasoning for including multiple financials is to minimize distortion.  But including Sahamitr's financial statement in the average would actually be more distortive because it does not produce identical merchandise or even comparable merchandise, and has benefitted from countervailable subsidies.

In sum, the Department properly and correctly chose to rely upon PNS's financial statement alone.

### B.  The Department Relied Upon the Correct Date for SMT's U.S. Sales.

Petitioner argues that the Department's reliance on the invoice date instead of the sales contract date for SMT's sales date is unlawful.  Pet. R56.2 Br. at 32-36.  The Department followed its normal well-established practice of relying on the commercial invoice date as the date of sale.

The regulation directs the Department with respect to the date of sale, stating that the Department "normally will use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business. However, the Secretary may use a date other than the date of invoice if the Secretary is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale."  19 C.F.R. 351.401(i). The invoice date is used in the vast majority of cases.  *See*, e.g., *Stainless Steel Bar From India: Preliminary Results of Antidumping Duty Administrative Review; 2022-2023*, 89 FR 15812 (March 5, 2024) and Prelim. Decision Memo at 9 (Using the invoice date as the date of sale "in

accordance with our regulation and practice."); *Circular Welded Carbon Steel Pipes and Tubes From Thailand: Preliminary Results and Rescission, in Part, of Antidumping Duty Administrative Review; 2022-2023*, 89 FR 15971 (March 6, 2024) and Prelim. Decision Memo at 7 (using the invoice date as the date of sale in accordance with its normal practice).  The invoice date is the presumptive date of sale with a very high burden of proof to use an alternative date. *ArcelorMittal USA LLC v. United States*, 302 F. Supp. 3d 1366, 1370 (Ct. Int'l Trade 2018) (An "interested party proposing a date of sale other than the presumptive invoice date must demonstrate that the material terms of sale were 'firmly' and 'finally' established on its proposed date of sale.") *citing Tosçelik Profil Ve Sac Endüstrisi A.Ş. v. United States*, 256 F. Supp. 3d 1260, 1263 (Ct. Int'l Trade 2017); *Allied Tube and Conduit Corp. v. United States*, 127 F. Supp. 2d 207, 220 (Ct. Int'l Trade 2000) ("Plaintiff . . . must demonstrate that it presented Commerce with evidence of sufficient weight and authority as to justify its [date of sale] as the only reasonable outcome. If, however, the record indicates that Commerce's decision to use the invoice date as the date of sale was reasonable and was supported by substantial evidence, Plaintiff's arguments must fail.").

Petitioner argues that the invoice date is inappropriate, claiming the material terms of sales are established at the earlier sales contract date rather than the subsequently issued commercial invoice.  Pet. R56.2 Br. at 29-33.  However, petitioner fails to show on the record that the material terms are set at the sales contract date rather than the invoice date.  SMT does set the price of the product at the time of the multi-month order prior to SMT's issuance of the commercial invoice.  There is no dispute over this fact. However, other material terms, including the quantities to be shipped and the destinations of the shipments, are not finalized at this time.

Petitioner acknowledges that the destination of the shipment is not finalized until the

commercial invoice, but disputes that this is a material term.  Destination must be a material term since, without knowing the destination of a particular shipment, the quantity shipped to the United States that should be included in the U.S. sales database is not determined. The multi-month order does not specify the destination of the shipment.  The unaffiliated trading company informs SMT of the destination with the booking confirmation slip, and then the final quantity and destination is finalized on the commercial invoice when each individual shipment is made.  Compare SMT 2nd Supp Qre (October 20, 2023) at Exhibit SQ2-8 (sales document package to U.S.) and SQ2-9 (sales document package to third country), CR103 PR201.  Under a particular sales contract, there are both shipments to the United States, and therefore reported in the U.S. sales database, and shipments to a third country, not included in the U.S. sales database.  *See* SMT Sales Verification (March 1, 2024) at Exhibit SVE.IX-G, On-Site Selected Sale No.2, pgs 29-31 (showing the shipments under a particular contract include shipment to the US and to third countries), CR265-266 PR301.  Thus, the sales contract document does not establish whether the shipments are destined to the United States and cannot be used as date of sale.

As also discussed by the United States, the lack of a destination in the sales contract is the core reason why the sales contract could not possibly be the date of sale.  Petitioner tries to confuse the scope of the destination as if it was not material, but misstates how critical it is.  For example, if the sales contract specified the contract was for United States destination sales only, and it was only which more specific U.S. destination that was not determined till the commercial invoice, then petitioner's argument that destination is not a material term perhaps would be more persuasive.  But that is <u>not</u> the case.  In our case, the unspecified destination in the contract is to which goods would be sold is the U.S. or a third country.  In petitioner's hypothetical case, on the date of contract, which the petitioner argues should be the date of sale, 100% of the

12

contracted quantity could be shipped to the US, 100% of the contracted quantity could be shipped to a third country, or any percentage in between could be shipped to the US. Therefore, on that contract date, there is simply no way to determine how much quantity should be reported to be U.S. sales in US database. Therefore, the "destination" in this case is clearly a material, substantive terms of sale, that is not provided for in the contract, but rather only determined in the commercial invoice.

Further, the quantity of the shipment is not finalized until shipping. As explained by SMT, "{a}t the time of the agreement covering multiple months, the price was set and the period covered by the price was set, but the quantities to be shipped at the price during the period is only tentative, and the final quantity shipped at the agreed price would only be finalized by the actual shipments during the period." SMT Sec A (July 10, 2023) at 14; CR21-22 PR89. SMT normally issues commercial invoices one day prior to the date that the merchandise is shipped out of the factory, or at least very close to the date that the merchandise is shipped out of the factory. *Id*. at 15. SMT also confirmed that "the quantity of the sale would not change after the issuance of a commercial invoice, and the quantity in the commercial invoice would be the same as in the shipment." SMT 2nd Supp Qre at 21, CR103 PR201. Petitioner attempts to rebuff this statement, pointing out that the eight sampled sales at verification had the same quantity in the commercial invoice as the sales contract. Pet. R56.2 Br. at 35. But this does not change the fact that by practice, the quantity is not finalized yet, even if in those sampled sales the quantity remained the same. Commerce's test is not whether the material terms in fact change, but whether the material terms could be changed. It is only at the commercial invoice that the material terms are set and cannot be changed.

In SMT's sales process, the material terms of sales are not all finalized until the issuance

of SMT's invoice, and therefore the Department properly found that the date of SMT's invoice should be the date of sale in accordance with the regulation and extensive practice.  In any event, petitioner did not overcome their high burden of proof to disqualify the Department's regulatory guidance and preference for the invoice date as date of sale for purposes of the sales files.

### C. The Department Relied on the Most Accurate Information for BSM and SMT's Cost Databases.

Petitioner argues that the Department "deferred" to BSM and SMT to rely on their reported costs.  Pet. R56.2 Br. at 38-44.  This language is misplaced.  The Department did not defer; rather, the Department's Office of Accounting relied on the respondents' reported manufacturing costs that were verified by the Department.  19 U.S.C. § 1677b(f)(1)(A) directs that costs shall "normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise."  In accordance with this statutory mandate, the Department's standard initial questionnaire directs companies that the costs must reconcile to their actual costs and to use actual costs if their accounting system is based on actual costs.  SMT Initial Qre (June 9, 2023) at page D-10, PR43.  Indeed, the Department is obligated to employ "a method that reasonably reflects and accurately captures all of the actual costs incurred in producing and selling the product under investigation or review.*" Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1377 (Fed. Cir. 2001) (citing Agreement on Implementation of Article VI of the GATT, 834–35, reprinted in 1994 U.S.C.C.A.N. at 4172). The Department followed this guidance in relying on the cost of manufacturing reported and verified.

*SMT*

For SMT, petitioner claims that the Department has actually deviated from its practice by relying on SMT's reporting cost file rather than the finished goods inventory movement that reflect the "actual costs recorded in SMT's normal books and records and audited financial statements."  Pet. R56.2 br. at 40.  Petitioner continues to misunderstand the finished goods inventory movement and what SMT's actual costs were.  The finished good inventory movement is not actual costs.  From the very beginning in the Section D questionnaire response, SMT explained that "SMT does not have a formal cost accounting system."  SMT Section D (August 4, 2023) at 10, CR53 PR109.  Without a cost accounting system, the finished goods inventory movement schedule in the normal business cannot possibly reflect actual cost of production.  The Department confirmed that the finished goods inventory values in the inventory movement schedule are not based on the actual consumption cost, i.e., the finished goods value in the movement schedule does not reflect the actual cost of production.  SMT Cost Verification Report (March 11, 2024) at 11, CR305 PR303.

Petitioner reiterates that the finished goods inventory movement is GAAP-consistent because it is in the financial statement.  However, there is GAAP-consistent COM in the audited report, which identified "cost of manufacturing" at page 7/1a (pdf pg 3) of CVE-7, and it is clear that such COM is not based on the finished goods inventory movement, but is composed of the actual direct material costs and manufacturing costs.  SMT Cost Verification (January 31, 2024) at Exhibit CVE-7, CR197, 204-207 PR289.  SMT relied upon the cost of manufacturing identified in the audited report and the method for reporting cost of manufacturing in the audited report to calculate TOTCOM.  This was fully verified by the Department and reconciled to the COM in the audited report, which is supported by the trial balance, general ledger, inventories

etc. kept by SMT in its normal business with no discrepancy. *Id*.

In sum, petitioner's argument to rely on SMT's finished goods inventory values for TOTCOM must fail because such values are not the actual costs. SMT's cost of manufacturing reporting is reliable and in accordance with the Department' requirements to rely on SMT's normal books and records that reflect the actual cost of production reported in the audited report prepared in accordance with GAAP.

### *BSM*

For BSM, petitioner makes arguments based on an incorrect understanding of the record and verified information. As BSM explained, "BM does not have a cost accounting system for production. As stated in our Section D response, the finished goods inventory is valued based on the raw material costs plus an estimate of production costs. The raw material quantities used to value FG inventory are based on the quantities listed on the bill of material (BOM)." BSM Supp Qre (September 18, 2023) at 5, CR86 PR164. The finished goods inventory is not equal to actual costs. In another supplemental questionnaire BSM again explained "The finished goods (FG) value is just that – a value of finished goods that BSM estimated based on standard raw material consumption and standard (estimated) production time. BSM reported actual production costs, as required by the Department's questionnaire, based on the actual POI consumption costs for raw materials and labor costs based on the actual production wages paid to produce MUC during the POI." BSM Supp Qre (October 31, 2023) at 1-2, CR115 PR218.

In contrast, the Department verified and confirmed BSM's cost accounting methodology. As explained in BSM's section D, "BM does not have a cost accounting system. BM relies on actual costs as recorded in the financial accounting system to derive the costs associated with production. The financial accounting system is an accrual accounting system. The costs and

expenses are reported in aggregate as described below and are accumulated and recorded in the appropriately titled accounts.  The financial accounting system provides the necessary account detail to determine the costs of manufacture as required by this questionnaire."  BSM Sec D (August 4, 2023) at 9, CR50 PR108.  As seen in the verification report, the Department examined BSM's methodology and found that the total of the per unit costs reported by BSM were reconciled in the step-by-step top-down approach to the POI COM and POI COGS in BSM's trial balance in its accounting system.  BSM Cost Ver Report at 4-5, CR308 PR307.

In sum, petitioner's argument to rely on BSM's finished goods inventory values for TOTCOM must fail because such values are not the actual costs.  BSM's cost of manufacturing reporting is reliable and in accordance with the Department' requirements to rely on BSM's normal books and records that reflect the actual cost of production reported in the audited report prepared in accordance with GAAP.  Petitioner has not pointed out any actual flaw in the Department's approach or reasoning.  Thus, the Department's cost methodology should be upheld by this Court.

**IV.     Conclusion and Prayer for Relief**

        For all the reasons described above and in Defendant's own response brief, Defendant-

Intervenors request that this Court sustain the Department's final determination.

                                        Respectfully submitted,


                                        /s/ Gregory S. Menegaz
                                        Gregory S. Menegaz
                                        Alexandra H. Salzman
                                        Vivien Jinghui Wang[**]
                                        THE INTER-GLOBAL TRADE LAW GROUP, PLLC
                                        Suite 1101
                                        1156 Fifteenth Street, N.W.
                                        Washington, D.C. 20005
                                        *Counsel to BSM and SMT*


Dated: March 31, 2025

---

[**] Admitted to New Mexico Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth.  Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **5,133** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**THE INTER-GLOBAL TRADE LAW GROUP, PLLC**

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

|  |  |
|---|---|
| EDSAL MANUFACTURING CO., LTD., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Court No. 24-00108 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant. ) | |

## ORDER

Upon consideration of Plaintiff's motion for judgment upon the agency record, responses thereto from Defendant and Defendant-Intervenors, Plaintiff's reply, the administrative record, and other pertinent papers, it is hereby:

**ORDERED** that plaintiff's motion is **DENIED**;

**ORDERED** that the Department of Commerce's determination is sustained;

and it is further

**ORDERED** that judgment is entered in favor of the United States.

DATED: _____        _____
New York, New York                        Mark A. Barnett, Senior Judge