**NONCONFIDENTIAL**

## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| EDSAL MANUFACTURING CO., LTD., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | Court No. 24-00108 |
| ) | |
| Defendant, ) | |
| ) | |
| BANGKOK SHEET METAL PUBLIC CO., ) | |
| LTD. AND SIAM METAL TECH CO., LTD., ) | |
| ) | |
| Defendant-Intervenors. ) | |

## PLAINTIFF'S REPLY BRIEF

KATHLEEN W. CANNON
JOSHUA R. MOREY
GRACE W. KIM
MATTHEW T. MARTIN
**KELLEY DRYE & WARREN LLP**
3050 K Street NW, Suite 400
Washington, DC 20007
(202) 342-8867
kcannon@kelleydrye.com
jmorey@kelleydrye.com
gkim@kelleydrye.com
mmartin@kelleydrye.com

Counsel to Plaintiff Edsal Manufacturing Co., Ltd.

April 30, 2025

**NONCONFIDENTIAL**

# TABLE OF CONTENTS

**Page**

ARGUMENT ........................................................................................................... 1

I.      COMMERCE'S REJECTION OF SAHAMITR'S FINANCIAL
        STATEMENTS IS UNLAWFUL ................................................................ 1

        A.      Commerce Failed to Analyze PNS's and Sahamitr's Financial Statements
                Based on the Law and Its Own Criteria ......................................... 2

                1.      Commerce Failed to Analyze Whether Sahamitr's Products and
                        Production Processes Were Within the Same General Category As
                        Boltless Steel Shelving ...................................................... 3

                2.      Commerce Failed to Address PNS's Production of Highly
                        Dissimilar Products and the Less Detailed Nature of its Financial
                        Statements ........................................................................ 8

        B.      Commerce Unlawfully Rejected Sahamitr's Financial Statements Based
                on Evidence of Countervailable Subsidies ................................... 10

        C.      Commerce's Failure to Follow Its Preference for Relying on Multiple
                Sources for CV Profit Calculations Is Unlawful ........................... 13

II.     COMMERCE UNLAWFULLY DETERMINED THE DATE OF SALE FOR
        SMT'S U.S. SALES ................................................................................. 14

        A.      Edsal Demonstrated During the Investigation that the Material Terms of
                SMT's U.S. Sales Were Established Before the Generation of Invoices ........... 14

        B.      Commerce's Finding that Destination Was a Material Term of Sale Is
                Unlawful ........................................................................................ 15

III.    COMMERCE'S ACCEPTANCE OF RESPONDENTS' TOTAL COST OF
        MANUFACTURE REPORTING IS UNLAWFUL ................................... 19

CONCLUSION....................................................................................................... 23

NONCONFIDENTIAL

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Atar, S.r.L. v. United States,
637 F. Supp. 2d 1068 (Ct. Int'l Trade 2009),
aff'g in relevant part Notice of Final Results of the Ninth Administrative
Review of the Antidumping Duty Order on Certain Pasta from Italy,
72 Fed. Reg. 7,011 (Dep't Commerce Feb. 14, 2007), and accompanying IDM
(Feb. 5, 2007)...................................................................................................... 17-18

Best Mattresses Int'l Co. v. United States,
703 F. Supp. 3d 1382 (Ct. Int'l Trade 2024) ................................................... 13-14

Eregli Demir ve Celik Fabrikalari T.A.S v. United States,
308 F. Supp. 3d 1297 (Ct. Int'l Trade 2018) .......................................................3, 5

GSA, S.r.L. v. United States,
77 F. Supp. 2d 1349 (Ct. Int'l Trade 1999) ..................................................... 18-19

Mid Continent Steel & Wire, Inc. v. United States,
941 F.3d 530 (Fed. Cir. 2019) ("Mid Continent III").................................... 11-12

Mid Continent Steel & Wire, Inc. v. United States,
2025 WL 40344 (Fed. Cir. Jan. 7, 2025) ("Mid Continent VI") .................... 10-11

Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,
463 U.S. 29 (1983)...................................................................................................13

SKF USA v. United States,
630 F.3d 1365 (Fed. Cir. 2011)...............................................................................15

Universal Camera Corp. v. NLRB,
340 U.S. 474 (1951)..................................................................................... 13, 22-23

**Statutes**

19 U.S.C. § 1516a(a)(2)(B)(i)..................................................................................22

19 U.S.C. § 1516a(b)(1)(B)(i)..................................................................................22

19 U.S.C. § 1677a(a) ........................................................................................... 18-19

NONCONFIDENTIAL

19 U.S.C. § 1677b(c)(4)(B) ...................................................................................7

19 U.S.C. § 1677b(e)(2)(B)(iii) ....................................................................... 10-12

19 U.S.C. § 1677f(i)(3)(a)...................................................................................15

**Legislative Authorities**

Statement of Administrative Action Accompanying the Uruguay Round
    Agreements Act, H.R. Doc. No. 103-316, vol. I (1994),
    reprinted in 1994 U.S.C.C.A.N. 4040 .................................................................. 2-4

**Administrative Determinations**

Boltless Steel Shelving Units Prepackaged for Sale From the People's Republic of
    China: Final Determination of Sales at Less Than Fair Value,
    80 Fed. Reg. 51,779 (Dep't Commerce Aug. 26, 2015), and accompanying
    IDM (Aug. 14, 2015) .......................................................................................... 6-7

Boltless Steel Shelving Units Prepackaged for Sale From Thailand: Preliminary
    Affirmative Determination of Sales at Less Than Fair Value, Postponement of
    Final Determination, and Extension of Provisional Measures, 88 Fed. Reg.
    83,389 (Dep't Commerce Nov. 29, 2023), and accompanying Decision
    Memorandum for the Preliminary Affirmative Determination in the Less-
    Than-Fair-Value Investigation of Boltless Steel Shelving Units Prepackaged
    for Sale from Thailand (Nov. 21, 2023) ("PDM")................................................ 5-6

Boltless Steel Shelving Units Prepackaged for Sale From Thailand:
    Final Affirmative Determination of Sales at Less Than Fair Value,
    89 Fed. Reg. 28,738 (Dep't Commerce Apr. 19, 2024)
    ("Final Determination"), and accompanying Decision Memorandum for the
    Final Affirmative Determination in the Less-Than-Fair-Value Investigation of
    Boltless Steel Shelving Units Prepackaged for Sale from Thailand
    (Apr. 12, 2024) ("IDM")................................................................................ *passim*

Certain Metal Lockers and Parts Thereof From the People's Republic of China:
    Final Results of Antidumping Duty Administrative Review; 2021–2022,
    89 Fed. Reg. 9,123 (Dep't Commerce Feb. 9, 2024), and accompanying
    IDM (Feb. 2, 2024) ........................................................................................... 7-8

Certain Metal Lockers and Parts Thereof from the People's Republic of China:
    Final Results of Antidumping Duty Administrative Review and Final
    Determination of No Shipments; 2022–2023, 90 Fed. Reg. 15,953

NONCONFIDENTIAL

(Dep't Commerce Apr. 16, 2025), and accompanying IDM (Apr. 9, 2025) ...........................7

Certain Steel Nails From Taiwan:
    Final Results of Antidumping Duty Administrative Review and Partial
    Rescission of Administrative Review; 2016–2017, 84 Fed. Reg. 11,506
    (Dep't Commerce Mar. 27, 2019), and accompanying IDM (Mar. 15, 2019) .......................12

Final Results of Redetermination Pursuant to Court Remand;
    Mid Continent Steel & Wire Inc. v. United States,
    Consol. Ct. No. 15-00214 (Dep't Commerce Apr. 11, 2022),
    aff'd, 586 F. Supp. 3d 1349 (Ct. Int'l Trade 2022) ("Mid Continent V"),
    aff'd, 2025 WL 40344 (Fed. Cir. Jan. 7, 2025) ("Mid Continent VI").................................. 8-9

Paper File Folders From India:
    Final Affirmative Determination of Sales at Less Than Fair Value,
    88 Fed. Reg. 69,138 (Dep't Commerce Oct. 5, 2023), and accompanying IDM
    (Sept. 29, 2023)............................................................................................................. 8-10

Utility Scale Wind Towers From Malaysia: Preliminary Results of Antidumping
    Duty Administrative Review, 2021–2022, 89 Fed. Reg. 461
    (Dep't Commerce Jan. 4, 2024), and accompanying Decision Memorandum
    for the Preliminary Results of the Antidumping Duty Administrative Review
    of Utility Scale Wind Towers from Malaysia; 2021-2022 (Dec. 28, 2023),
    unchanged in Utility Scale Wind Towers From Malaysia: Final Results of
    Antidumping Duty Administrative Review; 2021-2022, 89 Fed. Reg. 56,735
    (Dep't Commerce July 10, 2024)............................................................................................6

Welded Carbon Steel Standard Pipe and Tube Products From Turkey:
    Final Results of Antidumping Duty Administrative Review; 2011–2012,
    78 Fed. Reg. 79,665 (Dep't Commerce Dec. 31, 2013), and accompanying
    IDM (Dec. 23, 2013)............................................................................................................16

## Other Authorities

Regulations Enhancing the Administration of the Antidumping and
    Countervailing Duty Trade Remedy Laws, 89 Fed. Reg. 57,286
    (Dep't Commerce July 12, 2024) (proposed rule)...................................................................11

Regulations Enhancing the Administration of the Antidumping and
    Countervailing Duty Trade Remedy Laws, 89 Fed. Reg. 101,694
    (Dep't Commerce Dec. 16, 2024) (final rule)..........................................................................11

NONCONFIDENTIAL

On behalf of Plaintiff Edsal Manufacturing Co., Ltd. ("Edsal"), we submit this Reply Brief to Defendant's, the United States, Response to Plaintiff's Motion for Judgment Upon the Agency Record (ECF No. 29) (hereinafter, "Def.'s Resp."), and to Defendant-Intervenors,' Bangkok Sheet Metal Public Co., Ltd. ("BSM") and Siam Metal Tech Co., Ltd.'s ("SMT"), Response Brief (ECF No. 30) (hereinafter, "Def.-Ints.' Resp."). For the reasons set forth in Edsal's opening brief (ECF No. 23) (hereinafter, "Pl.'s Br.") and this Reply Brief, Edsal respectfully requests that this Court grant Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record and remand the U.S. Department of Commerce's ("Commerce") determination for reconsideration consistent with Edsal's request for relief.

## ARGUMENT

I. **COMMERCE'S REJECTION OF SAHAMITR'S FINANCIAL STATEMENTS IS UNLAWFUL**

Commerce rejected Sahamitr Pressure Container PLC's ("Sahamitr") financial statements for use in calculating constructed value ("CV") profit because "Sahamitr received countervailable subsidies from the Thai government" and because "Sahamitr does not produce shelving." Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Boltless Steel Shelving Units Prepackaged for Sale from Thailand (Apr. 12, 2024) ("IDM") at 7 (P.R. 330); see Boltless Steel Shelving Units Prepackaged for Sale From Thailand: Final Affirmative Determination of Sales at Less Than Fair Value, 89 Fed. Reg. 28,738 (Dep't Commerce Apr. 19, 2024) ("Final Determination") (P.R. 332).[1] Defendant and Defendant-Intervenors maintain that Commerce (1) properly rejected reliance on Sahamitr's

---

[1]    Documents in the administrative record are cited using the Public Record ("P.R.") or Confidential Record ("C.R.") number corresponding to the record documents identified in the Index to the Administrative Record filed with this Court on August 20, 2024 (ECF No. 18).

NONCONFIDENTIAL

financial statements because it did not produce merchandise identical to the subject merchandise; (2) had no reason to provide an analysis of the relative strengths and weaknesses of Sahamitr's and PNS Manufacturing Co., Ltd.'s ("PNS") financial statements; and (3) lawfully disregarded Edsal's arguments and explanation of the two subsidies at issue.  See Def.'s Resp. at 13-21; Def.-Ints.' Resp. at 3-10.  Defendant's and Defendant-Intervenors' arguments are wrong.

### A.    Commerce Failed to Analyze PNS's and Sahamitr's Financial Statements Based on the Law and Its Own Criteria

Commerce's Final Determination is unlawful because it failed to analyze the companies and financial statements it was presented within the legal criterion that Defendant has acknowledged should be applied.  Specifically, Defendant concedes that the relevant legal standard, as set forth in the Statement of Administrative Action ("SAA"), requires Commerce to determine profits "'normally realized' by other companies on merchandise of the same general category."  Def. Resp. at 15-16 (emphasis added) (citing Statement of Administrative Action Accompanying the Uruguay Round Agreements Act ("SAA"), H.R. Doc. No. 103-316, vol. I, at 841 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4176-77)).  Defendant further notes that Commerce articulated four criteria to make this assessment, the first of which is "the similarity of the potential surrogate companies' business operations and product to the respondents.'"  Id. at 13-14 (citing IDM at 6 (P.R. 330)).[2]  Edsal agrees with these legal standards; unfortunately, however, Commerce applied neither of these legal criteria in selecting PNS's financial

---

[2]    While Commerce articulated four criteria, it ultimately found that one of the criterion (contemporaneity) was the same for both PNS and Sahamitr and that two other criteria did not have available record information to analyze.  IDM at 6-7 (P.R. 330).  Accordingly, Commerce's decision came down to reliance on the first criterion only, which it unlawfully interpreted as based on production (to any degree) of identical merchandise irrespective of whether the company produced other products, and irrespective of whether another available financial statement reflected merchandise of the same general category.

NONCONFIDENTIAL

statements over Sahamitr's.  Commerce only considered whether PNS and Sahamitr produced merchandise <u>identical</u> to the subject merchandise - <u>without regard to</u> whether either produced merchandise within the "same general category," as the SAA requires.  Nor did Commerce consider the similarity of business operations or products of the companies as Commerce is required to do under its own standard.  Although Defendant and Defendant-Intervenors attempt to offer the explanation and analysis that Commerce was required to, but did not, undertake, the Court cannot sustain the agency's decision based on these <u>post hoc</u> rationalizations.

1.    **Commerce Failed to Analyze Whether Sahamitr's Products and Production Processes Were Within the Same General Category As Boltless Steel Shelving**

Defendant claims that "record information" "shows that the merchandise produced by Sahamitr is distinct from that of" Respondents, but Commerce never articulated or expounded on that argument and this Court should disregard Defendant's assertion as a <u>post hoc</u> rationalization. <u>See</u> Def.'s Resp. at 14-15; <u>Eregli Demir ve Celik Fabrikalari T.A.S v. United States</u>, 308 F. Supp. 3d 1297, 1317 (Ct. Int'l Trade 2018) ("The court may not accept '*post hoc* rationalizations for agency action,' and may only sustain the agency's decision 'on the same basis articulated in the order by the agency itself.'") (quoting <u>Burlington Truck Lines, Inc. v. United States</u>, 371 U.S. 156, 168-69 (1962)).  Defendant's attempt to offer this untimely analysis on Commerce's behalf only highlights the <u>Final Determination</u>'s flaws.

The **<u>sole</u>** bases identified by Commerce for selecting financial statements were (1) a conclusory statement that one company produced identical merchandise and the other did not, and (2) the presence of subsidies.  <u>See</u> <u>IDM</u> at 6-7 (P.R. 330).  Defendant and Defendant-Intervenors do not dispute that Commerce only briefly addressed the first of these issues, stating: "PNS is a significant Thai producer of shelving, while Sahamitr does not produce shelving; it

NONCONFIDENTIAL

produces LPG cylinders." Id. (P.R. 330). This conclusory statement is problematic both because it assumes the legal criteria for selecting a financial statement is that the producer manufactures identical merchandise and because it provides no analysis of the actual products at issue.

The SAA instructs Commerce to look at profits realized by "companies" that manufacture "merchandise of the same general category," not "identical merchandise." SAA at 841 (emphasis added). An examination of companies producing merchandise in the "same general category" does not require or even establish a preference for production of identical merchandise. Indeed, the reference to "companies" in plural that produce merchandise falling in the same "general category" is a broad mandate to examine companies producing products similar but not identical to the subject product.

Based on the statutory language, Commerce has adopted several criteria for selecting appropriate companies' financial statements, the first of which, as noted above, is "the similarity of the potential surrogate companies' business operations and products to the respondent's." IDM at 6-7 (P.R. 330). While Commerce articulated this criterion for its analysis in its Final Determination, it never applied the criterion, instead focusing solely on whether the company produced identical merchandise. Id. Commerce did not determine whether Sahamitr produced merchandise in the same general category or whether Sahamitr had similar business operations or products to Respondents.

As Edsal explained, Sahamitr's steel cylinders and Respondents' steel shelving products are "merchandise of the same general category." See, e.g., Edsal Case Brief re: BSM at 6 & n.4 (C.R. 310; P.R. 310). Sahamitr's and Respondents' products and production processes are very similar because "the manufacturing of both products start with large coils of flat rolled steel that are unwound/unrolled after which the material is pressed, stamped, and cut into desired shapes

NONCONFIDENTIAL

and finally welded, assembled and painted." Letter from Kelley Drye & Warren LLP to Sec'y of Commerce Pertaining to Petitioner CV Profit and Selling Expense Submission at 3-4 (Aug. 25, 2023) (citations omitted) (P.R. 132-34). Edsal also demonstrated the similarity in merchandise and production processes, including cites to relevant parts of the U.S. International Trade Commission's report from the Steel Propane Cylinders from China and Thailand investigation, and the main Standard Industrial Classification codes of Sahamitr and BSM. Id. (P.R. 132-34). Edsal also demonstrated the similarities between Sahamitr's and Respondents' use of flat-rolled steel, steel fabricating processes, and painting and finishing processes. See, e.g., Edsal Case Brief re: BSM at 6-8 (C.R. 310; P.R. 310) (first citing Response from deKieffer & Horgan to Sec'y of Commerce Pertaining to BSM Sec A QR at A-20, Exhs. A-9, A-13 (C.R. 23-26; P.R. 90-92), and then citing Response from deKieffer & Horgan to Sec'y of Commerce Pertaining to SMT Sec A QR at 19, Exh. A-9 (C.R. 21-22; P.R. 89) (hereinafter, "SMT AQR")). None of these arguments or record facts were addressed by Commerce. While Defendant-Intervenors attempt to refute this evidence and the arguments Edsal raised, this Court "may only sustain the agency's decision on the same basis articulated in the order by the agency itself." See Def.-Ints.' Resp. at 7-9; Eregli Demir, 308 F. Supp. 3d at 1317 (quotations omitted).

Defendant's argument that Commerce previously articulated that it found that Sahamitr's steel cylinders "were 'non-comparable' merchandise for the purposes of calculating CV profit" simply repeats the agency's conclusory finding and fails to establish that the Final Determination is supported by substantial evidence and in accordance with law. See Def.'s Resp. at 16 (quoting Decision Memorandum for the Preliminary Affirmative Determination in the Less-Than-Fair-Value Investigation of Boltless Steel Shelving Units Prepackaged for Sale from Thailand (Nov.

NONCONFIDENTIAL

21, 2023) ("PDM") at 11 (P.R. 237)).  Commerce's preliminary finding on this issue also provided no explanation and cited no record evidence.  See PDM at 11 (P.R. 237).

Further, Defendant mischaracterizes Edsal's reference to Wind Towers from Malaysia as "establish{ing} a rule that all steel products are in the same general category of merchandise." See Def.'s Resp. at 17.  Edsal made no such argument.  Rather, Commerce's willingness to consider and rely on a steel pipe producer's financial statements in calculating CV profit in that case undermines its reasoning here that "because Sahamitr doesn't produce shelving, Sahamitr's financial statements {were} not a viable option."  IDM at 7 (P.R. 330).  Indeed, Edsal agrees that producers of steel wire, bar, and pipes that involve very substantial upstream manufacturing processes like melting, refining, casting, and rolling steel have dissimilar products, production processes and involve different types of entities.  However, steel cylinders involve the same inputs and manufacturing processes as boltless steel shelving and thus should not be lumped together with the financial statements of other non-comparable producers on the record.  Def.'s Resp. at 16 (equating "the financial statements of BSBM, Millcon, and Tata Steel," producers of "steel bars, pipes, and rebar," with Sahamitr's data).

Defendant's dismissal of Boltless Steel Shelving from China as having "no relevance" because that case involved "distinct legal authorities and require{d} different considerations than those at question here" is also wrong.  See Def.'s Resp. at 17; Boltless Steel Shelving Units Prepackaged for Sale From the People's Republic of China: Final Determination of Sales at Less Than Fair Value, 80 Fed. Reg. 51,779 (Dep't Commerce Aug. 26, 2015), and accompanying IDM at cmt. 1 (Aug. 14, 2015) (hereinafter, "BSS China IDM").  The factors considered by Commerce in the CV profit context include "the similarity of the potential surrogate companies' business operations and products to the respondents."  Def.'s Resp. at 13-14.  In Boltless Steel

NONCONFIDENTIAL

Shelving from China, a case involving the same product, Commerce assessed whether producers of fabricated metal products were significant producers of comparable merchandise pursuant to 19 U.S.C. § 1677b(c)(4)(B).  BSS China IDM at cmt. 1.  Unlike in this proceeding, however, in Boltless Steel Shelving from China, Commerce did not dismiss a producer's financial statements outright simply because the company did not produce identical merchandise.  In fact, Commerce used the financial statements of a producer of comparable merchandise (fabricated steel products) **instead of** the financial statements from a steel shelving producer, and Commerce acknowledged the similarities in the production processes.  Id.

Commerce's reasoning in Boltless Steel Shelving from China is not unique to that proceeding.  Recently, in Metal Lockers from China, Commerce concluded that a producer of primarily fabricated steel products – **including steel cylinders** – reflected products, a production process, and profit experience similar to the respondent producers of metal lockers.  See Certain Metal Lockers and Parts Thereof from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2022– 2023, 90 Fed. Reg. 15,953 (Dep't Commerce Apr. 16, 2025), and accompanying IDM at cmt. 2 (Apr. 9, 2025).  Commerce found the production process for steel cylinders to be comparable to the production process for metal lockers, i.e., that the surrogate company manufactures "steel cylinders from hot-rolled steel coils, which requires trimming, welding, and painting, which is a similar process as the one to create subject merchandise."  Id. (quotation marks omitted).  Commerce also used the same producer's financial statements, along with the financial statements of other producers of comparable merchandise, in the first administrative review of that proceeding, noting "the majority of the goods producers by the Malaysian companies {relied on by Commerce} are made from flat-rolled steel, which is the primary basis of metal lockers."

NONCONFIDENTIAL

<u>Certain Metal Lockers and Parts Thereof From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2021–2022</u>, 89 Fed. Reg. 9,123 (Dep't Commerce Feb. 9, 2024), and accompanying IDM at cmt. 1 (Feb. 2, 2024). Commerce's rejection of Sahamitr's financial statements based on the company's production of steel cylinders is incompatible with the agency's analysis of a steel cylinder producer in <u>Metal Lockers from China</u>.

Commerce applied similar reasoning in <u>Paper File Folders from India</u> and resisted arguments similar to those offered by Defendant-Intervenors here that would rule out Sahamitr by making "too fine a distinction for the purpose of determining whether the two products are in the same general category." <u>Paper File Folders From India: Final Affirmative Determination of Sales at Less Than Fair Value</u>, 88 Fed. Reg. 69,138 (Dep't Commerce Oct. 5, 2023), and accompanying IDM at cmt. 1 (Sept. 29, 2023) (hereinafter, "<u>Paper Folders India IDM</u>"). Defendant's attempt to justify Commerce's laser focus on the production of identical merchandise as the only proper criterion for selecting PNS, therefore, is inconsistent with the law and its own precedent.

**2.    <u>Commerce Failed to Address PNS's Production of Highly Dissimilar Products and the Less Detailed Nature of its Financial Statements</u>**

Defendant also fails to justify Commerce's disregard of Edsal's arguments that PNS's financial statements are inferior to Sahamitr's financial statements because: (1) PNS's financial statements reflect a wide variety of dissimilar products (<u>e.g.</u>, wooden furniture, general equipment, plastic baskets, etc.), whereas Sahamitr's products and production processes reflect exclusively comparable fabricated steel products; and (2) PNS's financial statements provide less detailed breakouts of expenses than Sahamitr's financial statements, making them inferior in terms of quality. <u>See</u> Def.'s Resp. at 18-19; Pl.'s Br. at 23-24. First, although Defendant claims

NONCONFIDENTIAL

that it is "unclear" why PNS's production of dissimilar products is relevant (Def.'s Resp. at 18), Commerce has previously recognized that evaluation of "the potential distorting effects of production of dissimilar merchandise" is appropriate when comparing sources for CV profit calculations. Final Results of Redetermination Pursuant to Court Remand; Mid Continent Steel & Wire Inc. v. United States, Consol. Ct. No. 15-00214, at 10 (Dep't Commerce Apr. 11, 2022) (ECF No. 150), aff'd, 586 F. Supp. 3d 1349 (Ct. Int'l Trade 2022) ("Mid Continent V"), aff'd, 2025 WL 40344, at *1 (Fed. Cir. Jan. 7, 2025) ("Mid Continent VI"). Thus, even under Defendant-Intervenors' logic that the "whole reasoning for including multiple financials is to minimize distortion," averaging PNS's and Sahamitr's financial ratios is warranted to account for "the potential distorting effects" of PNS's production of dissimilar merchandise. See Def.-Ints.' Resp. at 10.

Commerce's reasoning in Paper File Folders from India further undermines its failure to contend with PNS's dissimilar products. Paper Folders India IDM at cmt. 1. In that case, Commerce concluded that although some producers made identical merchandise, they also produced "vastly dissimilar products," such as plastic bags, gift boxes, etc. Id. Commerce reasoned that the production of "vastly dissimilar" products, i.e., products not in the same general category, means a producer uses production processes that are dissimilar from the respondents' operations. Id. That reasoning should apply with equal force here to PNS.

Second, contrary to Defendant's assertion that "the overall quality of financial statements . . . is not one of the criteria Commerce considers when determining which source to use for CV profit and selling expenses," Commerce has explained that it "must weigh the quality of the data" as a whole against the preference for using information reflecting production and sales in the foreign country and merchandise that is in the same general category when selecting sources

NONCONFIDENTIAL

for CV profit.  See Def.'s Resp. at 19; Paper Folders India IDM at cmt. 1.  As Commerce recognized in Paper File Folders from India, the agency "may have profit information that reflects production and sales in the foreign country of merchandise that is similar to the foreign like product but also includes significant sales of completely different merchandise," and they may "not provide sufficient detail" to calculate precise CV profit ratios.

Thus, this Court should remand the Final Determination with instructions to adequately compare the relative strengths and weaknesses of PNS's and Sahamitr's financial statements.

**B.    Commerce Unlawfully Rejected Sahamitr's Financial Statements Based on Evidence of Countervailable Subsidies**

Defendant claims that Commerce appropriately refused to consider Edsal's explanations for why Sahamitr's financial statements should not be rejected despite the presence of subsidies because addressing Edsal's arguments "requires a *de facto* countervailable subsidy investigation into the particulars of Sahamitr's financial statements, and goes beyond 'engaging in a comparative analysis of the deficiencies of multiple financial statements.'"  See id. at 20 (quoting Mid Continent V, 586 F. Supp. 3d at 1367).  Those arguments fail to contend with the central holding of the Mid Continent line of cases that, while the presence of subsidies in a potential source of CV profit data is relevant to Commerce's analysis, it does not render the source as unusable per se.

In the latest decision in the Mid Continent litigation, the U.S. Court of Appeals for the Federal Circuit ("CAFC") concluded that Commerce complied with the court's instruction for additional explanation and its holding that receipt of countervailable subsidies is relevant but not dispositive of a company's suitability for CV profit calculations.  Mid Continent VI, 2025 WL 40344, at *2-3.  After previously failing to address the size or impact of a subsidy in the financial statements of a company in calculating CV profit under 19 U.S.C. § 1677b(e)(2)(B)(iii), the

-10-

NONCONFIDENTIAL

court noted that, upon remand, "Commerce did note the size of the subsidy." Id. at *3. The court explained that the subsidy amount was "tiny relative to Sundram's total revenue for the period of investigation (about $336 million)," and "{t}he insignificance of the subsidy to any profit calculation means that . . . {i}t could not have affected the choice of Sundram" over a non-subsidized alternative company. Id. This holding reaffirms that the size of subsidies matters, and that Commerce is obligated to meaningfully analyze and explain its analysis of the deficiencies of the sources for CV profit calculations.

Further, Commerce recently amended its regulations to clarify the information it will consider in selecting financial statements for CV profit under 19 U.S.C. § 1677b(e)(2)(B)(iii) following Mid Continent III. Mid Continent Steel & Wire, Inc. v. United States, 941 F.3d 530 (Fed. Cir. 2019) ("Mid Continent III"); Regulations Enhancing the Administration of the Antidumping and Countervailing Duty Trade Remedy Laws, 89 Fed. Reg. 57,286, 57,306-07 (Dep't Commerce July 12, 2024) (hereinafter, "Proposed Regulatory Updates"); Regulations Enhancing the Administration of the Antidumping and Countervailing Duty Trade Remedy Laws, 89 Fed. Reg. 101,694, 101,717 (Dep't Commerce Dec. 16, 2024) (hereinafter, "Final Regulatory Updates"). Notably, Commerce acknowledged Mid Continent III and declined to codify any supposed practice of ruling out financial statements because they might indicate receipt of countervailable subsidies. See Proposed Regulatory Updates, 89 Fed. Reg. at 57,307; Final Regulatory Updates, 89 Fed. Reg. at 101,717. This comprehensive regulatory update undertaken in full awareness of Mid Continent III further undermines Commerce's rejection of Sahamitr's financial statements based in part on a factor Commerce did not bother to mention or codify.

NONCONFIDENTIAL

Here, contrary to Defendant's assertion, complying with <u>Mid Continent</u> and the substantial evidence standard does not require "a *de facto* countervailable subsidy investigation into the particulars of Sahamitr's financial statements." Def.'s Resp. at 20. First, the CAFC explained that when a source of CV profit information under 19 U.S.C. § 1677b(e)(2)(B)(iii) reflects subsidies, Commerce "might determine the amount of subsidies and adjust its calculation of {CV} downward to eliminate the effect of the subsidies," or even "decide that the subsidies are so insignificant that no change needs to be made at all." <u>Mid Continent III</u>, 941 F.3d at 544.

Second, only two alleged subsidies are at issue: the Board of Investments corporate income tax reduction and the Board of Investments subsidies for the exemption on import duty on machinery. <u>See</u>, <u>e.g.</u>, Brief from Kelley Drye & Warren LLP to Sec'y of Commerce Pertaining to Petitioner Case Brief at 8-9 (C.R. 311; P.R. 311) (hereinafter, "Edsal Case Brief re: SMT"). Addressing Edsal's arguments pertaining to just two subsidies, therefore, does not require a <u>de facto</u> countervailable subsidy investigation.

Here, the income tax reduction is not distortive because CV profit is based on profit before taxes. <u>Id.</u> (C.R. 311; P.R. 311); <u>Certain Steel Nails From Taiwan: Final Results of Antidumping Duty Administrative Review and Partial Rescission of Administrative Review; 2016–2017</u>, 84 Fed. Reg. 11,506 (Dep't Commerce Mar. 27, 2019), and accompanying IDM at cmt. 2 (Mar. 15, 2019) (explaining "Commerce's longstanding policy to calculate tax-neutral dumping margins" and, accordingly, to calculate CV profit based on net profit before taxes). As to the exemption of import duty on machinery, Sahamitr's financial statements show that Sahamitr had not yet received any benefits under that program, and in prior cases, the benefit amount under that program amounted to miniscule, <u>de minimis</u> levels of 0.04 percent and 0.01 percent. Edsal Case Brief re: SMT at 9 n.18 (C.R. 311; P.R. 311). Thus, nothing in the record

NONCONFIDENTIAL

supports Defendant-Intervenors' assertion that the mere presence of these subsidies "would distort the ratio calculation and result in a less accurate margin." See Def.-Ints.' Resp. at 5. Defendant-Intervenors' other arguments – none of which were asserted by Commerce – are similarly unsupported and speculative. See id. at 5-6.

In sum, the CAFC has articulated an approach for assessing the presence of subsidies that Commerce ignored here. Edsal cogently explained why the subsidies at issue do not support blind adherence to an unlawful position that the presence of countervailable subsidies automatically renders a source unusable for CV profit. Because Commerce failed to "examine the relevant data" and failed to "take into account whatever in the record fairly detracts" from Commerce's determination, findings, and conclusions on this issue, the Final Determination is unlawful. See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).

**C.    Commerce's Failure to Follow Its Preference for Relying on Multiple Sources for CV Profit Calculations Is Unlawful**

Commerce's justification for refusing to follow its preference of averaging multiple financial statements is based on the same flawed reasoning for its rejection of Sahamitr's financial statements – Sahamitr does not produce an identical product and its financial statements indicate countervailable subsidies. See Def.'s Resp. at 14-15. As discussed above, Sahamitr produces products in the same general category as steel shelving and using a similar production process and the two subsidies at issue are not distortive. Relying on more than PNS's financial statements alone is particularly warranted here in order to account for comparative deficiencies in PNS's financial data, including the fact that PNS's product portfolio and profit experience reflect a mix of products that are not within the same general category as boltless steel shelving, unlike Sahamitr's financial data, which pertains exclusively to comparable fabricated steel

NONCONFIDENTIAL

products.  See Best Mattresses Int'l Co. v. United States, 703 F. Supp. 3d 1382, 1395-96 (Ct. Int'l Trade 2024).  Thus, this Court should instruct Commerce to reconsider its refusal to average the financial data of PNS and Sahamitr in calculating CV profit.

## II.   COMMERCE UNLAWFULLY DETERMINED THE DATE OF SALE FOR SMT'S U.S. SALES

Commerce used the second commercial invoice date instead of the sales contract date as the date of sale for SMT's U.S. sales.  IDM at 9-12 (P.R. 330).  Commerce found that the sales contract does not establish all material terms of sale because it does not identify the shipment destination, even though no party claimed that destination was a material term.  See id. at 11 (P.R. 330).  Defendant and Defendant-Intervenors argue that (1) Edsal did not demonstrate that the material terms of sale were established before the commercial invoice, and (2) Commerce's finding that destination is a material term is reasonable because it comports with this Court's holdings.  Def.'s Resp. at 25; Def.-Ints.' Resp. at 11-14.  These arguments are wrong.

### A.   Edsal Demonstrated During the Investigation that the Material Terms of SMT's U.S. Sales Were Established Before the Generation of Invoices

Defendant claims that "Edsal attempts to shift the burden to Commerce" for rebutting Commerce's presumption that the date of sale is the date of the commercial invoice.  See Def.'s Resp. at 23.  According to Defendant, "Commerce is not required to justify using the invoice date, in the absence of evidence identified by Edsal that the material terms of sale were established on an alternative date."  Id.  Defendant further argues that while "Edsal goes to great lengths to establish that price and quantity were established by the sales contract," "Edsal failed to make this showing in the investigation."  Id.; see also Def.-Ints.' Resp. at 11-13 ("{P}etitioner fails to show on the record that the material terms are set at the sales contract date rather than the invoice date.").  Those arguments are wrong.

-14-

NONCONFIDENTIAL

Edsal acknowledges Commerce's regulatory presumption for using the invoice date. See Pl.'s Br. at 30. Commerce, however, failed to fully consider or address Edsal's arguments and the evidence detracting from its use of the second commercial invoice date as the date of sale despite its obligation to do so. See, e.g., 19 U.S.C. § 1677f(i)(3)(a); SKF USA v. United States, 630 F.3d 1365, 1374 (Fed. Cir. 2011). Further, Defendant is wrong that Edsal "failed to" demonstrate that price and quantity were established by the sales contract during "the investigation." See Def.'s Resp. at 23 (citing Pl.'s Br. at 32-26); Def.-Ints.' Resp. at 11. During the investigation, Edsal identified specific evidence demonstrating that the material terms of sale were established and recorded in the sales contract before the generation of invoices. See, e.g., Letter from Kelley Drye & Warren LLP to Sec'y of Commerce Pertaining to Petitioner Pre-Prelim Cmts at 8-10 (C.R. 170; P.R. 231); Edsal Case Brief re: SMT at 18-31 (C.R. 311; P.R. 311). Defendant-Intervenors' argument that the quantity of SMT's U.S. sales was not "finalized" until shipping is both contrary to the record and not a basis relied on by Commerce in reaching its determination. See Def.-Ints.' Resp. at 13; Pl.'s Br. at 7, 10, 34-36.

In sum, Edsal identified evidence during the investigation showing that the material terms of sale are established on a date other than the invoice date, contrary to Defendant's and Defendant-Intervenors' claims.

**B.** **Commerce's Finding that Destination Was a Material Term of Sale Is Unlawful**

Defendant and Defendant-Intervenors assert that Commerce's reliance on destination as a material term "comports with this Court's holdings and is therefore reasonable." See Def.'s Resp. at 25. Neither Defendant nor Defendant-Intervenors, however, identify **any** prior instances of Commerce or the courts finding that "destination" was a material term affecting the date of sale. Defendant even attempts to distinguish Commerce's prior explanation in Shrimp from

NONCONFIDENTIAL

Thailand by asserting that the agency's precedent "says nothing about . . . *destination country*." See Def.'s Resp. at 24 (citing Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Frozen and Canned Warmwater Shrimp From Thailand, 69 Fed. Reg. 76,918 (Dep't Commerce Dec. 23, 2004), and accompanying IDM).  As explained by Edsal during the investigation and in Plaintiff's opening brief, Commerce unlawfully found that destination was a material term of sale for SMT's U.S. sales.

Defendant cites inapposite case precedent explaining that "delivery terms" are material terms of sale (in addition to price, quantity, payment terms, and aggregate quantity tolerance levels).  See Def.'s Resp. at 24 (citing Eregli Demir ve Celik Fabrikalari T.A.S v. United States, 308 F. Supp. 3d 1297, 1306-07 (Ct. Int'l Trade 2018)).  Defendant, however, incorrectly conflates destination with "delivery terms" – which, as explained by field 14 in section C of Commerce's antidumping duty questionnaire, refers to incoterms (e.g., delivered, FOB) rather than destination, which is separately reported in field 37.  See Response from deKieffer & Horgan to Sec'y of Commerce Pertaining to SMT Sec C QR at 3-4, 20, 35 (C.R. 33-41; P.R. 106).  In addition, Commerce has previously declined to find terms to be "material" when "there are no terms in the contracts themselves that indicate that the parties considered the delivery terms material."  See Welded Carbon Steel Standard Pipe and Tube Products From Turkey: Final Results of Antidumping Duty Administrative Review; 2011–2012, 78 Fed. Reg. 79,665 (Dep't Commerce Dec. 31, 2013), and accompanying IDM at cmt. 2 (Dec. 23, 2013).  Moreover, while Defendant attempts to distinguish Shrimp from Thailand, where the agency declined to find destination to be a material term, that decision is not the only precedent undermining Commerce's finding on this issue.  See Def.'s Resp. at 24.

NONCONFIDENTIAL

Specifically, the U.S. Court of International Trade rejected the contention that destination was a material term of sale in a challenge to Commerce's final results of the ninth administrative review of the antidumping duty order on pasta from Italy. See Atar, S.r.L. v. United States, 637 F. Supp. 2d 1068, 1074-77 (Ct. Int'l Trade 2009), aff'g in relevant part Notice of Final Results of the Ninth Administrative Review of the Antidumping Duty Order on Certain Pasta from Italy, 72 Fed. Reg. 7,011 (Dep't Commerce Feb. 14, 2007), and accompanying IDM (Feb. 5, 2007) (hereinafter, "Pasta from Italy IDM").  In that case, Atar, S.r.L. ("Atar") argued on appeal that "the destination of the goods" was a material term not defined in the sales agreement at issue. Id. at 1075.  Commerce had found that the sales agreement did in fact establish the material terms, noting that Atar was later invoiced "pursuant to the prices agreed upon with the third party trading company in the price agreement, at the quantities ordered by phone," and that the price and quantity of the goods delivered did not differ from the agreed-upon terms. Id. at 1076; see also id. ("With regard to quantity, Commerce found that 'the quantity specified in the sales agreement is identical to the quantity invoiced and delivered.'") (quoting Pasta from Italy IDM at 12).  The court concluded that Commerce did not err "in concluding that other matters did not constitute essential terms." Id. at 1076-77.

Here, as in Pasta from Italy, neither SMT nor Commerce established during the investigation that destination was considered a material term by SMT and its trading companies. Cf. Pasta from Italy IDM at 12 ("Regarding Atar's argument that freight costs, shipping dates, or delivery times were not established in the agreement, Atar has not indicated how these items would be considered essential terms of sale, which are normally just price and quantity.").  In addition, just like in Atar, S.r.L. where the respondent conceded that price and other terms were contained in the sales agreement at issue, here, Defendant-Intervenors similarly concede that

NONCONFIDENTIAL

"SMT does set the price of the product at the time of the multi-month order prior to SMT's issuance of the commercial invoice." See Atar, S.r.L., 637 F. Supp. 2d at 1076; Def.-Ints.' Resp. at 11. Edsal also demonstrated that the quantity recorded in the sales contract does not change. Pl.'s Br. at 34-36. Thus, consistent with Commerce's and the court's reasoning in prior cases, the record here does not support finding that destination is a material term for SMT's U.S. sales.

Second, Defendant-Intervenors and Defendant misapprehend Commerce's date of sale framework by conflating the timing of the sale with the destination, which involves the agency's "knowledge test." Defendant-Intervenors argue that "{d}estination must be a material term since, without knowing the destination of a particular shipment, the quantity shipped to the United States that should be included in the U.S. sales database is not determined." Def.-Ints.' Resp. at 12. Defendant similarly argues that because the date of sale "will determine which sales are reported," the country of destination must be a material term. Def.'s Resp. at 25 (quoting SMT AQR at 12 (C.R. 21-22; P.R. 89)). That reasoning, however, is contrary to the record because its fails to acknowledge that SMT and its trading companies prepared sales contracts for the boltless steel shelving with specified prices and quantities without regard to the sales destination, thereby demonstrating that they did not consider destination to be material. Moreover, pursuant to 19 U.S.C. § 1677a(a), the export price is a function of the timing and destination of a respondent's sale. The date of sale analysis addresses the timing component of the export price, i.e., "the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States." See 19 U.S.C. § 1677a(a). To ensure its calculations pertain to the appropriate destination market, i.e., "the price . . . to an unaffiliated purchaser *in the United States* or to an unaffiliated purchaser for exportation *to the United States*," however, Commerce

-18-

NONCONFIDENTIAL

applies a "knowledge test." <u>See</u> <u>id.</u> (emphases added); <u>GSA, S.r.L. v. United States</u>, 77 F. Supp. 2d 1349, 1354-55 n.14 (Ct. Int'l Trade 1999). Thus, contrary to Defendant's logic, the destination country is addressed by the knowledge test and is not <u>determined by or linked to the date of sale</u>.

Last, Defendant asserts that Edsal's arguments risk "unjustifiably constrain{ing} Commerce's discretion." Def.'s Resp. at 24. Not only is this an insufficient reason to reject Edsal's arguments, but there is no such risk because Edsal is merely explaining that the record of this proceeding does not support finding that destination is a material term for SMT's U.S. sales.

In sum, Commerce's use of the second commercial invoice date instead of the sales contract date for SMT's date of sale is unlawful.

## III.    COMMERCE'S ACCEPTANCE OF RESPONDENTS' TOTAL COST OF MANUFACTURE REPORTING IS UNLAWFUL

Defendant does not address the issues Edsal raised concerning Commerce's acceptance of Respondents' total cost of manufacture ("TOTCOM") reporting. Defendant states "Edsal argues that each producer's reporting is not 'reasonably reflective of the costs associated with the production and sale of merchandise.'" Def.'s Resp. at 26. Defendant's rebuttal demonstrates a lack of understanding of the issue and Edsal's arguments.

In discussing the applicable legal standard, Edsal explained that the statute provides that "costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if" (1) "such records are kept in accordance with the GAAP of the exporting country (or the producing country, where appropriate)" and (2) "reasonably reflect the costs associated with the production and sale of the merchandise." Pl.'s Br. at 38 (quoting 19 U.S.C. § 1677b(f)(1)(A)). Edsal then explained that Commerce's standard practice when there are differences between *reported* costs and the costs recorded in the respondents' GAAP-compliant

NONCONFIDENTIAL

records is to "increas{e} costs by the amount of {the} unreconciled difference." Id. at 38-39 (citations omitted). The issue Edsal has briefed is that Respondents' *reported* costs differ from the costs recorded in Respondents' GAAP-compliant records, and Commerce's failure to increase costs to account for this unreconciled difference is unlawful. Defendant's apparent lack of understanding of the issue is reason enough for a remand for Commerce to address the issue Edsal raised throughout the investigation in the first instance.[3]

Additionally, contrary to Defendant-Intervenors' explanation as well as Commerce's statements in the verification reports, the record demonstrates Respondents' finished goods inventory are not "estimated costs." IDM at 15 (P.R. 330). As Edsal explained in great detail in its case brief, BSM reconciled its finished goods inventory value to its financial statements demonstrating finished goods inventory is equivalent to the actual costs recorded in BSM's financial statements.

- In response to Commerce's request for "monthly inventory movement schedules that show the quantity and value of the beginning inventory, purchases, self-produced, sold, other adjustments, and ending inventory, for the period covering both the POI and the most closely matching fiscal year" as well as a "the average monthly per-unit production cost" BSM reported the average TOTCOM for the merchandise under consideration as [                    ]. Response from deKieffer & Horgan to Sec'y of Commerce Pertaining to BSM Sec D QR at 23, Exh. D-15 (C.R. 50-51; P.R. 108) (hereinafter, "BSM DQR"); see also **Attachment 1**.

- BSM stated that is "financial statements are prepared in Thai baht at the actual cost incurred" *and* are consistent with Thai GAAP. BSM DQR at 6 (C.R. 50-51; P.R. 108).

- While BSM claimed these finished goods inventory values are "estimates" (see e.g., Response from deKieffer & Horgan to Sec'y of Commerce Pertaining to BSM Sec D Supp QR at 1-2, Exh. S4-D1 (C.R. 115-21; P.R. 218) (hereinafter,

---

[3]    Defendant-Intervenors respond to Edsal's arguments with post hoc rationalizations, but this further demonstrates that a remand is necessary for Commerce to respond to Plaintiff's claims in the first instance. Def-Ints.' Resp. at 15-17.

NONCONFIDENTIAL

"BSM Supp DQR")) BSM reconciled its finished goods inventory to its financial statements, undercutting its claim that the values are estimates. Id. at 3, Excel Files (C.R. 115-21; P.R. 218) (**Attachments 3-4**).[4]

- As shown in BSM's finished goods inventory movement schedule, the closing inventory value for the merchandise under consideration is [            ]. See BSM DQR at Exh. D-15 (C.R. 50-51; P.R. 108) (reproduced in **Attachment 1**).

- BSM also broke down the closing inventory value for the merchandise under consideration by product code as follows:

| Product Code | | Finish Goods Total Costs (Thai Baht) | |
|:---:|:---:|:---:|:---:|
| [ | ] | [ | ] |
| [ | ] | [ | ] |
| [ | ] | [ | ] |
| [ | ] | [ | ] |
| **Source:** BSM Supp DQR at Exh. S4-D1 (C.R. 115-21; P.R. 218) (reproduced in **Attachment 2**) | | | |

- BSM reconciled the December 2022 finished goods inventory value for product code [            ] of [            ] baht to its balance sheet.

- In the first step, BSM provided the December 2022 total finished goods inventory value of all merchandise inclusive of [            ]. **Attachment 3**. The file demonstrates that the figure is inclusive of the December 2022 finished goods inventory value for product code [            ] of [            ]. Id.

- Next, in the second step, BSM showed that its December 2022 total finished goods inventory value of all merchandise [            ] is the value recorded in BSM's financial statements (in this case its balance sheet), as the closing balance for December 2022 of [            ]. **Attachment 4**.

---

[4]    For the Court's ease of reference and review, Plaintiff has prepared PDF versions of the excel files submitted by BSM in its October 31, 2023 Supplemental Section D Questionnaire Response. See **Attachments 2-3 hereto**.

NONCONFIDENTIAL

Thus, BSM's finished goods inventories are not "estimates," they are the actual costs recorded in BSM's financial statements, which BSM reported "are prepared in Thai baht at the actual cost incurred" and are consistent with Thai GAAP. BSM DQR at 6 (C.R. 50-51; P.R. 108).

This same demonstration can be made for SMT. Specifically, SMT also reported that it: (1) records actual costs in its financial statements (Response from deKieffer & Horgan to Sec'y of Commerce Pertaining to SMT Sec D QR at 10, 14 (C.R. 53-67; P.R. 109)); (2) its financial statements are in accordance with Thai GAAP; and (3) SMT reconciled its finished inventory goods movement schedule to its normal, Thai GAAP-compliant books and records (Response from deKieffer & Horgan to Sec'y of Commerce Pertaining to SMT 2nd Sec D Supp QR at Exhs. SQ5-18, SQ5-21 (C.R. 138-56; P.R. 228)).

Contrary to Defendant's claim, the record contradicts Commerce's findings and reliance on Respondents' reported TOTCOM, as the costs identified in the finished goods inventory for subject merchandise are based on actual costs recorded in Respondents' Thai GAAP-compliant financial statements.

Commerce's unsupported Final Determination cannot be insulated by the fact that Commerce "verified" Respondents' costs. Contrary to Defendant's claim that its factual conclusions and findings stemming from the verification report are somehow beyond scrutiny, this Court "shall hold unlawful any determination, finding, or conclusion" that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(a)(2)(B)(i), (b)(1)(B)(i). Nothing in the statute exempts verification findings or conclusions adopted by Commerce from judicial review. Thus, as with any other aspects of the Final Determination, Commerce's findings and conclusions pertaining to SMT's and BSM's

NONCONFIDENTIAL

TOTCOM calculations warrant reconsideration if this Court holds that they are not in accordance with law and not supported by substantial evidence, taking into account "whatever in the record fairly detracts" from their weight.  See Universal Camera, 340 U.S. at 488.

Last, neither Commerce below nor Defendant has responded to Edsal's argument that nothing in the record supports the conclusion that the finished goods inventory values were recorded at purchase price.  TOTCOM should reflect the cost of finished goods, not the cost of raw materials purchased.  Thus, that SMT records the production cost of raw materials based on their purchase price is not material.  Commerce has not addressed the timing aspect of the cost calculation and this Court should remand for Commerce to address the issue in first instance.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully urges this Court to determine that Commerce's Final Determination is not supported by substantial evidence and is otherwise not in accordance with law and remand the Final Determination with instructions to correct the errors set forth above and in Plaintiff's Rule 56.2 Brief.

**NONCONFIDENTIAL**

Respectfully submitted,

/s/ Joshua R. Morey

KATHLEEN W. CANNON
JOSHUA R. MOREY
GRACE W. KIM
MATTHEW T. MARTIN
KELLEY DRYE & WARREN LLP
3050 K Street NW, Suite 400
Washington, DC  20007
(202) 342-8867
kcannon@kelleydrye.com
jmorey@kelleydrye.com
gkim@kelleydrye.com
mmartin@kelleydrye.com

Counsel to Plaintiff Edsal Manufacturing Co., Ltd.

Dated: April 30, 2025

# ATTACHMENT 1

Barcode:4413994-01 A-549-846 INV - Investigation  -

# Exhibit D-15

# Finished Goods Inventory Movement

NONCONFIDENTIAL

PUBLIC VERSION

Barcode:4413954-01 A-549-846 INV - Investigation -

**Bangkok Sheet Metal**

**FINISHED GOODS**

| MONTH | OPENING INVENTORY Unit | OPENING INVENTORY Baht | PRODUCTION Unit | PRODUCTION Baht | SALES Unit | SALES Baht | CLOSING INVENTORY Unit | CLOSING INVENTORY Baht |
|---|---|---|---|---|---|---|---|---|
| Apr-22 | 6,800 | | | | | | | |
| May-22 | | | | | 5,000 | | | |
| Jun-22 | | | | | | | | |
| Jul-22 | | | 13,000 | | | | | |
| Aug-22 | | | | | | | | |
| Sep-22 | | | | | | 39,000,000 | | |
| Oct-22 | | | | | | | | |
| Nov-22 | | | | | | | | |
| Dec-22 | | 6,800,000 | | | | | | |
| Jan-23 | | | | | | | 5,000 | |
| Feb-23 | | | | | | | | |
| Mar-23 | | | | | | | | |
| TOTAL | | | | | | | | |

# ATTACHMENT 2

NONCONFIDENTIAL

# Exhibit S4-D1

# FG Valuation Explanation





NONCONFIDENTIAL

**PUBLIC VERSION**



Barcode:4455531-01 A-549-846 INV - Investigation -

# Finished Goods Inventory Valuation Methodology
## (Not Actual Costs of Productions)

**MUC products**

1.1
| Closing inventory | | |
|---|---|---|

1.2
| Closing inventory | | 150,000 |
|---|---|---|

1.3
| Closing inventory | 8 | |
|---|---|---|

1.4
| Closing inventory | | |
|---|---|---|

TOTAL Closing inventory MUC

| Closing inventory | | 6,800,000 |
|---|---|---|

**EXAMPLE OF**              calculation

1.1
| Closing inventory | 2,000* | |
|---|---|---|

*

**As of DEC 22**

The value of FG was calculated as following,



REMAINING PAGES NOT SUSCEPTIBLE
TO PUBLIC SUMMARY

# ATTACHMENT 3

# THE BUSINESS PROPRIETARY ATTACHMENT IS NOT SUSCEPTIBLE TO SUMMARIZATION AND THEREFORE IS NOT PROVIDED WITH THIS PUBLIC VERSION

# ATTACHMENT 4

**THE BUSINESS PROPRIETARY
ATTACHMENT IS NOT
SUSCEPTIBLE TO SUMMARIZATION
AND THEREFORE IS NOT PROVIDED
WITH THIS PUBLIC VERSION**

**CERTIFICATE OF COMPLIANCE**
**WITH COURT OF INTERNATIONAL TRADE**
**STANDARD CHAMBERS PROCEDURES**

Pursuant to this Court's Order dated September 18, 2024 (ECF No. 21), setting the word limitation to the reply brief of Plaintiff, Edsal Manufacturing Co., Ltd., to 7,000 words, counsel for Plaintiff certifies that this Reply Brief contains 6,981 words, including footnotes. The word count certification is made in reliance on the word-count feature contained in Microsoft Enterprise – 365.

Respectfully submitted,

/s/ Joshua R. Morey

KATHLEEN W. CANNON
JOSHUA R. MOREY
GRACE W. KIM
MATTHEW T. MARTIN
KELLEY DRYE & WARREN LLP
3050 K Street NW, Suite 400
Washington, DC  20007
(202) 342-8867

Counsel to Plaintiff Edsal Manufacturing Co., Ltd.

Dated: April 30, 2025