Slip Op. 25-103

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| EDSAL MANUFACTURING CO., LTD., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> BANGKOK SHEET METAL PUBLIC CO., LTD. AND SIAM METAL TECH CO., LTD., <br><br> Defendant-Intervenors. | Before: Mark A. Barnett, Chief Judge <br> Court No. 24-00108 |

## OPINION

[Sustaining the U.S. Department of Commerce's affirmative final determination in the less-than-fair-value investigation of boltless steel shelving units prepackaged for sale from Thailand.]

Dated: August 12, 2025

Matthew T. Martin and Joshua R. Morey, Kelley Drye & Warren LLP, of Washington, DC, argued for Plaintiff Edsal Manufacturing Company, Limited. On the brief were Kathleen W. Cannon and Grace W. Kim.

An Hoang, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant United States. On the brief were Yaakov M. Roth, Acting Assistant Attorney General, Patricia M. McCarthy, Director, and Franklin E. White, Jr., Assistant Director. Of counsel on the brief was Jesus N. Saenz, Senior Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Alexandra H. Salzman, The Inter-Global Trade Law Group, PLLC, of Washington, DC, argued for Defendant-Intervenors Bangkok Sheet Metal Public Co., Ltd. and Siam Metal Tech Co., Ltd. On the brief were Gregory S. Menegaz and Vivien Jinghui Wang.

Barnett, Chief Judge:  Edsal Manufacturing Co., Ltd. ("Plaintiff" or "Edsal") challenges the final affirmative determination of the U.S. Department of Commerce ("Commerce" or "the agency") in the less-than-fair-value investigation of boltless steel shelving units prepackaged for sale from Thailand.  *See Boltless Steel Shelving Units Prepackaged for Sale From Thailand*, 89 Fed. Reg. 28,738 (Dep't Commerce Apr. 19, 2024) (final affirmative determination of sales at less than fair value) ("*Final Determination*"), ECF No. 18-6, and accompanying Issues and Decision Mem., A-549-846 (Apr. 12, 2024) ("I&D Mem."), ECF No. 18-5.[1]  The court has jurisdiction pursuant to section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2018), and 28 U.S.C. § 1581(c).[2]  For the reasons discussed below, the court denies Plaintiff's motion for judgment on the agency record and sustains Commerce's determination.

## BACKGROUND

On May 19, 2023, based on a petition from Edsal, Commerce initiated an investigation to determine whether boltless steel shelving from Thailand was being or was likely to be sold in the United States at less than fair value.  *Boltless Steel Shelving*

---

[1] The administrative record filed in connection with the *Final Determination* is divided into a Public Administrative Record ("PR"), ECF No. 18-2, and a Confidential Administrative Record ("CR"), ECF No. 18-3.  Parties submitted joint appendices containing record documents cited in their briefs.  Confid. J.A. ("CJA"), ECF Nos. 33 through 33-6; Public J.A., ECF Nos. 34, 34-1; Suppl. Confid. J.A., ECF No. 38; Suppl. Public J.A., ECF No. 39.  The court references the confidential version of the relevant record documents, unless otherwise specified.
[2] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition unless otherwise specified.

*Units Prepackaged for Sale From India, Malaysia, Taiwan, Thailand and the Socialist Republic of Vietnam*, 88 Fed. Reg. 32,188 (Dep't Commerce May 19, 2023) (initiation of less-than-fair-value investigations). The period of investigation for Thailand was April 1, 2022, through March 31, 2023. *Id.* at 32,189. Commerce selected Bangkok Sheet Metal Public Co., Ltd. ("Bangkok Sheet") and Siam Metal Tech. Co., Ltd. ("Siam Metal") as mandatory respondents. Resp't Selection Mem. (June 7, 2023), CR 18, PR 42, CJA Tab 5.

To determine the dumping margin, Commerce usually compares the normal value (the price in the home market) to the export price or constructed export price (the price in the United States). 19 U.S.C. § 1677(35); *see also* 19 U.S.C. § 1677b(a)(1)(A)–(C). Bangkok Sheet and Siam Metal, however, did not have a viable home market or third-country market for purposes of determining normal value. Decision Mem. for the Prelim. Affirmative Determination ("Prelim. Mem.") (Nov. 21, 2023) at 7, PR 237, CJA Tab 21. In this scenario, the agency may use constructed value ("CV") based on the cost of production, selling expenses, and profit of the relevant merchandise. *See* 19 U.S.C. § 1677b(a)(4), (e). Relevant here, Commerce may use "any other reasonable method" to determine the CV for profit and selling, general, and administrative expenses ("selling expenses"). 19 U.S.C. § 1677b(e)(2)(B)(iii).

Commerce sought financial statements from fiscal year 2022 to determine the profit and selling expenses for CV purposes. As relevant to this litigation, Edsal submitted financial statements for Sahamitr Pressure Container PLC ("Sahamitr"), a Thai company making "liquefied petroleum gas (LPG) and other pressure containers,"

and for PNS Manufacturing Co., Ltd. ("PNS"), a Thai company making "steel shelving products." Pet'r's Cmts. on Constructed Value Profit and Selling Expenses ("Pet'r's CV Cmts.") (Aug. 25, 2023) at 3–4, PR 132–34, CJA Tab 13. Bangkok Sheet and Siam Metal contested the use of Sahamitr's financial statements. [Bangkok Steel and Siam Metal] Rebuttal CV Profit and Selling Expenses Cmts. (Sept. 5, 2023) at 1–3, PR 148–51, CJA Tab 14.

Commerce determined that PNS's statements were the most appropriate surrogate financial statements for calculating CV profit and selling expenses. I&D Mem. at 5–7; Prelim. Mem. at 11–12. Commerce explained that "PNS's financial statements are contemporaneous with the [period of investigation], reflect the experience of a profitable Thai producer of steel shelving, and do not contain evidence of countervailable subsidies." I&D Mem. at 5. In particular, Commerce rejected Sahamitr's financial statements noting that "Sahamitr does not produce shelving; it produces LPG cylinders." *Id.* at 6; *see also* Prelim. Mem. at 11. Commerce did not initially mention any subsidies in Sahamitr's financial statements, *see* Prelim. Mem. at 11–12, but Commerce later "note[d] that Sahamitr received countervailable subsidies from the Thai government," I&D Mem. at 7. Thus, Commerce explained that "it would be equally inappropriate to include Sahamitr's profit rate in any averaging of a CV profit ratio." *Id.*

Meanwhile, to determine the relevant universe of U.S. sales subject to the investigation, Commerce relied on the commercial invoice date as the date of sale. *Id.* at 9. Specifically, Commerce used the date of the invoice "issued by the affiliated

Court No. 24-00108                                                                                                      Page 5

trading company to the unaffiliated trading company." *Id.* Commerce explained that "the price paid by the U.S. customer is listed in the invoice issued to the unaffiliated trading company." *Id.* at 10. Commerce rejected Edsal's argument that the material terms of the sale were established earlier in the sales process, on the date of the sales contract. *Id.* at 11.[3]

Commerce also considered and rejected Edsal's argument that the reported total cost of manufacturing ("TOTCOM") for both Bangkok Sheet and Siam Metal did not reflect the actual cost of producing the merchandise in the companies' "normal books and records." *Id.* at 12–13. Edsal argued that the inventory values that each company recorded "reflect[ed] the companies' respective actual 'GAAP-compliant' costs." *Id.* at 14.[4] Commerce explained that, because neither company used a "formal cost accounting system," "the companies relied on the actual costs as recorded in the financial accounting systems to derive the material, labor and overhead costs associated with the production of the [merchandise under consideration]." *Id.* Based on its verification of the two respondents, Commerce concluded that the TOTCOM reported

---

[3] In the *Final Determination*, Commerce used the second commercial invoice date, rather than the initial commercial invoice date that the agency had used in the preliminary determination. I&D Mem. at 9. Although Edsal argues generally that the material terms of sale "were established in writing prior to the issuance of the second commercial invoice," Edsal does not specifically contest Commerce's choice between the two commercial invoices but rather argues that the sales contract contains the appropriate date of sale. [Confid.] Rule 56.2 Br. in Supp. of Pl.'s Mot. for J. on the Agency R. at 32, ECF No. 23.

[4] "GAAP" refers to generally accepted accounting principles. *See* 19 U.S.C. § 1677b(f)(1)(A).

Court No. 24-00108                                                                                          Page 6

to the agency "reasonably reflect[ed] the costs associated with the production and sale of the merchandise." *Id.* at 17 (quoting 19 U.S.C. § 1677b(f)(1)(A)).

Plaintiff moves for judgment on the agency record pursuant to U.S. Court of International Trade Rule 56.2. [Confid.] Rule 56.2 Br. in Supp. of Pl.'s Mot. for J. on the Agency R. ("Edsal Br."), ECF No. 23; [Confid.] Pl.'s Reply Br. ("Edsal Reply"), ECF No. 31. The United States ("Defendant" or "the Government"), with Bangkok Sheet and Siam Metal as Defendant-Intervenors, defends Commerce's decision. Def.'s Resp. to Pl.'s Mot. for J. Upon the Agency R. ("Gov't Resp."), ECF No. 29; *see also* Def.-Ints.' Resp. Br. ("Def.-Ints. Resp."), ECF No. 30. The court heard oral argument on July 23, 2025. Docket Entry, ECF No. 40.

## STANDARD OF REVIEW

The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i). "An agency finding may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence." *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1374 (Fed. Cir. 2015) (citing *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). "Commerce must explain the basis for its decision" such that "the path of Commerce's decision must be reasonably discernible." *NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) (citing *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).

Court No. 24-00108																				Page 7

## DISCUSSION

### I. Commerce's Selection of PNS's Statements

Commerce determines CV based on "the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method" for "merchandise that is in the same general category of products as the subject merchandise." 19 U.S.C. § 1677b(e)(2)(B)(iii). Commerce "will determine on a case-by-case basis the profits 'normally realized' by other companies on merchandise of the same general category." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1 at 841 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4176 ("SAA"). Even if financial statements reflect receipt of countervailable subsidies, Commerce must reasonably explain why the agency declines to use those statements. *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 543–45 (Fed. Cir. 2019).

####    a. Comparability of Merchandise

Edsal contends that Commerce's explanation that Sahamitr does not produce comparable merchandise is conclusory. Edsal Reply at 3; *see also* Edsal Br. at 21–24 (arguing why Sahamitr's products are sufficiently comparable). In selecting PNS, Commerce explained that the company "is a significant Thai producer of shelving," I&D Mem. at 6, which is "identical or comparable merchandise," Prelim. Mem. at 12. In contrast, Commerce found that "Sahamitr does not produce shelving; it produces LPG cylinders." I&D Mem. at 6; *see also* Prelim. Mem. at 11. While the statement is simple, the support is evident—PNS and Sahamitr make different products. The product names

Court No. 24-00108                                                                                                    Page 8

alone explain that one is more like the subject merchandise than the other. And although Commerce looks for companies with "merchandise of the same general category," SAA at 841, Commerce may reasonably select the financial statements of a company producing identical or nearly identical merchandise over those of a company producing non-identical merchandise, even if that non-identical merchandise, such as the LPG cylinders here, might be considered sufficiently comparable in another case with fewer alternatives. Thus, Commerce's selection of PNS over Sahamitr is plainly reasonable. And while Edsal argues that PNS also makes non-comparable merchandise, Edsal Br. at 23, Commerce found that PNS's production of steel shelving was "significant," I&D Mem. at 6.

      Edsal argues that "the manufacturing of both products [i.e., LPG cylinders and steel shelving] start with large coils of flat rolled steel that are unwound/unrolled after which the material is pressed, stamped, and cut into desired shapes and finally welded, assembled and painted." Edsal Reply at 4–5 (citation omitted). This argument speaks to the production process but not to the products themselves, and Commerce reasonably considered factors other than the production process.[5] Edsal's reliance on other administrative proceedings is similarly unpersuasive because the facts of those

---

[5] Defendant-Intervenors explain why the production process is distinct from steel shelving, emphasizing the end use (holding dangerous liquids) and the required certifications. Def.-Ints. Resp. at 7–8. Commerce did not discuss those reasons, and the court does not rely on them either.

cases are distinct[6] and Commerce makes its determinations on a case-by-case basis. *See* SAA at 841.

### b. Countervailable Subsidies

Edsal's arguments that Commerce erred in rejecting Sahamitr's financial statements because of countervailable subsidies are unpersuasive. Commerce rejected Sahamitr's financial statements because the company's products were less comparable than PNS's, not simply because they contained evidence of receipt of countervailable subsidies. Prelim. Mem. at 11; I&D Mem. at 6. In fact, Commerce did not discuss the receipt of countervailable subsidies in its preliminary determination. *See* Prelim. Mem. at 11. Rather, Commerce emphasized that Sahamitr did not produce shelving, while PNS did. *Id.* at 11; *see also* I&D Mem. at 6 (continuing to rely on comparability of merchandise, in addition to countervailable subsidies). Edsal's further contention that Commerce failed to consider the minimal distortive effects of any

---

[6] *See* Prelim. Decision Mem. for Utility Scale Wind Towers from Malaysia, A-557-821 (Dec. 28, 2023) at 14 (determining that steel pipe was comparable to utility scale wind towers, but no company produced identical merchandise); Issues & Decision Mem. for Boltless Steel Shelving United Prepackaged for Sale from the People's Republic of China, A-570-018 (Aug. 14, 2015) at 16–17 (using comparable merchandise rather than identical merchandise when the companies were from countries with different levels of economic development); Issues & Decision Mem. for Mattresses from Indonesia, A-560-836 (Mar. 18, 2021) at 23 (using information from a producer of exclusively comparable merchandise because the producer of identical merchandise also made non-comparable merchandise and its identical merchandise made up only six percent of the company's revenue); Issues and Decision Mem. for Certain Nails from Taiwan, A-583-854 (May 13, 2015) at 13 (rejecting a company producing comparable merchandise because it also produced non-comparable merchandise, but also because the company was from a different country than the respondent). Commerce's decision memoranda are publicly available at https://access.trade.gov/public/FRNoticesListLayout.aspx, with separate links for pre- and post-June 2021 memoranda.

countervailable subsidies received by Sahamitr is similarly misplaced because Commerce reasonably relied on the nature of the products to select PNS over Sahamitr. Moreover, while the size and distortive effect of subsidies may be relevant to the agency's selection, so too are the "comparative deficiencies of the alternative sources." *Mid Continent*, 341 F.3d at 544.  Here, nothing in the record suggests any comparative deficiencies (i.e., subsidies) in the PNS financial statements.

### c. Lack of Detail

Edsal's contentions that Commerce erred by using PNS's financial statements because those statements are "less detailed and comprehensive" than Sahamitr's financial statements, Edsal Br. at 25, are not well supported.  Edsal avers that in a previous administrative proceeding, Commerce rejected financial statements "because they did not provide a sufficient 'level of detail to reasonably breakdown selling expenses between direct and indirect.'" Edsal Br. at 25 (citing Issues and Decision Mem. for Steel Nails from Oman, A-523-808 (Feb. 24, 2021) ('Steel Nails from Oman Mem.").  What Commerce actually found in that proceeding was that the financial statements provided "*no* level of detail to reasonably breakdown selling expenses between direct and indirect."  Steel Nails from Oman Mem. at 15 (emphasis added). Here, in contrast, PNS's financial statements included sufficient details about its expenses for Commerce's purposes.  *See* Pet'r's CV Cmts., Attach. 3 (listing 18 categories of selling and administration expenses).  To the extent that Edsal suggests that Commerce did not adequately address this argument, given the weakness of the argument, any failure by Commerce to address it more specifically does not amount to

error. *See Husteel Co. v. United States*, 49 CIT __, __, 98 F. Supp. 3d 1315, 1359 (2025) ("Because this argument and accompanying evidence were not significant, Commerce did not err in failing to specifically address them.").

### d. Averaging Financial Statements

The court finds no error on Commerce's part for declining Edsal's alternative request to average both PNS's and Sahamitr's financial statements. Edsal Br. at 27; *see also* I&D Mem. at 7. The point of averaging is to "normalize any potential distortions" and "account for flaws in both datasets." Edsal Br. at 27–28 (quoting administrative and court decisions). Here, as explained above, PNS's statements had no comparative deficiencies that warranted Commerce considering whether to average its financial statements with Sahamitr's statements.

Therefore, the court sustains Commerce's determination to use PNS's financial statements to determine profit and selling expenses for CV purposes.

## II. Date of Sale for Siam Metal

To determine the date of sale, Commerce "normally will use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business." 19 C.F.R. § 351.401(i). Commerce may, however, use a different date if the agency "is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale." *Id.*; *see also* SAA at 810 (defining the date of sale as "a date when the material terms of sale are established"). "Material terms of sale may include price, quantity, and delivery and payment terms." *Eregli*

*Demir ve Celik Fabrikalari T.A.S v. United States*, 42 CIT __, __, 308 F. Supp. 3d 1297, 1306–07 (2018).

Here, Commerce reasonably followed its normal practice and used the date of invoice. No party disputes that the sales contract does not identify the destination of the shipment; however, the parties contest whether the destination is a material term. Commerce may deviate from invoice date if another date "better reflects" the date on which the material terms of sale are established. In this case, though, Commerce found that the proffered alternative, the sales contract, did not better reflect the establishment of the material terms of sale. Commerce explained that the sales contract "does not identify the destination of the shipment and cannot be relied upon to determine whether [the] shipment was bound for the United States or a third country or whether a sale should be included in the U.S. sale database." I&D Mem. at 11. At no point does Edsal recognize, and grapple with, the fact that it is not just the destination that is unknown but the destination *country*.

Edsal argues that the fact that the price and quantity did not change between the sales contract and the commercial invoice demonstrates that the material terms were set earlier. Edsal Br. at 33–36. While price and quantity are certainly material, *see, e.g.*, *Eregli Demir*, 308 F. Supp. 3d at 1306–07, Commerce reasonably explained that, because the agency is gathering information on U.S. sales, the destination is also material, I&D Mem. at 11. Indeed, the quantity and price are only relevant to

Court No. 24-00108 Page 13

determining U.S. sales if the sales are, in fact, destined for the United States.[7] While Edsal suggests that the destination was not material to the contracting parties, the regulation does not limit the question to terms that are material *to the parties*. *See Atar, S.r.L. v. United States*, 33 CIT 658, 664, 637 F. Supp. 2d 1068, 1076 (2009) ("The pertinent question, therefore, is whether substantial evidence of record supports Commerce's finding that the Sale Agreement established *the material terms of [the respondent's] entire selling activity in [the third country]* during the period of review." (emphasis added)).

Edsal relies on a single previous administrative proceeding in which Commerce determined that the destination was not a material term of sale to argue that Commerce has a practice of treating destination as not material. Edsal Br. at 37 (citing Issues and Decision Mem. for Shrimp from Thailand, A-549-822 (Dec. 23, 2004) ("Shrimp from Thailand Mem.")). In that case, Commerce determined that the changes in shipping and freight expenses based on a change to the delivery location were "simply passed on to the customer" and, therefore, the alternative destination was not a material term. Shrimp from Thailand Mem. at 36. Nothing in that decision memorandum suggests that the change in the delivery location involved a country other than the United States. In contrast, here Commerce explained that the sales contract did not establish whether the

---

[7] It is not clear to the court that it is accurate to say that the quantity did not change between the sales contract and the commercial invoice for the purposes of Commerce's analysis. While it may be true that the aggregate quantity to a particular customer was consistent with the contracted quantity, the quantity to be reported in the U.S. sales database for any given sale was subject to change based upon whether the sale was to be shipped to the United States or a third country. *See* I&D Mem. at 11.

sales were to a third country or the United States.  I&D Mem. at 11.  Because the destination country is material to determining whether a sale is a U.S. sale for antidumping purposes, Commerce did not err when it denied Edsal's request to use the sales contract as the date of sale.

The court sustains Commerce's determination to use the commercial invoice to determine the date of sale.

### III.  Total Cost of Manufacturing

#### a.  Additional Background

"Costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise."  19 U.S.C. § 1677b(f)(1)(A).

Bangkok Sheet and Siam Metal do not keep formal cost accounting systems and do not calculate product-specific costs in the normal cost of business.  I&D Mem. at 14.  Therefore, Bangkok Sheet and Siam Metal relied on actual costs as recorded in their financial accounting systems to report TOTCOM to Commerce.  *Id.*  They were able to distinguish costs relevant to the merchandise under consideration.  *Id.*

Each company also provided a monthly inventory movement schedule in the course of the investigation.  *Id.*  Edsal argued that those schedules should be used in place of the companies' reported costs because the schedules were reconciled to the normal books and records, unlike, Edsal claimed, the reported costs.  *Id.* at 12.

Commerce rejected Edsal's arguments, finding that the reported costs reflect the actual cost of manufacturing of the foreign like product as recorded in the companies' normal books and records.  *Id.* at 13.  Commerce further found that each company's inventory schedule was flawed and, therefore, a poorer option than the reported costs.  For Bangkok Sheet, Commerce explained that certain inventory values were calculated based on the company as a whole, not the individual products, and that the merchandise under consideration had a distinct production process, resulting in a different cost.  *Id.* at 15.  For Siam Metal, Commerce explained that the schedule was based on information from stock card reports, which record additions based on purchase prices, rather than costs.  *Id.* at 15–16.

### b. Bangkok Sheet

Bangkok Sheet reported that the company "relies on actual costs as recorded in the financial accounting system to derive the costs associated with production." [Bangkok Sheet] Sec. D. Questionnaire Resp. (Aug. 4, 2023) ("Bangkok Sheet Sec. D Resp.") at 9, CR 50–52, PR 108, CJA Tab 10.  Bangkok Sheet further noted that the company "produces only one product to the United States that falls within this investigation," though the product "accounts for significant sales revenue."  *Id.*  Bangkok Sheet then explained that the inventory movement schedule represented the "monthly estimated production costs [that] are based on finished goods value."  *Id.* at 23; *see also* [Bangkok Sheet] Sec. D Suppl. Questionnaire Resp. (Oct. 31, 2023) ("Bangkok Sheet

Court No. 24-00108 Page 16

Sec. D Suppl.") at 1–2, CR 115–21, PR 218, CJA Tab 17 (explaining that the finished goods value was "a value of finished goods that [the company] estimated").

Edsal argues that when Commerce asked Bangkok Sheet to explain and demonstrate how the costs reflected in the finished goods inventory movement schedule could differ so significantly from the company's reported TOTCOM, the company "failed to do so." Edsal Br. at 43 (citing Bangkok Sheet Sec. D Suppl. at 1–3). Edsal cites Bangkok Sheet's supplemental questionnaire response in support of its conclusion; however, that response contains a direct explanation from Bangkok Sheet. Specifically, Bangkok Sheet noted that the subject merchandise is mass produced, whereas other products are individually produced and therefore have higher per unit costs, thus explaining the difference. Bangkok Sheet Sec. D Suppl., Ex. S4-D1.

Edsal next pursues a line of transitive reasoning. Edsal points out that although Bangkok Sheet averred that its inventory schedule contained estimates, Bangkok Sheet also stated that its financial statements reflect actual costs, and the financial statements match the inventory schedule; therefore, the inventory schedule must not be based on estimates and Commerce should have rejected that claim. Edsal Reply at 20–21 (citing Bangkok Sheet Sec. D Resp. and Bangkok Sheet Sec. D. Suppl.). Edsal's reasoning, however, is flawed because financial statements reflect the aggregate costs, which Bangkok Sheet roughly allocated, using estimates, in its inventory schedule, as compared to the bottom-up calculation of product-specific costs in its questionnaire response. Commerce ultimately weighed the evidence, and the agency reasonably

Court No. 24-00108                                                                                                                         Page 17

explained its reliance on the reported costs rather than the inventory schedule. *See* I&D Mem. at 15.

      **c. Siam Metal**

      Edsal argues that Commerce did not adequately address the argument regarding Siam Metal that "nothing on the record supports the conclusion that the finished goods inventory values were recorded at purchase price." Edsal Br. at 40 (quoting I&D Mem. at 16). Not only did Commerce specifically identify this argument, *see* I&D Mem. at 16 ("According to the petitioner, there is nothing on the record which supports the conclusion that the finished goods inventory values were recorded at purchase price."), Commerce then cited to the evidence supporting its decision and explained that the "per-unit amount recorded as the inventory value (after converting to [U.S. dollars]) ties to the per-unit sales price from an invoice," *id.* at 16 n.69.

      The parties also debate whether the court may review the verification report as sufficient evidence to support Commerce's finding. Namely, Edsal asserts that the Government "claim[s] that [Commerce's] factual conclusions and findings stemming from the verification report are somehow beyond scrutiny." Edsal Reply at 22. To the contrary, the court reads the Government's response simply to recognize that the verification report is part of the record as a whole. Commerce conducts verifications "to verify the accuracy and completeness of submitted factual information." 19 C.F.R. § 351.307(d). Here, Commerce relied on its verification to confirm its understanding of the data in the finished good inventory schedule. *See* I&D Mem. at 16. Edsal did not seek to submit rebuttal information regarding any of the verification findings.

Consequently, Edsal is left with nothing other than speculation, because nothing in the record suggests any flaw in Commerce's verification regarding the inventory schedule.[8]

Edsal also disputes Commerce's reliance on Siam Metal's reports of direct materials, asserting that nothing in the record justifies that reliance such that Commerce should not have used Siam Metal's cost reporting. Edsal Br. at 41. Again, Commerce explained that it verified Siam Metal's direct materials costs by reviewing reported costs and comparing them with source records which, in turn, reconciled to the audited financial statements. *See* I&D Mem. at 17. Edsal's speculation that Commerce's verification was somehow flawed or insufficient does not detract from the substantial evidence that supports Commerce's determination.

### d.  Remaining Argument

Edsal argues that Commerce disregarded its practice of accounting for discrepancies between reported costs and recorded costs by increasing reported costs. Edsal Br. at 38–39 (quoting and citing various administrative proceedings). As discussed with respect to each respondent company, in this case, Commerce determined that the reported TOTCOM reflected the costs recorded in the normal books

---

[8] Edsal also asserts that, because "TOTCOM should reflect the cost of <u>finished goods</u>, not the cost of raw materials purchased," Siam Metal's recording of "the production cost of raw materials based on their purchase price is not material." Edsal Reply at 23; *see also* Edsal Br. at 41. This argument is inapposite and underdeveloped. Commerce noted that, "[i]n its inventory system, [Siam Metal] records the production cost of raw materials based on the purchase price." Verification of the Cost Resp. of Siam Metal (Mar. 11, 2024) at 11, CR 305, PR 303, CJA Tab 25. Accepting that TOTCOM should not reflect the cost of raw materials, if the inventory system reflects the cost of raw materials, then Edsal's argument supports Commerce's decision not to rely on the finished goods inventory schedule.

and records.  I&D Mem. at 12.  Any differences between those costs and the companies' inventory schedules were found to be based on the manner in which those schedules were developed rather than constituting discrepancies with the reported costs.  *Id.* at 15–16.  Thus, there was no need for Commerce to adjust the reported TOTCOMs.

For these reasons, the court sustains Commerce's determination to use Bangkok Sheet's and Siam Metal's reported costs to calculate TOTCOM.

## CONCLUSION

For the reasons discussed above, the court will sustain Commerce's *Final Determination*.  Judgment will enter accordingly.

/s/     Mark A. Barnett
Mark A. Barnett, Chief Judge

Dated: August 12, 2025
      New York, New York